Nos. 23-1084

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION, PETITIONERS

———————————————

## OPPOSITION TO CONDITIONAL PETITION FOR WRIT OF
## MANDANMUS TO THE FEDERAL COMMUNICATIONS COMMISSION

———————————————

Andrew Jay Schwartzman            Arthur V. Belendiuk
4000 Cathedral Avenue, N.W.       Smithwick & Belendiuk, P.C.
Apt. 617B                         5028 Wisconsin Ave. N.W.
Washington, D.C. 20016            Suite 301
                                  Washington, DC 2001

*Counsel for Intervenors*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenors certify as follows:

### A.    Parties

**Petitioners:** SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Respondent:** Federal Communications Commission

**Intervenors:** The NewsGuild-CWA; National Association of Broadcast Employees and Technicians-CWA; Common Cause; United Church of Christ, OC Inc.; National Association of Broadcasters.

**Amicus Curiae:** National Association of Broadcasters

### B.    Rulings Under Review

There is no final agency order under review.  Petitioners seek to invoke this Court's jurisdiction to review alleged agency inaction in an ongoing agency proceeding, as to which Respondent Federal Communications Commission is conducting a hearing.  Hearing Designation Order, *Consent to Transfer Control of Certain Subsidiaries of TEGNA, Inc. to SGCI Holdings III LLC*, MB Docket No. 22-162, DA 23-149 (Feb. 24, 2023)(HDO).

### C.    Related Cases

Petitioners filed an appeal in this Court of the HDO in a case docketed as No. 23-1083.  By Order dated April 4, 2023, this Court dismissed the appeal.

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenors certify as follows:

**A.    Parties**

**Petitioners:** SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Respondent:** Federal Communications Commission

**Intervenors:** The NewsGuild-CWA; National Association of Broadcast Employees and Technicians-CWA; Common Cause; United Church of Christ, OC Inc.; National Association of Broadcasters.

**Amicus Curiae:** National Association of Broadcasters

**B.    Rulings Under Review**

There is no final agency order under review.  Petitioners seek to invoke this Court's jurisdiction to review alleged agency inaction in an ongoing agency proceeding, as to which Respondent Federal Communications Commission is conducting a hearing.  Hearing Designation Order, *Consent to Transfer Control of Certain Subsidiaries of TEGNA, Inc. to SGCI Holdings III LLC*, MB Docket No. 22-162, DA 23-149 (Feb. 24, 2023)(HDO).

**C.    Related Cases**

Petitioners filed an appeal in this Court of the HDO in a case docketed as No. 23-1083.  By Order dated April 4, 2023, this Court dismissed the appeal.

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUPPLEMENTAL STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Petitions to Deny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Processing of the Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    PETITIONERS HAVE VAINLY ATTEMPTED TO CREATE AN ARTIFICIAL DEADLINE TO SALVAGE THEIR IMPRUDENT MAY 22, 2023 CONTRACTUAL DEADLINE. . . . . . . . . . . . . . . . . . . . . . . 12

II.   THE COMMISSION HAS NOT UNREASONABLY DELAYED THIS PROCEEDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  THE COMMISSION MET ITS STATUTORY DUTY TO ACT BY DESIGNATING A HEARING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.  THE FCC HAS THE AUTHORITY, AND THE MANDATE, TO EXPLORE THE UNRESOLVED ISSUES, AS DESIGNATED, THROUGH THE HEARING PROCESS.. . . . . . . . . . . . . . . . . . . . . . 18

    A.   The FCC Has Statutory Authority to Designate a Hearing Issue to Determine If Retransmission Fees Will Artificially Rise Because of How the Applicants Structured Their Transaction. . . . . . . . . 19

    B.   The FCC Has Statutory Authority to Designate a Hearing Issue Concerning Potential Diminution of Local Content and Programming.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.   THE REQUESTED RELIEF AND THE LIMITED NATURE OF THE DESIGNATION DO NOT IMPLICATE ARTICLE II. IN ANY EVENT, THE FCC HAS ALTERNATIVE MEANS TO CONDUCT A HEARING WITHOUT AN ALJ. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Intervenors The NewsGuild-CWA and National Association of Broadcast Employees and Technicians-CWA, United Church of Christ, OC., Inc. doing business as United Church of Christ Media Justice Ministry and Common Cause (all collectively, "Intervenors") respectfully submit this response to the Petitioners' "Conditional Petition for a Writ of Mandamus to the Federal Communications Commission" ("Petition").[1]

## INTRODUCTION

To supplement Respondent FCC's response, Intervenors wish to stress that the Petition is based on five false premises:

False Premise 1:     This Court and the FCC must take final action in sufficient time for the Petitioners to close on their proposed transaction by the May 22, 2023 contractual deadline.

> *The May 22 date was a result of Petitioners' unwise decision in a private negotiation.  They could have provided for a different date or allowed for additional extensions.  Neither the FCC nor this Court can or should*

---

[1]To minimize confusion, Petitioners before this Court are, where appropriate, called "Applicants" here because of their posture below.  Intervenors were Petitioners below, and the term "Intervenors" is used here to refer to them at the agency as well as before this Court.

*rescue them.*

False Premise 2:    The FCC intentionally and improperly processed Petitioners'
applications differently than other complex transactions and unreasonably delayed
their disposition.

> *Many transactions before the FCC take as long or longer*
>
> *than this one to reach decision on whether to grant the*
>
> *application or designate a hearing.  In fact, the FCC staff*
>
> *assisted Petitioners by flagging shortcomings in the*
>
> *record.  Ultimately, it is the failure of the Petitioners to*
>
> *meet their statutory burden that led to a hearing.*

False Premise 3:    By designating a hearing, the FCC has unreasonably withheld
agency action.

> *The FCC did not withhold agency action, much less*
>
> *unreasonably so.  The decision to designate fact-finding*
>
> *issues for hearing fully complies with the relevant*
>
> *statutory mandate to act.*

False Premise 4:     The FCC staff unreasonably applied 47 U.S.C. §§309(d)(2)-(e).

> *The Media Bureau's ("MB") Hearing Designation Order ("HDO")[2] properly applied the statute.  Under Section 309(d)(2), upon review "of the application, the pleadings filed, or other matters which it may officially notice...," the MB found substantial and material questions of fact.  Section 309(e) commands that "[i]f...a substantial and material question of fact is presented or if the Commission for any reason is unable [to find that grant of the application is in the public interest]...it shall formally designate the application for hearing."  That is precisely what the MB did.*

False Premise 5:     The ALJ was unconstitutionally appointed and therefore there can be no hearing.

> *There is no constitutional defect, and no relief at this juncture requires constitutional analysis.  Moreover, because of the limited nature of the designation, and the FCC's alternative hearing mechanisms, there is no justification to interfere with the administration of this case.*

---

[2]*Hearing Designation Order*, DA 23-149 (February 24, 2023). (Add. 938)

## SUPPLEMENTAL STATEMENT OF THE CASE

The Petition blandly — and very incompletely — states at page 1:

Petitioners SGCI Holdings III LLC (Standard General), TEGNA Inc., and CMG Media Corporation (collectively, broadcasters) presented the Commission in March 2022 with applications to approve station-license transfers needed to effectuate Standard General's acquisition of TEGNA and its 61 television and two radio broadcast stations.

However, this is not a garden variety transfer of control of a single broadcast licensee. There are sixty-six — not sixty-one — TV stations that would be transferred. There are three transferors (Standard General, CMG Media Corporation ("CMG") and TEGNA) and two transferees (Standard General and CMG). Indeed, after the otherwise unexplained reference to CMG quoted above, Petitioners make no further reference to CMG, notwithstanding the important role it plays as a transferor, transferee and equity holder in post-transaction TEGNA.

The HDO required three paragraphs to provide a high-level description of the carefully sequenced transactions of the numerous interrelated applications for TV station transfers between and among the three companies. Oversimplified, on the first transfer, a CMG subsidiary that controls CMG's Boston TV station would acquire TEGNA and its stations. Standard General would then acquire the newly created 65 station group. Then, Standard General would spin off its existing 4 station group and 4 of TEGNA's stations back to CMG. The deal would also allow

CMG (controlled *de facto* by one of the largest private equity firms in the country, Apollo Global Management ("AGM")) to acquire a substantial, nominally non-voting, interest in post-transaction TEGNA.  It would do so while still holding *de facto* control of CMG's 13 stations, six of which are in markets that overlap TEGNA holdings, potentially in violation of FCC ownership rules.

Not surprisingly, the interrelationships in this unorthodox package raise many unprecedented questions, which led the FCC staff to find that there are substantial and material questions of fact.  Nor should it be surprising that reviewing these convoluted transactions might take longer than many - but not all - transactions.

### The Petitions to Deny

The Communications Act affords interested parties the right to petition to deny broadcast applications and to participate in any hearings designated in such proceedings.  Although Petitioners act as if theirs are the only interests here, 47 U.S.C. §309(d)(1) expressly guarantees interested parties the right to file petitions to deny,[3] and 47 U.S.C. §309(e) allows their participation in hearings.[4]  Intervenors' petitions claimed that grant without hearing was contrary to the public interest,

---

[3] 47 U.S.C. §309(d)(1). ("Any party in interest may file with the Commission a petition to deny any application....")

[4] 47 U.S.C. §309(e). ("The Commission...shall forthwith notify the applicant and all other known parties in interest of such action and the grounds and reasons therefor, specifying with particularity the matters and things in issue....")

explaining questions about concentration of control, anti-competitive pay-TV rate increases, remained unresolved, and that Standard General's practices would undermine the goal of localism.

It is undisputed that CMG's Boston station was included in the deal to allow both Standard General and CMG to use a contractual provision to enable post-transaction TEGNA to circumvent the FCC's retransmission consent rules to enhance revenues. Those fee increases would then be passed on to subscribers. Intervenors also showed that this structure could allow Standard General and CMG to circumvent retransmission consent rules by sharing information and collaborating on contractual negotiations on programming, labor relations and other matters.[5] It is obvious how this might be mutually beneficial, as this structure could allow Standard General and CMG to share information in circumvention of retransmission consent rules, and also to collaborate in negotiating programming, labor relations and other contracts. Pay-TV providers also commented on how the deal would facilitate anti-competitive information sharing and evasion of retransmission consent rules.[6]

―――――――――――――

[5] *See, e.g.*, Intervenors' Comments, pp.20-22. (January 13, 2023)(Add. 881).
[6] Comments of American Television Alliance (January 13, 2023)(Add. 850-856); see also Partial Opposition of the vision Alliance (April 3, 2023)(MTNAdd 28).

Intervenors also presented evidence, much of which comes from the Applicants' own submissions, that Standard General would finance operations by reducing salary and other costs by cutting jobs, thereby reducing local service and impeding the Commission's localism goal.[7]

### Processing of the Applications

The FCC staff set May 23, 2022 as the deadline for petitions to deny.[8]  Rather than waiting to object in petitions to deny, on May 12, 2022, two Intervenors here, NewsGuild-CWA and Common Cause, joined with non-profit Public Knowledge to file a motion showing that the applications were incomplete and identifying information necessary to ruling on the applications.[9]  In partial response, the MB granted a "limited extension" of the petition to deny deadline to June 22, 2022 to allow time to review the motion.[10]  On June 3, 2022, the MB partially granted the motion, promulgating an information request, and setting a short 10 day deadline, until June 13, 2022; "to maintain the [already] extended pleading cycle...." However, the MB did not further extend the petition to deny deadline.[11]

---

[7]See e.g., Ex Parte Letter, September 29, 2022. (App. 724-728).

[8]*Public Notice*, DA 22-443 (April 21, 2022)(Add. 2).

[9]Motion for Additional Information and Extension of Time, filed by Common Cause, The NewsGuild-CWA, and Public Knowledge (May 12, 2022)(Add. 324).

[10]*Public Notice*, DA 22-562 (May 20, 2022)(Add. 348).

[11]*Letter to Scott R. Flick*, DA 22-603 (June 3, 2022)(Add. 357).

Petitions to deny, comments, an opposition and replies were timely filed.
Intervenors' August 1, 2022 reply pointed to deficiencies not addressed in the June
3 Letter Order, and laid out nine categories of information without which the
Commission "cannot determine the exact nature of AGM's relationship to Standard
General...."[12]

The Applicants could have mooted the still-pending May 12, 2022 motion by
following the road map that Intervenors had supplied, and voluntarily
supplementing the record.  But they chose not to do so.  Thus, on September 29,
2022, upon review of the pleadings and the Applicants' submissions, the MB issued
a further information request, again setting tight deadlines for responses.[13]

Upon completion of the ordinary pleadings cycle on August 1, 2022, the
Commission could have designated a hearing, ruling that Applicants had failed to
establish that grant is in the public interest.  Instead, the FCC gave Applicants an
extra opportunity to establish entitlement to grant without hearing.  Applicants did
not take advantage of this lenience.

Petitioners themselves are also responsible for slowing down the proceeding

---

[12]Reply to Applicants' Consolidated Opposition and Response to Comments
of The NewsGuild-CWA, National Association of Broadcast Employees and
Technicians-CWA, United Church of Christ Media Justice Ministry and Common
Cause, pp.25-26 (August 1, 2022)("Joint Reply")(Add. 691-692).
        [13]*Letter to Scott R. Flick* (September 29, 2022)(Add. 716).

one more time.  Perhaps finally realizing that they had failed to meet the requirements necessary for grant without a hearing, just before Christmas, Petitioners submitted three letters to the Commission purporting to ameliorate what the record showed were fatal shortcomings.[14]  The Commission responded with alacrity, soliciting comments the very same day as the third letter was filed, which was the last working day before Christmas.[15]  Comments and replies were filed by January 20, 2023.  Judging from the text of the HDO, addressing these new submissions necessitated additional work that may well have added several weeks to the processing.

Within one month after the last substantive filings, MB issued a comprehensive 23-page order detailing the disputed matters in both issues specified for hearing.[16]  Unlike many such orders, the HDO did not designate the "ultimate issue," usually expressed as follows:

> Whether, in light of the evidence adduced on the issues presented, the above-captioned applications should be granted or denied.[17]

---

[14]*Letters to Marlene Dortch* (December 16, 2022, December 22, 2022, December 23, 2022)(Add. 831-837).

[15]*Public Notice*, DA 22-1368 (December 23, 2022)(Add. 838).

[16]*See* 47 U.S.C. §309(d)(2).

[17]*Tribune Media Company,* 33 FCCRcd 6830, 6839 (2018).  *See, e.g., Snake River Radio, LLC*, 87 FR 9049, 9052 (Feb. 17, 2022); *Vandalia Media Partners 2*, LLC, 36 FCCRcd 7012, 7019 (2022); *NIA Broadcasting, Inc.* 36 FCCRcd 4864, 4871 (2021).

The HDO here more constrained than most such orders, simply directing the ALJ to gather evidence on two substantial and material questions of fact. That will ultimately leave it to the Commission to assess whether in light of those findings, grant of the applications would be in the public interest and grant or deny the applications.

## ARGUMENT

Petitioners fall far short of the extraordinary showing necessary to invoke this Court's All Writs Act jurisdiction to cut short an ongoing agency proceeding. None of the traditional *TRAC* factors support a finding that agency action has been unlawfully withheld:[18]

- !    The agency has taken decisive action, albeit in a manner that displeases Petitioners.

- !    Congress has not imposed any deadline for action, and notwithstanding the important issues raised by the unusual complexity of the applications, the agency fulfilled its obligation to comply with 47 U.S.C. §§309-310 in a timeframe that is hardly uncommon, and faster than some

---

[18]*TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1985).

-10-

such cases.

!     This case is not about health regulations; rather it is about
the machinations of private equity and hedge fund firms
seeking to replicate the economic model they have used to
decimate the nation's local newspaper industry.

!     Petitioners attempt to prioritize their own contractual
problems over the agency's need to protect the public
interest, ignoring the public's established right to
participate in broadcast proceedings to protect localism.[19]

!     Contrary to Petitioners' inflammatory allegations, there is
not the slightest indication of impropriety here; the agency
simply exercised its best judgment to adhere to the statute
and to precedent.

!     Even in the improbable event that a reviewing court
ultimately were to reverse the agency at the completion of
this proceeding, it would not do so because the career staff
was acting in bad faith. Even when the requirements for

---

[19]See *Office of Communication of the United Church of Christ v. FCC*, 425
F.2d 543, 546 (D.C. Cir. 1969)("[I]ntervenors representing a public interest
[should not] be treated as interlopers.")

mandamus are otherwise met, "a court may grant relief only when it finds compelling equitable grounds" to do so.[20]

! Petitioners present no proper constitutional issue at this juncture, if at all.

## I.   PETITIONERS HAVE VAINLY ATTEMPTED TO CREATE AN ARTIFICIAL DEADLINE TO SALVAGE THEIR IMPRUDENT MAY 22, 2023 CONTRACTUAL DEADLINE.

The threshold premise of the Petition is that Petitioners are entitled to relief by their self-selected termination date of May 22, 2023.  They maintain that "Financing commitments can never be extended indefinitely, but the [Petitioners] secured more than enough runway to secure approval and close the transaction."[21]  They are wrong; if the runway is too short, they have themselves to blame.  This alone is sufficient reason for this Court to deny the Petition.

---

[20]*American Hospital Association v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)(quoting *Medicare Reimbursement Litigation*, 414 F.3d 7, 10 (D.C. Cir. 2005)).

[21]Petition, p. 11.  As if the FCC is responsible for the macro economy, Petitioners also say "[A]s economic conditions have radically changed, the financing underlying the transaction cannot be replicated today."  Petition, pp. 31-32.  *See also, id.*, p.11("Today, however, in a markedly different interest-rate environment, these financing commitments cannot be replicated after they expire." Put differently, this amounts to saying that if economic conditions had transpired differently, it might have been possible to obtain an extension of their financing arrangements.

Private parties do not dictate regulatory deadlines. Whether the Petitioners can extend their loan commitments or find new lenders is entirely their responsibility. Their sales agreement allowed the parties to avail themselves of two extensions of 90 days each.[22]  In arms-length private negotiations among themselves and their lenders, the parties could have selected a different termination date. They could have negotiated for three, four or more extensions.  Evidently blind to the regulatory implications of their Rube Goldberg-esque scheme, they made a bad deal and left themselves without an escape hatch.

Petitioners should not have been surprised that consideration of this labyrinthine construct would take longer than straightforward transfer applications. This proceeding has lingered because Petitioners have not yet met their burden of demonstrating that grant would be in the public interest.  A simple sale of TEGNA to a single qualified purchaser would likely have been approved as a matter of course.  It is *Petitioners* who contrived a sequenced series of transactions of unprecedented complexity with the undenied purpose of increasing retransmission fees that would be passed on to the public.  It is *Petitioners* who chose to include an additional non-TEGNA station, notwithstanding that the station is controlled by a competing licensee which would hold an equity interest in post-transaction TEGNA,

---

[22]Merger Agreement, Section 8.1, pp.85-86, https://bit.ly/43iB7Et.

-13-

potentially in violation of FCC ownership rules.  It is *Petitioners* whose internal

documents raise questions about whether they will impair the Commission's core

localism goals through cutting job positions necessary for adequate local

programming,  It is *Petitioners* who failed to take advantage of multiple

opportunities to supplement the record to correct deficiencies, many of which were

called to their attention even before the initial deadline for petitions to deny.

     In short, time is *not* of the essence, Petitioners' core underlying premise is

false, and that alone is sufficient reason to deny them the sweeping relief they seek.

Whatever harm they face is of their own making, and can be fixed by amending their

contracts.  If, as Petitioners claim, lenders will not extend their deadline, that is their

own concern, not that of this Court's.

## II.   THE COMMISSION HAS NOT UNREASONABLY DELAYED THIS PROCEEDING.

     Perhaps the most astonishing claim in a petition filled with innuendo and

misdirection is the bald assertion at p.19 that:

> [T]he Commission has chosen to kill the deal through calculated
> inaction on a procedural maneuver....

As discussed above, the Commission staff gave Petitioners not one, but two,

opportunities to cure identified deficiencies in the record, and solicited comments on

their December 23, 2022 letter the very day it was filed.  This is hardly calculated

inaction.

Petitioners also claim they have been mistreated because of the duration of the proceeding. They elevate the Commission's informal, unpublished and entirely aspirational goal of completing action on transactions within 180 days to a "policy,"[23] complaining that unidentified "comparable transactions have been resolved in 62 to 182 days." Even without knowing the transactions to which they refer, it is certain that none of them are "comparable" to this one; there is no precedent for a three-way deal involving 66 stations, while also giving a competing broadcaster an equity interest in the post-transaction licensee. But more important, it is a gross mischaracterization of how long the FCC takes to process major transactions.

To facilitate processing of major cases, the FCC has a specialized "Transaction Team." It maintains an online "Archive of Major Transactions,"[24] and a page listing "Current and Recent Major Transactions,"[25] with links to a page dedicated to each, showing the "shotclock" timeline. For example, the Standard General page shows that the clock was stopped on day 309, the date the HDO was

---

[23]*Public Notice*, DA 15-327 (March 13, 2015)("The clock carries with it no procedural or substantive rights or obligations but merely represents an informal benchmark by which to evaluate the Commission's progress.")
[24]https://bit.ly/3KfmZmV
[25]https://bit.ly/41cZpy5

-15-

issued.[26]

Intervenors have attempted to analyze each of the 120 listed transactions, as shown on Exhibit A hereto.[27]  The conclusion is unmistakable.  Processing of 60 (33%) of these transactions exceeded 180 days.  Resolution of 17 (14%) transactions took longer than 309 days.  Even without taking into account the extraordinary complexity of this case, the 309-day processing time within which the staff concluded its analysis is well within the range of normal.

The handling of this case was reasonable, and does not compare with the protracted delays in the rare instances where this Court has granted mandamus.[28]

## III.    THE COMMISSION MET ITS STATUTORY DUTY TO ACT BY DESIGNATING A HEARING.

The Commission met its statutory obligation to act upon the applications by designating a hearing.  In straining to find a way to argue that the FCC somehow had a "clear duty" not just to designate a hearing, but to grant their applications, Petitioners start with a grievous misreading of Section 310(e) to show that their

---

[26]https://bit.ly/3ZOQdPj

[27]Intervenors caution that they have limited resources and constructed this Exhibit  under the tight filing deadline here.  It is possible, indeed likely, that there are some errors in the presentation.  But given the clear results discussed in the text, such errors would not alter the conclusion.

[28]*See, e.g., Core Communications, Inc*., 531 F.3d 849 (D.C. Cir. 2008)(seven years).

applications "shall be disposed of,..."  This implies the Commission is somehow

required to finish off, *i.e.*, "dispose of" their case, as opposed to designating it for

hearing.[29]  However, the quoted language is in the so-called 1952 "Avco

amendment" that was enacted to overrule an FCC decision[30] which allowed third

parties to file competing transfer applications.[31]  It has no relevance here.

Petitioners then seek to embrace Section 309(a), which applies when no

petitions to deny are filed, providing that if the Commission finds that the public

interest will be served, it "shall grant such application."[32] That, too, does not confer

any relevant duty on the Commission as to this case.  Moreover, Petitioners'

suggested construction would entirely negate Section 310(e).

The operative provision here is Section 309(d)(2).  As to that, Petitioners

cherry pick to focus on the statute's instruction for when the FCC determines  no

substantial or material facts preclude grant of an application.  The instruction does

not apply (except in the minds of Petitioners), because the FCC staff found

otherwise "on the basis of the application, the pleadings filed, or other matters which

---

[29]Petition, pp.21-22.
[30]*Powel Crosley, Jr.*, 11 F.C.C. 3 (1945).
[31]*See* Fisher, "Communications Act Amendments, 1952—An Attempt to Legislate Administrative Fairness," 22 Law and Contemporary Problems 672, 674 (1957).
[32]Petition, p.22.

-17-

it may officially notice...."

Petitioners wish to elide two statutory "shall" commands. Section 309(d)(2)

states:

> If a substantial and material question of fact is presented or if the
> Commission for any reason is unable to find that grant of the
> application would be consistent with [the public interest], it shall
> proceed as provided in subsection (e).

Section 309(e) says that the FCC "shall formally designate the application for

hearing,..."

Yes, the Commission had a duty to act. It acted, and did so in accordance

with the statute. As such, this Court lacks jurisdiction to issue a writ of mandamus

and should dismiss the Petition.

## IV.    THE FCC HAS THE AUTHORITY, AND THE MANDATE, TO EXPLORE THE UNRESOLVED ISSUES, AS DESIGNATED, THROUGH THE HEARING PROCESS.

Petitioners contend that the FCC lacks statutory authority to review either of

the two designated issues, which they trivialize as "supposedly increased

retransmission fees and decreased station-level employment."[33]  The designated

issues, based on thousands of pages of documents that reveal the parties' plans and

representations to prospective lenders, seek to determine whether Standard General's

---

[33]Petition, p. 27.

-18-

acquisition (and joint ownership with CMG) will result in increased pay-TV rates for consumers and reduction in local station employee headcounts that could reduce post-transaction TEGNA's ability to serve the local needs of its communities of license.  Depending on the facts the ALJ ascertains in the hearing, the Commission — not the ALJ — will then decide if grant of the applications in the public interest.

### A.     The FCC Has Statutory Authority to Designate a Hearing Issue to Determine If Retransmission Fees Will Artificially Rise Because of How the Applicants Structured Their Transaction.

The HDO details how Petitioners carefully sequenced the proposed transaction for the undisputed purpose of exploiting a contractual provision to increase retransmission fees charged to pay-TV operators, which would then pass through to consumers.  Their own documents show that the Applicants' "investment thesis" contemplated a significant jump in revenues by structuring the deal so that CMG's Boston TV station would be the vehicle initially acquiring TEGNA.[34]  That would allow post-transaction TEGNA to extract CMG's higher retransmission rates from pay-TV operators.  Importantly, Intervenors and pay-TV operators' comments also showed that the arrangement could facilitate information sharing among the parties, including with respect to markets in which TEGNA and CMG operate

---

[34]*See, e.g.*, Intervenors' Comments, pp.13-17. (January 13, 2023)(Add. 892-896)

overlapping stations.[35]  They also argued that these collusive arrangements could also extend to other kinds of contractual negotiations.[36]

Petitioners argue that the FCC is bound by its precedents holding that increased retransmission fees are not a legitimate public interest concern.[37]  Leaving aside the question of whether the merits of that issue are germane to a mandamus petition, and how increased costs to consumers could not be a classic form of harm to consumer welfare, the argument is based on a gross misreading of agency caselaw.  While the agency has sometimes declined to interfere in private contractual disputes that do not impact the general public, in the very case upon which Petitioners rely, the Commission said that when increased retransmission fees are "a product of market power," it is a matter affecting the public interest.[38]

Petitioners further contend that their partial waiver of retransmission rights filed by letter on December 16, 2022 entirely resolves the retransmission consent

---

[35]Such information sharing is prohibited.  47 C.F.R. §76.65(b)(viii).

[36]The concern is not hypothetical; in fact, both CMG and TEGNA remain subject to a DOJ consent decree because of past collusion on advertising rates in violation of the Sherman Act.  *U.S. v. Sinclair Broadcast Group, Inc*., 2019 WL 7584759 (2019)(TEGNA); *U.S. v. Sinclair Broadcast Group, Inc.*, 2019 WL 7584730 (2019)(Cox).

[37]Petition, p. 28.

[38]*Tribune Media Company*, 34 FCCRcd 8436, 8452 (2019).  *See, e.g.*, Partial Opposition of the vision Alliance (April 3, 2023)(MTNAdd 28).

issue.[39]  However, Intervenors and pay-TV companies dispute that assertion.[40]
Intervenors also presented evidence from Standard General's internal documents
contradicting the letter's assertion that increased fees are "not central to Standard
General's thesis for the proposed transaction."[41]  This is precisely the kind of
disputed factual issue that calls upon the expertise of the agency to evaluate at a
hearing and for it, not this Court, to resolve in the first instance.

**B.    The FCC Has Statutory Authority to Designate a Hearing Issue
        Concerning Potential Diminution of Local Content and
        Programming.**

Intervenors demonstrated below a legitimate basis, including experience with
hedge fund ownership of local newspapers, for their concerns that the takeover of
TEGNA by the Standard General/CMG combination and consequential financial
constraints will result in job cuts and other steps that will, in turn, diminish service
and programming in TEGNA's local markets.  Intervenors supported their charges
with internal documents indicating plans to reduce station headcounts and cut costs
in other ways.  Based on that record, the MB designated a hearing issue that

---

[39]Petition, p.30.
[40]Partial Opposition of vision Alliance, p.6 (April 3, 2023)(MTNAdd. 33);
Comments of vision Alliance, p.6 (January 13, 2023)(Add. 855); Intervenors'
Comments, pp.17-19. (January 13, 2023)(Add. 896-898).
[41]Intervenors' Comments, Intervenors' Comments, pp.12-17. (January 13,
2023)(Add. 891-896).

specifically addresses the potential loss of local content and programming resulting

from, *inter alia,* Standard General's proposed job cuts.[42]  The issue is framed as

follows:

> Whether,...local content and programming...in the affected communities
> would be adversely affected due to the proposed plans and
> commitments of SGCI Holdings for station-level staff; its intentions for
> investments in the stations; the potential financial pressures connected
> with the acquisition and ownership structure;...

Petitioners start with the bold assertion that "the Commission lacks statutory

authority...to assess...decreased station-level employment...."[43]  This ignores entirely

much of the scope of the issue.  Moreover, although Petitioners do discuss local

staffing, their attempt to recast the designated issue as relating exclusively to

"nondiscriminatory employment practices"[44] does not even mention the core public

interest obligation underlying the issue: localism.

The factual dispute is not about who Standard General hires, or how it does

so.[45]  Rather, it is about whether the record shows that Standard General will

maintain the capacity to provide local program service sufficient to meet its

---

[42]HDO, p. 22 (Add. 959).
[43]Petition, p.27.
[44]*Id.*
[45]For one example, Intervenors pointed to Standard General's stated intent to create a "Washington News Desk" that would feed nationally oriented coverage to the stations, at the expense of reduced air time for local coverage.  *See* HDO, pp.20-21. (Add. 957-958)

obligations to serve its communitie of license. The designated issue is not just about

staffing levels; the HDO points also to Standard General's statements and

commitments to investors and banks indicating plans that consummation of the

proposed transactions could reduce station-level resources and, consequently, local

service.[46]

The FCC has not only the authority, but the statutory obligation, to investigate

these issues before granting licenses.

> Indeed, the Commission would be remiss in its duties if it failed, in the
> exercise of its licensing authority, to aid in implementing the statute,
> either by general rule or by individual decisions.[47]

Localism is a core element of the FCC's public interest goals. Broadcasters must

> provide community responsive programming such as news and public
> affairs, and programming targeted to the particular needs or interests of
> certain segments of the public.[48]

A licensee is a trustee charged to operate in the public interest. This includes, *inter*

*alia*, "the diligent, positive, and continuing effort by the licensee to discover and

fulfill the tastes, needs and desires of his community or service area, for broadcast

---

[46]HDO, p.16. (Add. 953)

[47]*FCC v. ABC,* 347 U.S. 284, 289 (1954).

[48]*Report on Broadcast Localism*, 23 FCC Rcd1324, 1325 (2007). Quoted in
HDO. p.14 n.94.

service."[49]

The question before the FCC is whether Standard General's stewardship of publicly-owned spectrum will provide the public with the programming service to which it is entitled. Examination of that question requires a hearing.

Petitioners also complain that the FCC should have accepted Standard General's last-ditch attempt to salvage their applications by promising to "avoid[] journalism or newsroom layoffs at stations for two years...." Intervenors described numerous shortcomings in this offer,[50] and explained the offer actually narrowed the Standard General's repeatedly stated commitment, not to reduce local staffing levels art all,[51] first expressed in response to the FCC staff's inquiry even before petitions to deny were followed.[52] The MB agreed, finding that "the specific deficiencies highlighted by the [Intervenors], including the practicality and sufficiency of the SG Staffing Letter, remain unaddressed and unresolved...."[53]

_____

[49]*PIX, Inc.*, 68 FCC2d 381, 400 (1978)(*quoting En Banc Programming Inquiry*, 44 FCC 2303, 2316 (1960))

[50]Intervenors' Comments, pp.8-13 (January 13, 2023). (Add. 887-892)

[51]Response to First Request for Information, p.10 (June 13, 2022)(Add. 379).

[52]*Id.*, pp.8-11 (Add. 888-890). (Explaining that Standard General has retreated from its June 13, 2022 statement that it "does not intend to reduce station-level staffing" (Add. 629) to the much weaker promise in December, 2022, "that it will not conduct any journalism or newsroom staffing layoffs...for a minimum of two years.") (Add. 832).

[53]HDO, p.19. (Add. 956).

## V.  THE REQUESTED RELIEF AND THE LIMITED NATURE OF THE DESIGNATION DO NOT IMPLICATE ARTICLE II.  IN ANY EVENT, THE FCC HAS ALTERNATIVE MEANS TO CONDUCT A HEARING WITHOUT AN ALJ.

Petitioners' effort to inject a constitutional challenge in this case is unavailing. Leaving aside that the Fifth Circuit's *Jarkesy* case upon which they rely involved an enforcement proceeding.[54]  At this early juncture, a finding on whether the appointment of the ALJ violated Article II would not change the relief this Court can grant, for three reasons.

First, in the unlikely event this Court were to hold that the FCC improperly designated a hearing, the Article II issue would not arise at all.  Second, in the almost as unlikely event that this Court were to grant Petitioners' requested relief and direct the FCC to issue a ruling, the Article II issue would not be presented because of the very limited nature of the designation in this case.[55]  Third, and in any event, the FCC has alternative mechanisms in place that would allow for a Commissioned or employee without for-cause protection to administer the hearing.[56]

---

[54]*See* Intervenors' Opposition to Motion to Certify, p.10 (March 6, 2023)(App. 1019).

[55]*See* p.9, supra.

[56]*See* Procedural Streamlining of Administration of Hearings, 35 FCCRcd 10729 (2020).  See also, *Opposition to Unauthorized Application for Review*, pp. 19-20 (March 24, 2023)(MTNADD 23-24)(discussing *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Tribunal Board*, 684 F.3d 1322, 1340 (D.C. Cir. 2012).

## CONCLUSION

WHEREFORE, the Commission should dismiss the Petition.

Respectfully submitted,

/s/Arthur V. Belendiuk
Arthur V. Belendiuk
Smithwick & Belendiuk, P.C.
5028 Wisconsin Avenue, N.W.
Suite 301
Washington,D.C. 20016
abelendiuk@fccworld.com
(202) 363-4559

/s/Andrew Jay Schwartzman
Andrew Jay Schwartzman
1341 G Street, NW - Fifth Floor
Washington, DC 20005
AndySchwartzman@gmail.com
(202) 812-3210

April 11, 2023

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this motion complies with the applicable type- face, type style, and type-volume limitations. This motion was prepared using a proportionally spaced type (New Times Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this motion contains 5285 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this motion.

Respectfully Submitted,

/s/ Andrew Jay Schwartzman
Andrew Jay Schwartzman
1341 G Street, NW Fifth Floor
Washington, DC 20005
AndySchwartzman@gmail.com
(202) 812-3210

/s/Arthur V. Belendiuk
Arthur V. Belendiuk
Smithwick & Belendiuk, P.C.
5028 Wisconsin Avenue, N.W.
Suite 301
Washington, D.C. 20016
abelendiuk@fccworld.com
(202) 363-4559

April 11, 2023

**EXHIBIT A**

|   | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Transaction | Timeclock | Pause Y/N | Days Paused | Total Time |
| 2 | Adelphia/TW/Comcast | 404 | No Pause | | 404 |
| 3 | ALLTEL Communications/Cellco | 98 | No Pause | | 98 |
| 4 | ALLTEL Comm/CenturyTel | 51 | No Pause | | 51 |
| 5 | ALLTEL/Atlantis | 123 | No Pause | | 123 |
| 6 | ALLTEL/Midwest | 276 | No Pause | | 276 |
| 7 | ALLTEL/WWC | 154 | No Pause | | 154 |
| 8 | Altice/Cablevision | 179 | No Pause | | 179 |
| 9 | AOL/TimeWarner | 179 | Pause | 111 | 290 |
| 10 | Arch Wireless  Inc./Metrocall Holdings | 182 | No Pause | | 182 |
| 11 | AT&T Mobility/Aloha Spectrum | 75 | No Pause | | 75 |
| 12 | AT&T Wireless and Cingular Joint Venture | 97 | No Pause | | 97 |
| 13 | AT&T Wireless Services  Inc./Telecorp PCS | 96 | No Pause | | 96 |
| 14 | AT&T/Cingular/Meriwether/Skagit | 90 | No Pause | | 90 |
| 15 | AT&T/ATNI | 175 | Pause | 24 | 199 |
| 16 | AT&T/BellSouth | 753 | No Pause | | 753 |
| 17 | AT&T/Centennial | 323 | No Pause | | 323 |
| 18 | AT&T/Comcast | 188 | Pause | 42 | 230 |
| 19 | AT&T/Dobson | 112 | No Pause | | 112 |
| 20 | AT&T/Leap | 180 | Pause | 17 | 197 |
| 21 | AT&T/Qualcomm | 204 | Pause | 113 | 317 |
| 22 | AT&T/T-Mobile | 178 | Pause | 38 | 216 |
| 23 | AT&T/WCS Licensees | 109 | No Pause | | 109 |
| 24 | Cablevision/Bresnan | 43 | No Pause | | 43 |
| 25 | CenturyLink/Level 3 | 195 | Pause | 119 | 314 |
| 26 | CenturyLink/Qwest | 294 | No Pause | | 294 |
| 27 | CenturyTel/Embarq | 197 | No Pause | | 197 |
| 28 | Cingular/AT&T Wireless | 208 | No Pause | | 208 |
| 29 | Citadel/Disney | 380 | No Pause | | 380 |
| 30 | Clear Channel | 400 | No Pause | | 400 |
| 31 | Comcast/NBCU | 234 | Pause | 43 | 277 |
| 32 | Comcast/Time Warner Cable | 165 | Pause | 90 | 255 |
| 33 | COMSAT/ elenor | 208 | No Pause | | 208 |
| 34 | Comsat/Intelsat | 124 | No Pause | | 124 |
| 35 | Cumulus/Citadel | 153 | No Pause | 153 | 153 |
| 36 | DoCoMo/Guam | 187 | No Pause | | 187 |
| 37 | EchoStar/GM/Hughes | 156 | Pause | 138 | 294 |
| 38 | EchoStar/Hughes | 82 | No Pause | | 82 |
| 39 | EchoStar/Rainbow | 227 | No Pause | | 227 |
| 40 | FairPoint/Verizon | 301 | No Pause | | 301 |
| 41 | Fox TV Stations/Chris-Craft Industries | 261 | Pause | 41 | 302 |
| 42 | Frontier/AT&T | 164 | No Pause | | 164 |
| 43 | Frontier/Verizon (WC Docket 09-95) | 283 | No Pause | | 283 |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 44 | Frontier/Verizon (WC Docket 15-44) | 174 | No Pause | | 174 |
| 45 | Gannett/Belo | 165 | Pause | 17 | 182 |
| 46 | GCI-ACS-AWN | 279 | Pause | 51 | 330 |
| 47 | GHL Acquisition/Iridium | 260 | No Pause | | 260 |
| 48 | Global Crossing/CCC | 180 | No Pause | | 180 |
| 49 | Global Crossing/GC | 149 | No Pause | | 149 |
| 50 | Harbinger/SkyTerra | 329 | No Pause | | 329 |
| 51 | Inmarsat/CIP/Stratos | 186 | No Pause | | 186 |
| 52 | Intelsat/PanAmSat | 248 | No Pause | | 248 |
| 53 | Intelsat/Serafina | 91 | No Pause | | 91 |
| 54 | Iridium Satellite LLC | 230 | Pause | 67 | 297 |
| 55 | Level 3/Global Crossing | 112 | No Pause | | 112 |
| 56 | Liberty Media/DirecTV | 369 | No Pause | | 369 |
| 57 | Liberty Media/Sirius | 93 | No Pause | | 93 |
| 58 | Lockheed Martin/COMSAT and Intelsat | 177 | Pause | 8 | 185 |
| 59 | MCI/Worldcom | 75 | Pause | 90 | 165 |
| 60 | Media General/Young Broadcasting | 104 | Pause | 17 | 121 |
| 61 | Communications Group | 156 | No Pause | | 156 |
| 62 | New Globalstar/ICO | 173 | No Pause | | 173 |
| 63 | New Operating Globalstar LLC/ICO | 60 | No Pause | | 60 |
| 64 | New Skies/Blackstone | 108 | No Pause | | 108 |
| 65 | NewComm Wireless/ClearComm/TEM | 179 | Pause | | 179 |
| 66 | News Corp/DIRECTV | 182 | Pause | 38 | 220 |
| 67 | Nexstar/Media General | 329 | No Pause | | 329 |
| 68 | Nextel Comm/Arch | 89 | No Pause | | 89 |
| 69 | Nextel Comm/Chadmore | 105 | No Pause | | 105 |
| 70 | Nextel Communications  Inc. and Motorola | 180 | No Pause | | 180 |
| 71 | Nextel/Pacific Wireless | 94 | No Pause | | 94 |
| 72 | NextWave and Cingular Wireless | 129 | No Pause | | 129 |
| 73 | NorthPoint Communications | 92 | Pause | 143 | 235 |
| 74 | Old Iridium/ Iridium Constellation LLC | 230 | Pause | 67 | 297 |
| 75 | Orbiral License Corp/Orbital Domms Corp | 143 | Pause | 51 | 184 |
| 76 | Pacific Telecom/Bell AtlanticBNew Zealand | 182 | No Pause | | 182 |
| 77 | Allegiance Telecom | 42 | No Pause | | 42 |
| 78 | Qwest Wireless - Verizon Wireless | 141 | No Pause | | 141 |
| 79 | SBC/AT&T | 199 | Pause | 36 | 235 |
| 80 | SES Global/GE American Communications | 166 | No Pause | | 166 |
| 81 | SES GLOBAL/New Skies | 63 | No Pause | | 63 |
| 82 | Sinclair/Allbritton | 327 | Pause | 17 | 344 |
| 83 | Sinclair/Tribune | 167 | No Pause | | 167 |
| 84 | SoftBank/Sprint/Clearwire | 217 | No Pause | | 217 |
| 85 | Sprint/Clearwire | 133 | No Pause | | 133 |
| 86 | Sprint/Nextel | 157 | No Pause | | 157 |
| 87 | Stratos/CIP/Franklin | 191 | No Pause | | 191 |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 88 | T-Mobile License/AT&T Mobility | 103 | No Pause | | 103 |
| 89 | T-Mobile/Cingular | - | No Pause | | - |
| 90 | T-Mobile/MetroPCS | 137 | No Pause | | 137 |
| 91 | T-Mobile/SunCom | 108 | No Pause | | 108 |
| 92 | T-Mobile/Verizon Wireless | 56 | No Pause | | 56 |
| 93 | TDS/Choeua | 144 | No Pause | | 144 |
| 94 | Texas 10/AT&T | 146 | No Pause | | 146 |
| 95 | Tibune/LocalTV | 136 | Pause | 17 | 153 |
| 96 | Time Warner Inc and Time Warner Cable | 225 | No Pause | | 225 |
| 97 | Tribune Bankrupcy Transfer of Control | 177 | Pause | 297 | 474 |
| 98 | Tritel and Indus and TeleCorp PCS | 102 | No Pause | | 102 |
| 99 | Univision Communications | 246 | No Pause | | 246 |
| 100 | Univision/Hispanic Broadcasting Corporation | 258 | Pause | 158 | 416 |
| 101 | Verestar/SES Americom | 164 | No Pause | | 164 |
| 102 | Verizon Communications.OnePoint | 78 | No Pause | | 78 |
| 103 | Verizon/XO | 170 | Pause | 86 | 256 |
| 104 | Verizon Wireless/Grain/Cincinnati Bell | 89 | No Pause | | 89 |
| 105 | Verizon/América Móvil | 285 | No Pause | | 285 |
| 106 | Verizon/AT&T | 175 | Pause | 174 | 349 |
| 107 | Verizon/NextWave Telecom | 77 | No Pause | | 77 |
| 108 | Verizon/SpectrumCo & Verizon/Cox | 180 | Pause | 35 | 215 |
| 109 | VoiceStream Wireless Corporation Powertel | 196 | No Pause | | 196 |
| 110 | VoiceStream /Cook Inlet Region Inc. | 50 | No Pause | | 50 |
| 111 | Wireless Joint Venture of SBC and BellSouth | 133 | No Pause | | 133 |
| 112 | WorldCom/Intermedia | 73 | No Pause | | 73 |
| 113 | XM/Sirius | 412 | No Pause | | 412 |
| 114 | Zell/Tribune | 204 | No Pause | | 204 |
| 115 | XO Communications | 172 | Pause | 12 | 184 |
| 116 | Zeus/Intelsat | 93 | No Pause | | 93 |
| 117 | AT&T/DirecTV | 170 | Pause | 42 | 212 |
| 118 | Charter/Time Warner Cable/Bright House | 221 | Pause | 15 | 236 |
| 119 | Nexstar/Tribune 210 | 210 | No Pause | | 210 |
| 120 | T-Mobile/Sprint | 317 | Pause | 84 | 401 |

## CERTIFICATE OF FILING AND SERVICE

I, Arthur V. Belendiuk, hereby certify that on April 11, 2023, I filed the foregoing Opposition to Conditional Petition For A Writ of Mandamus To the Federal Communications Commission with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Arthur V. Belendiuk*

Arthur V. Belendiuk
*Counsel for Intervenors*