Nos. 23-1083, 23-1084

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SGCI HOLDINGS II LLC, TEGNA INC.,
AND CMG MEDIA CORP.

*Appellants/Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION

*Appellees/Respondents.*

_____

## MOTION OF
## AMERICAN TELEVISION ALLIANCE
## FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE*

_____

Timothy J. Simeone
Michael D. Nilsson
Amy C. Robinson
HWG LLP
1919 M Street NW | Eighth Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com
*Counsel for American Television Alliance*

April 11, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. Rule 28(a)(1), movant American Television Alliance certifies as follows:

### A.    Parties and Amici

**Appellants/Petitioners**: SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Appellee/Respondent**: Federal Communications Commission

**Intervenors**: The NewsGuild-Communications Workers of America; National Association of Broadcast Employees and Technicians-Communications Workers of America; Common Cause; Office of Communication of the United Church of Christ, Inc.

**Amicus**:  National Association of Broadcasters

### B.    Rulings Under Review

References to the rulings at issue appear in the Notice of Appeal (20-1083) and the Petition for Mandamus (20-1084).

### C.    Related Cases:

There are no related cases other than the appeal and mandamus identified above.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, movant American Television Alliance ("ATVA") states that it is a non-profit professional association—comprising cable, satellite, and telephone companies, independent programmers, and consumer groups—formed primarily to advocate on retransmission consent issues. It has no parent company and does not issue debt or equity securities and accordingly there is no publicly held company holding ten percent or more of its stock.

/s/ Timothy J. Simeone
Timothy J. Simeone
*Counsel of Record*
HWG LLP
1919 M Street NW | Eighth
Floor Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com
*Counsel for American*
*Television Alliance*

**MOTION FOR LEAVE TO FILE AS *AMICUS CURIAE***

Amicus American Television Alliance ("ATVA") is a non-profit professional association—comprising cable, satellite, and telephone companies, independent programmers, and consumer groups—formed primarily to advocate on retransmission consent issues. ATVA advocates on behalf of its members before the Federal Communications Commission ("Commission") and in other fora. Because the proceedings below directly affected ATVA's members, it participated actively in those proceedings. Indeed, the Media Bureau (the "Bureau") order challenged here, *Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, Hearing Designation Order, DA 23-149, MB Docket No. 22-162 (MB rel. Feb. 24, 2023) ("Hearing Order"), accorded substantial significance to materials placed on the record by ATVA. ATVA therefore has a substantial interest in this Court's review, particularly with respect to Petitioners' novel arguments about the Bureau's treatment of retransmission consent issues. ATVA submits that its perspective on retransmission consent issues—the only issues on which ATVA participated below—will aid the Court in resolving the questions presented.[1]

---

[1] ATVA sought consent from all parties to its filing of an *amicus curiae* brief, and nearly all consented. Specifically, the Commission consented, as did Intervenors NewsGuild-Communications Workers of America, National Association of Broadcast Employees and Technicians-Communications Workers of America, Common Cause, and the Office of Communication of the United Church of Christ,

Petitioners' effort to obtain mandamus must fail because they cannot show that the Commission had a "clear duty" to approve the applications *without* a hearing on retransmission consent issues.  Indeed, the writ is "reserved only for the most transparent violations of a clear duty to act."  *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)).  Applying that standard here, Petitioners would need to demonstrate that it is crystal-clear that the Bureau's reasons for invoking the hearing process with respect to retransmission consent—rather than moving directly to ruling on the application, as Petitioners claim the Commission had a duty to do—were unlawful.

Not only do Petitioners fall far short of that showing, but in fact the Bureau's analysis of the retransmission consent issues was entirely consistent with its delegated authority, with the Commission's past practice, and with applicable appellate precedent.  The Commission may properly consider potential anticompetitive retail price increases in its public interest review.  In *FCC v. National Citizens Committee for Broadcasting*, for example, the Supreme Court said that the Commission "is permitted to take antitrust policies into account in

---

Inc.  Petitioners SGCI Holdings III LLC, TEGNA Inc., and CMG Media Corporation stated that they take no position on ATVA's request. Accordingly, pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Circuit Rule 29(b), ATVA files this Motion for Leave to file an amicus curiae brief.

making licensing decisions pursuant to the public-interest standard." 436 U.S. 775, 795 (1978).  This is what the Commission has done for decades.  *See, e.g.*, *Applications for Consent to the Transfer of Control of Licenses XM Satellite Radio Holdings Inc., Transferer to Sirius Satellite Radio Inc., Transferee*, Memorandum Opinion & Order and Report & Order, 23 FCC Rcd. 12,348, 12,352 ¶ 6 (2008) (concluding that conditions were necessary since otherwise applicants "would have the incentive and ability to raise prices for an extended period of time").  As further set forth in ATVA's brief, Petitioners have the law backward: It is *not* arbitrary and capricious to consider such potential consumer price increases under the "public interest" standard, but, at least in some circumstances, it might be arbitrary and capricious to decline to do so.  It likely would be so in this case, where—as also set forth in our brief—the record so strongly supports the challenged Hearing Order.

In sum, ATVA's proposed brief (attached hereto as an addendum) presents its unique view—as also presented to the Bureau—on the Commission's authority to address anticompetitive consumer price increases as part of its "public interest" review.  ATVA's brief also addresses the wealth of evidence in the record—much of it supplied by ATVA and its member companies—supporting the Bureau's decision *not* to grant the Applicants without a hearing to resolve critical, unresolved issues

3

of fact.  ATVA respectfully submits that this brief will aid the Court in resolving the issues at hand.

## CONCLUSION

This Court should grant leave for ATVA to file the attached brief as amicus curiae.

Dated: April 11, 2023                    Respectfully submitted,

/s/ Timothy J. Simeone
Timothy J. Simeone
Michael D. Nilsson
Amy C. Robinson
HWG LLP
1919 M Street NW | Eighth Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com
*Counsel for American Television Alliance*

## <u>CERTIFICATE OF COMPLIANCE</u>

This motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 731 words, excluding the parts of the brief exempted by Rule 32(f).  This motion complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14-point font.

<u>/s/ Timothy J. Simeone</u>
Timothy J. Simeone
HWG LLP
1919 M Street NW | Eighth Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com

April 11, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2023, I caused copies of the Motion for

Leave to File Brief as *Amicus Curiae* to be served by the Court's CM/ECF system,

which will send a notice of the filing to all registered CM/ECF users.

<u>/s/ Timothy J. Simeone</u>
Timothy J. Simeone
HWG LLP
1919 M Street NW | Eighth Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com

April 11, 2023

# Addendum

Nos. 23-1083, 23-1084

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SGCI HOLDINGS II LLC, TEGNA INC.,
AND CMG MEDIA CORP.

*Appellants/Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION

*Appellees/Respondents.*

_____

**BRIEF OF AMICUS CURIAE AMERICAN TELEVISION ALLIANCE
IN SUPPORT OF RESPONDENTS**

_____

Timothy J. Simeone
Michael D. Nilsson
Amy C. Robinson
HWG LLP
1919 M Street NW | Eighth Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com
*Counsel for American Television Alliance*

April 11, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. Rule 28(a)(1), Amicus American Television Alliance certifies as follows:

### A.    Parties and Amici

**Appellants/Petitioners**: SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Appellee/Respondent**: Federal Communications Commission

**Intervenors**: The NewsGuild-Communications Workers of America; National Association of Broadcast Employees and Technicians-Communications Workers of America; Common Cause; Office of Communication of the United Church of Christ, Inc.

**Amicus**:  National Association of Broadcasters

### B.    Rulings Under Review

References to the rulings at issue appear in the Notice of Appeal (20-1083) and the Petition for Mandamus (20-1084).

### C.    Related Cases

There are no related cases other than the appeal and mandamus identified above.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Amicus American Television Alliance ("ATVA") states that it is a non-profit professional association—comprising cable, satellite, and telephone companies, independent programmers, and consumer groups—formed primarily to advocate on retransmission consent issues. It has no parent company and does not issue debt or equity securities and accordingly there is no publicly held company holding ten percent or more of its stock.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 DISCLOSURE STATEMENT ............................................................. ii

TABLE OF AUTHORITIES ............................................................................. iv

GLOSSARY ...................................................................................................... vi

INTEREST OF AMICUS .................................................................................. 1

STANDARD OF REVIEW ............................................................................... 2

ARGUMENT .................................................................................................... 2

    A.  The Commission Lawfully Can, and Always Does, Consider Competition and Consumer Protection in Its Public Interest Review of Proposed License Transfers. ........................................................................ 3

    B.  On the Record Before It, the Bureau Properly Concluded That the Question of Whether the Transactions Could Result in Rate Increases Due to Higher Retransmission Consent Fees Requires Further Inquiry. ........................... 8

    C.  The Additional Arguments Regarding Retransmission Consent Made by Applicants' Amicus are Meritless. ............................................................ 12

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

<div align="right">Page(s)</div>

## Cases

*Allied Chem. Corp. v. Daiflon, Inc.*,
  449 U.S. 33 (1980)...................................................................................2

*Bilingual Bicultural Coal. on Mass Media, Inc. v. FCC*,
  595 F.2d 621 (D.C. Cir. 1978) ...............................................................11

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367 (2004)................................................................................3

*FCC v. Nat'l Citizens Comm. for Broad.*,
  436 U.S. 775 (1978)................................................................................4

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986)..............................................................................14

*FTC v. Whole Foods Mkt., Inc.*,
  548 F.3d 1028 (D.C. Cir. 2008) ...............................................................5

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
  485 U.S. 271 (1988)................................................................................2

*Hosp. Corp. of Am. v. FTC*,
  807 F.2d 1381 (7th Cir. 1986)..........................................................4, 11

*In re Core Commc'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) .................................................................3

*In re Nat'l Nurses United*,
  47 F.4th 746 (D.C. Cir. 2022) .................................................................2

*Md. People's Couns. v. FERC*,
  761 F.2d 780 (D.C. Cir. 1985) .................................................................5

*N. States Power Co. v. U.S. Dep't of Energy*,
128 F.3d 754 (D.C. Cir. 1997) ............................................................2

## Administrative Decisions

*Applications for Consent to the Assignment and/or Transfer of Control of Licenses*,
Memorandum Opinion & Order, 21 FCC Rcd. 8203 (2006) .............................5

*Applications for Consent to the Transfer of Control of Licenses XM Satellite Radio Holdings Inc., Transferer to Sirius Satellite Radio Inc., Transferee*,
Memorandum Opinion & Order and Report & Order, 23 FCC Rcd. 12,348 (2008)........................................................................................................6

*Applications of Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee)*,
Memorandum Opinion & Order, 34 FCC Rcd. 8436 (2019) ............................13

*Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, Hearing Designation Order, DA 23-149,
MB Docket No. 22-162 (MB rel. Feb. 24, 2023) .................. 1, 4, 7, 9, 10, 11, 12

## Other Authorities

Applicants' Joint Reply Comments,
MB Docket No. 22-162 (filed Jan. 20, 2023)......................................................12

Horizontal Merger Guidelines
(U.S. Dep't of Just. & Fed. Trade Comm'n 2010) .............................................14

Letter from Cristina Chou to Marlene H. Dortch,
MB Docket No. 22-162 (filed Oct. 20, 2022) ......................................................9

Letter from Michael Nilsson to Marlene H. Dortch,
MB Docket No. 22-162 (filed Dec. 2, 2022)........................................................9

Letter from Michael Nilsson to Marlene H. Dortch,
MB Docket No. 22-162 (filed Jan. 13, 2023)..................................................9, 10

# GLOSSARY

| | |
|---|---|
| Applicants | Petitioners SGCI Holdings III LLC; TEGNA Inc.; and CMG Media Corporation |
| ATVA | American Television Alliance |
| Bureau | Media Bureau |
| CMG | CMG Media Corporation |
| FERC | Federal Energy Regulatory Commission |
| FCC or Commission | Federal Communications Commission |
| NAB | National Association of Broadcasters |

## INTEREST OF AMICUS[1]

Amicus American Television Alliance ("ATVA") is a non-profit professional association—comprising cable, satellite, and telephone companies, independent programmers, and consumer groups—formed primarily to advocate on retransmission consent issues.  ATVA advocates on behalf of its members before the Federal Communications Commission ("FCC" or "Commission") and in other fora.  Because the proceedings below directly affected ATVA's members, it participated actively in those proceedings.  Indeed, the Media Bureau (the "Bureau") order challenged here, *Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, Hearing Designation Order, DA 23-149, MB Docket No. 22-162 (MB rel. Feb. 24, 2023) ("Hearing Order"), accorded substantial significance to materials placed on the record by ATVA.  ATVA therefore has a substantial interest in this Court's review, particularly with respect to Applicants' novel arguments about the Bureau's treatment of retransmission consent issues.

---

[1] ATVA certifies that no party, party's counsel, or person other than ATVA, its members, or counsel authored this brief in whole or in part, or contributed money intended to fund its preparation or submission.

## STANDARD OF REVIEW

"[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980) (citations omitted). A petitioner seeking mandamus bears the heavy burden of showing that "its right to issuance of the writ is 'clear and indisputable.'" *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988) (quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 384 (1953)). The petitioner must show: (1) it has a clear right to relief; (2) the agency has a clear duty to act; and (3) there is no other adequate remedy available to the party. *N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997) (quoting *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983)).

## ARGUMENT

Amicus ATVA limits this brief to issues related to retransmission consent because those were the only issues as to which ATVA participated below. Applicants' effort to obtain mandamus must fail because they cannot show that the Commission had a "clear duty" to approve or deny the applications *without* a hearing on retransmission consent issues. This Court recently described the relevant inquiry as "whether the agency has a *crystal-clear* legal duty to act." *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022) (emphasis added). The

writ is "reserved only for the most transparent violations of a clear duty to act."

*In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *In re*

*Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)); *see also Cheney v. U.S.*

*Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (even where a clear duty exists, the

writ is a drastic remedy reserved for extraordinary circumstances).

Applying that standard here, Applicants need to demonstrate that it is

"crystal-clear" that the Bureau's reasons for invoking the hearing process with

respect to retransmission consent were unlawful. Not only do Applicants fall far

short of that showing, but in fact the Bureau's analysis of the retransmission

consent issues presented here was entirely consistent with its delegated authority,

with the Commission's past practice, and with applicable appellate precedent.

Moreover, contrary to Applicants' arguments, the record in this proceeding strongly

supports the challenged Hearing Order.

## I.   APPLICANTS HAVE NOT MET THEIR BURDEN TO SHOW THAT THE RIGHT TO ISSUANCE OF THE WRIT IS CLEAR AND INDISPUTABLE.

### A.   The Commission Lawfully Can, and Always Does, Consider Competition and Consumer Protection in Its Public Interest Review of Proposed License Transfers.

ATVA focuses in this brief on one of the Bureau's two primary justifications

for designating the application for hearing. Specifically, the Bureau found that

further factual investigation is required into "whether retransmission consent fees

3

will rise" if the Transactions were to be approved, given the Transactions' "unique structure" designed to "take advantage of after-acquired station clauses and maximize retransmission revenue."  Hearing Order ¶ 16.  Before this Court, Applicants claim that the "Commission lacks *statutory* authority to block a transaction on . . . grounds [of] . . . supposedly increased retransmission fees." Conditional Pet. for Writ of Mandamus to the Federal Communications Commission 27 ("Pet.").  Applicants and their amicus maintain that this is simply not "an appropriate 'public interest' consideration in reviewing an application." Pet. 28 (citations omitted); Corrected Br. of *Amicus Curiae* National Association of Broadcasters in Supp. of Pet'rs and Reversal or Mandamus 4-5 ("NAB Br.") (whether the transaction would "impermissibly increase" rates was not "even colorably material to a proper public-interest inquiry").

That is incorrect.  Applicable precedent makes clear that the Commission may properly consider potential anticompetitive retail price increases in its public interest review.  In *FCC v. National Citizens Committee for Broadcasting*, for example, the Supreme Court said that the Commission "is permitted to take antitrust policies into account in making licensing decisions pursuant to the public-interest standard."  436 U.S. 775, 795 (1978).  Those policies include whether a "merger or other acquisition" may "create an appreciable danger of [higher prices] in the future."  *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986).

Indeed, in reviewing the Federal Energy Regulatory Commission's ("FERC")

application of the essentially identical "public convenience and necessity" standard

under Section 7 of the Natural Gas Act—where "antitrust concepts are [as here]

intimately involved in a determination of what action is in the public interest," *Md.*

*People's Couns. v. FERC*, 761 F.2d 780, 786 (D.C. Cir. 1985)—this Court found

that FERC's *failure* to consider the potential for higher prices for some consumers

under the challenged order was unreasonable and required remand.  *Id.* at 786-89;

*see also FTC v. Whole Foods Mkt., Inc*., 548 F.3d 1028, 1037 (D.C. Cir. 2008)

(remanding for further analysis of possible price increases for "targeted buyers" as

a result of the proposed merger).

For decades, the Commission has interpreted its public interest review under

Section 309 to include protecting consumers from anticompetitive, transaction-

related retail price increases.  For example, in *Applications for Consent to the*

*Assignment and/or Transfer of Control of Licenses*, the Commission imposed

remedial conditions because "we find that the transactions . . . ultimately could

increase retail prices for consumers . . . ."  Memorandum Opinion & Order, 21

FCC Rcd. 8203, 8256 ¶ 116 (2006).  Similarly, in *Applications for Consent to the*

*Transfer of Control of Licenses XM Satellite Radio Holdings Inc., Transferer to*

*Sirius Satellite Radio Inc., Transferee*, the Commission found that voluntary

commitments and other conditions were necessary in part because otherwise the

applicants there "would have the incentive and ability to raise prices for an extended period of time."  Memorandum Opinion & Order and Report & Order, 23 FCC Rcd. 12,348, 12,352 ¶ 6 (2008).  These Commission determinations went unchallenged in the courts, and were not even subject to reconsideration at the Commission on the issue relevant here.  In short, the Hearing Order's approach was a run-of-the-mill application of the Commission's longstanding approach to public interest review.

In the Hearing Order challenged here, the Bureau provided a well-reasoned explanation of the why higher retransmission consent fees caused by the Transactions would implicate the Commission's duty to protect consumers from anticompetitive, transaction-related retail price increases.  Specifically, the Bureau wrote:

> The Commission has recognized . . . that supra-competitive increases in retransmission consent fees can result in pressure for retail price increases for subscription video services to the detriment of consumers, and therefore, the public interest.  As such, the Commission has been alert to the potential for public interest harms arising from retransmission consent rates, particularly in the context of transactions involving large broadcast television companies or ["multichannel video programming distributors"].   And, in previous transactions, the Commission has found that such increases and the resulting increased retail rates are not in the public interest.

Hearing Order ¶ 21 (footnotes omitted) (citing Commission cases).[2]  Given this clear explanation, the Bureau's focus on potential retail price increases resulting from supra-competitive retransmission rates in its public interest review under Section 309 certainly was not an arbitrary and capricious application of that standard.  That is particularly true here because the Bureau emphasized that "any increase in retransmission fees" following the Transaction would *not* run afoul of the public interest if it were "the result of a properly functioning, competitive marketplace," but *would* contravene the public interest if it resulted from the "unique structure of the Transactions."  Hearing Order ¶ 24.

In sum, Applicants' argument that the Bureau lacked statutory authority to order further factual inquiry into whether the Transaction might result in higher rates for consumers due to higher retransmission consent fees inconsistent with competitive market forces is wrong.  Applicants have the law backward: It is *not* arbitrary and capricious to consider such potential consumer price increases under the "public interest" standard, but, at least in some circumstances, it might be arbitrary and capricious to decline to do so.

---

[2]    As the Bureau observed, ATVA and others explained on the record "that it is axiomatic that increased transmission fees will certainly be directly passed on to consumers."  Hearing Order ¶ 25.  The Commission cases cited by the Bureau each stand for the proposition that price increases to consumers caused by a transaction constitute a public interest harm.

**B.**  **On the Record Before It, the Bureau Properly Concluded That the Question of Whether the Transactions Could Result in Rate Increases Due to Higher Retransmission Consent Fees Requires Further Inquiry.**

As discussed above, Applicants' argument that the Bureau lacked statutory authority to consider the potential for higher consumer prices resulting from the proposed Transactions is wrong.  But Applicants and their amicus *also* argue that "no evidence was tendered" by the parties challenging the Transactions that could justify a hearing.  Pet. 28; NAB Br. 8 (claiming that the Bureau "identified no evidence of anticompetitive wrongdoing here remotely justifying a hearing under Section 309(e)").  That argument is also incorrect.

First, contrary to Applicants' arguments, the record in this case was replete with evidence of potential anticompetitive conduct regarding retransmission consent fees requiring further investigation.  For example, before the Bureau, both ATVA and its member Altice explained that the Applicants here appeared to be engaged in an "unprecedented array of sequenced transactions and swaps" intended to raise retransmission consent prices artificially.  Specifically,

- CMG had negotiated retransmission consent agreements with cable and satellite operators charging relatively high rates.  Those agreements generally had "after-acquired station clauses" under which, if CMG bought a new station, that station would fall under the CMG agreement and be entitled to charge CMG rates.

- CMG would sell Standard General a single station and assign its retransmission consent agreement along with the station.

8

- Standard General would use that single Standard General station as the vehicle to buy TEGNA's sixty stations.

- TEGNA's stations would thereby artificially reset to the CMG agreement's rates, potentially triggering a massive overall increase in retransmission consent fees for many cable and satellite companies —even though neither TEGNA nor Standard General (its new owner) negotiated the contractual provision used to inflate these fees.

- This particular transaction structure also gave TEGNA and CMG knowledge of the expiration date of each other's contracts, which would create additional leverage in *future* retransmission consent negotiations.

Letter from Michael Nilsson to Marlene H. Dortch, MB Docket No. 22-162, at 4-5 (filed Jan. 13, 2023) (Attachment A) (citation omitted); Letter from Cristina Chou to Marlene H. Dortch, MB Docket No. 22-162, at 1-3 (filed Oct. 20, 2022) (Attachment B); Hearing Order ¶¶ 25-32.

ATVA member Altice argued that Applicants' complicated, multi-step Transaction boiled down to Standard General "commandeer[ing]" CMG's after-acquired station clause to raise prices of *TEGNA's* stations. Attachment B at 1-3. And ATVA further argued that Applicants could not have orchestrated such commandeering without the unlawful and anticompetitive sharing of information beforehand, particularly since Applicants never provided any alternative explanation for the Transaction's structure. *See* Attachment A at 4-5; Letter from Michael Nilsson to Marlene H. Dortch, MB Docket No. 22-162, at 2 (filed Dec. 2, 2022) (Attachment C).

Notably, Applicants did offer commitments to address concerns relating to increased retransmission consent fees, including by waiving the after-acquired station clauses in at least some circumstances. ATVA and others, however, argued that these commitments were insufficient, as they failed to address enforcement and other important issues. *See* Attachment A at 2.

After careful analysis, the Bureau concluded that "given questions about the intended scope" of Applicants' proposed commitments, "we are unable to find that [they] would adequately mitigate" the potential for anticompetitive increases in consumer rates. Hearing Order ¶ 32. The Bureau therefore reasonably designated for hearing specific questions that would shed additional light on the agency's concerns relating to after-acquired station clauses:

- "[W]hether the sequencing of the Transactions was intended primarily to increase retransmission fees; . . ."
- "[W]hether consummation of the Transactions will likely cause an increase in rates for the retail subscribers . . . ;"
- "[W]hether the sequencing of the Transactions constitutes anticompetitive activity; . . ."
- "[W]hat the extent of harm to viewers and the public interest would be as a result; . . ."
- "[W]hether any such harm would be adequately mitigated by the commitments offered by the Applicants . . . ;" and
- "[W]hether any of the Applicants violated any Commission rules or committed other wrongdoing in constructing the Transactions."

Hearing Order ¶ 32.  For mandamus to be appropriate, this Court would need to conclude that the record here provides no justification for *any* of these questions. But plainly it does.

Applicants' contrary claim that such designations may occur based only on allegations "'supported by affidavit' by witnesses with 'personal knowledge'" misses the point.  Pet. 29 (quoting 47 U.S.C. § 309(d)(1)).  The facts relevant to the Bureau's concerns about retransmission consent fees and potential consumer price increases—including facts relating to the structure of the Transactions and the specific content of the relevant after-acquired station clauses—appear on the record and are undisputed.  The Bureau's primary concern was whether, given those *undisputed* facts, the Transactions "create an appreciable danger" of "higher prices in the affected market" in the future.  *Hosp. Corp.*, 807 F.2d at 1389.  To answer that question, as the *Hospital Corp.* court said, a "predictive judgment, necessarily probabilistic and judgmental rather than demonstrable . . . is called for."  *Id.*  The Bureau here reasonably concluded that such a judgment would be informed by further factual development at a hearing.  *See Bilingual Bicultural Coal. on Mass Media, Inc. v. FCC*, 595 F.2d 621, 633 (D.C. Cir. 1978) (finding that the FCC abused its discretion in renewing a license because it had failed to hold a hearing and therefore had insufficient factual information to approve the license, and accordingly remanding for a hearing).

11

It also bears emphasis that the final issue designated for hearing by the Bureau—again, "whether any of the Applicants violated any Commission rules or committed other wrongdoing in constructing the transactions"—provides an independent basis for denying mandamus.  Hearing Order ¶ 32.  As noted above, before the Bureau, ATVA argued that the unique structure of the proposed Transactions had likely been informed by information sharing among the Applicants in violation of the Commission's rules.  *See supra* at 9.  The Applicants denied that this was the case.  Applicants' Joint Reply Comments at 16-17, MB Docket No. 22-162 (filed Jan. 20, 2023) (Attachment D).  Given this dispute, the Bureau understandably wished to obtain further information about whether the structure of the proposed Transactions involved rule violations or other wrongdoing.  Like the Bureau's apprehension about potential consumer price increases here, this concern relates to the facts underlying the highly unusual structure of these specific Transactions and is thus a particularly suitable subject for further factual development.

### C.    The Additional Arguments Regarding Retransmission Consent Made by Applicants' Amicus are Meritless.

In addition to the primary arguments addressed above, Amicus NAB presents a scattershot array of additional claims that merit little attention:

1.    NAB appears to argue that the Bureau *cannot* consider retransmission consent in transaction review because Section 325 of the Communications Act

12

authorizes the Commission "only to promulgate regulations ensuring that the parties negotiate in good faith" over retransmission consent. NAB Br. 6. But the fact that Congress did not *generally* intend the Commission to regulate retransmission consent rates or conditions is irrelevant here. Congress *also* instructed the Commission to ensure that license transfers are in the public interest, and there is no exception to that instruction for issues involving retransmission consent. Here, as discussed above, the Bureau found that the Transactions raise questions about the public interest in connection with retransmission consent, and that a hearing would help to answer those questions.

2.    NAB also appears to suggest—without saying why it is significant for this Court's review—that the Hearing Order departed from the Commission's prior treatment of retransmission consent issues, particularly in *Applications of Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee)*, Memorandum Opinion & Order, 34 FCC Rcd. 8436, 8462-63 ¶ 59 (2019) ("*Nexstar*"). Even if that were true, the proper remedy is of course to appeal the Bureau's order to the full Commission, as Applicants have in fact done. Seeking review from this Court at this time is "incurably premature." Order 1, Apr. 3, 2023. But it is also worth noting that NAB is simply wrong. In *Nexstar*, the Commission found that an "increase in retransmission consent rates" is only a "public interest harm" where the increase is *not* the product of "competitive

13

marketplace considerations." *Nexstar* ¶ 29 (citation omitted).  We agree.  But that is precisely the point here—the potential increases that the hearing is to investigate would result not from the operation of the competitive marketplace, but from complex machinations underlying the proposed Transactions.

      3.     NAB also suggests that the Bureau's examination of consumer price increases was inadequate because it was "unadorned by any legal theory of competition, economic analysis, or discussion of the relevant markets."  NAB Br. 8.  But the antitrust analysis that "informs" the Commission's inquiry here contains no such requirement.  To the contrary, "proof of actual detrimental effects"—like retail price increases—"can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'"[3]  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) (quoting 7 P. Areeda, Antitrust Law ¶ 1511, at 429 (1986)); *see also* Horizontal Merger Guidelines § 2.2.1 (U.S. Dep't of Just. & Fed. Trade Comm'n 2010) ("Explicit or implicit evidence that the merging parties intend to raise prices" is "highly informative in evaluating the likely effects of a merger.").

---

[3]     Similarly, during post-consummation reviews, "[e]vidence of observed post-merger price increases . . . . can be dispositive," absent evidence that the increases resulted from increased demand or other background non-merger forces. Horizontal Merger Guidelines § 2.1.1 (U.S. Dep't of Just. & Fed. Trade Comm'n 2010).

14

## CONCLUSION

For the foregoing reasons, this Court should deny the petition for mandamus.

Respectfully submitted,

/s/ Timothy J. Simeone
Timothy J. Simeone
Michael D. Nilsson
Amy C. Robinson
HWG LLP
1919 M Street NW | Eighth Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com
*Counsel for American Television Alliance*

April 11, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,154 words, excluding the parts of the brief exempted by Rule 32(f).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14-point font.

<div style="margin-left:40%">

/s/ Timothy J. Simeone
Timothy J. Simeone
HWG LLP
1919 M Street NW | Eighth Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com

</div>

April 11, 2023

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 11, 2023, I caused copies of the foregoing

Brief of Amicus Curiae American Television Alliance in Support of Respondents

to be served by the Court's CM/ECF system, which will send a notice of the filing

to all registered CM/ECF users.


<u>/s/ Timothy J. Simeone</u>
Timothy J. Simeone
HWG LLP
1919 M Street NW | Eighth Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com

April 11, 2023

# Attachment A



HWG LLP
1919 M STREET NW
WASHINGTON, DC 20036
TEL: +1 202 730 1300 | HWGLAW.COM

Michael Nilsson
direct dial: +1 202 730-1334
mnilsson@hwglaw.com

January 13, 2023

**BY ELECTRONIC FILING**

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

      Re:    MB Docket No. 22-162 (TEGNA-Standard General)

Dear Ms. Dortch:

    Applicants[1] recently submitted a series of letters seeking to address issues raised by opponents to and commenters on the TEGNA-Standard General transaction.  The first sought to address issues related to the use of after-acquired and divested-station clauses.[2]  The second sought to address issues related to jobs.[3]  The third relates to information sharing and coordination.[4]

    The American Television Alliance hereby responds to the *Public Notice* seeking comment on the proposed conditions with respect to coordination and after-acquired station clauses.[5]  If such conditions are to have any hope of remedying the harm caused by intertwining Cox and TEGNA, they must be precise, extensive, clear, and easily enforceable.

    At the outset, we would encourage the Commission to codify all of Applicants' commitments as conditions, even though only Applicants' letter regarding information sharing

---

[1]    Parties to the transaction include Standard General L.P., SGCI Holdings III LLC (collectively, "Standard General"), TEGNA, Inc., CMG Media Corporation, which is owned by Apollo Global Management, Inc.  For convenience's sake, we refer to all as "Applicants."

[2]    Letter from Soohyung Kim to Marlene Dortch, MB Docket No. 22-162 (filed Dec. 16, 2022) ("SG After-Acquired Letter").

[3]    Letter from Soohyung Kim to Marlene Dortch, MB Docket No. 22-162 (filed Dec. 22, 2022) ("SG Jobs Letter").

[4]    Letter from Soohyung Kim *et al.* to Marlene Dortch, MB Docket No. 22-162 (filed Dec. 23, 2022) ("Applicants Coordination Letter").

[5]    Public Notice, *Media Bureau Seeks Comment on Letters Filed by SGCI Holdings II LLC and Standard General L.P. Regarding Applications to Transfer Control of TEGNA, Inc.*, DA No. 22-1368, MB Docket No. 22-162 (rel. Dec. 23, 2022).

Marlene Dortch
January 13, 2023
Page 2 of 7

and collusion specifies so.[6]  This would include the other commitments Applicants have made throughout this proceeding, such as that "they will not engage in joint retransmission consent negotiations or coordination between post-closing TEGNA and CMG, Apollo or their respective affiliates, even where it would be legally permissible under the Commission's rules."[7]

Yet even if codified, Applicants' proposed conditions as currently drafted do not fully address the harms caused by the proposed transaction.  Below, we provide our concerns regarding, respectively, the proposed information sharing and after-acquired station conditions:

*Regarding Information Sharing:*

- The proposed condition would prohibit information sharing regarding retransmission consent among the parties and with respect to those involved in retransmission consent negotiations.  The Commission should either broadly interpret who is "involved in retransmission consent negotiations" or, as we had previously proposed, prohibit each Applicant from sharing any such information with one another or with third parties.

- The Commission should impose enforcement and monitoring requirements, as we have proposed.

*Regarding After-Acquired Station Clauses:*

- The Commission should prevent the parties from evading the condition by creating simultaneous expirations of their respective contracts.

- The Commission should prohibit future abuse of after-acquired station clauses and information sharing related to due diligence.

- The Commission should ensure that all conditions apply to all entities affiliated with Applicants.

On December 2, we submitted to the Commission a proposed omnibus set of conditions based on an earlier consent decree agreed to between the Commission and Sinclair.[8]  If helpful,

---

[6]     *Compare* Applicants' Coordination Letter (stating that "Standard General, Apollo, and CMG propose the Commission incorporate [the commitments] into its Order in this proceeding"); *with* SG After-Acquired Letter *and* SG Jobs Letter (neither containing such language).

[7]     Applicants' Coordination Letter at 2; *see also* Applicants' Consolidated Opposition and Response to Comments, MB Docket No. 22-162, at 45 (filed July 7, 2022).

[8]      Letter from Michael Nilsson to Marlene Dortch, MB Docket No. 22-162 (filed Dec. 2, 2022) ("ATVA Conditions Letter").

Marlene Dortch
January 13, 2023
Page 3 of 7

we would be happy to propose edits to either our proposal or Applicants' proposal should the Commission so desire.

<p style="text-align:center">*    *    *</p>

## I.    Information Sharing and Coordination.

### A.    Scope of the Information Sharing Restriction.

Applicants propose to restrict information sharing *among themselves* and *with respect to individuals "that may be involved in retransmission consent negotiations."*[9] This language stems, in part, from language originally proposed by NCTA.[10]

We think this language needs further clarification. At a minimum, we believe that the phrase "may be involved in retransmission consent negotiations" must be interpreted broadly to have any practical effect. Imagine, for example, that a broadcast CEO or CFO learns confidential information about retransmission consent rates from another broadcaster—but is considered not to be "involved" in retransmission consent negotiations. She could then set targets or quotas for her retransmission consent negotiators, requiring them to insist on rates based on the rates she has learned. If the condition is to work, the CEO must be thought of as being "involved in" the retransmission consent negotiations, even if she never participates in a negotiation call. After all, the rates demanded of the counterparty often come from the CEO, not from the putative "negotiator." We thus understand that Applicants' CEOs, CFOs, and General Counsels, at a minimum, would be "involved in" retransmission consent agreements.

Yet we continue to think that the better approach is that of the Sinclair consent decree—to prohibit Applicants from sharing retransmission consent information with *any* third parties (including one another),[11] regardless of whether the recipient is or is not involved in retransmission consent negotiations.[12] Our approach would address the root of the problem—preventing Applicants from engaging in future information sharing—rather than just a symptom or two. It would also eliminate interpretive questions about who is or isn't "involved in retransmission consent negotiations." And it would eliminate the possibility that Applicants could share information through third parties *other* than counsel or agents.[13]

---

[9]    Applicants' Coordination Letter at 2 (emphasis added).

[10]    Letter from Radhika Bhat to Marlene Dortch, MB Docket No. 22-162, at 4 (filed June 22, 2022).

[11]    For that matter, we do not understand why Applicants need to be sharing retransmission consent information with one another at all. They are presumably not, for example, conducting diligence on one another with respect to a potential purchase. Nor do we understand why such information sharing would be required for normal-course auditing.

[12]    ATVA Conditions Letter at 4.

[13]    Applicants' Coordination Letter at 2.

Marlene Dortch
January 13, 2023
Page 4 of 7

### B.    Enforcement and Reporting.

Applicants seek to address the substance of concerns regarding information sharing and collusion through proposed conditions.  These conditions, however, contain no enforcement or reporting provisions.

The Commission, of course, has the inherent power to enforce its own conditions and to impose remedies for failure to comply.  Our Member Companies' recent experience with Sinclair, however, suggests that substantive conditions of the sort proposed by Applicants work best when accompanied by detailed enforcement and reporting provisions.  This is why our December 2 letter contains a variety of such provisions,[14] which we suggest the Commission replicate here.

## II.    After-Acquired and Divested Station Clauses.

After-acquired station clauses are often problematic.[15]  As ATVA member Altice has explained, however, this transaction presents a special—and especially harmful—case.[16]  Here, Cox, Standard General, and TEGNA have engaged in an "unprecedented array of sequenced transactions and swaps"[17] to enable Standard General to purchase TEGNA.  As part of that larger transaction, Standard General has acquired a single Boston station from Cox and 97 stations from TEGNA.  If Standard General were to use Cox's Boston station to raise TEGNA's prices, Standard General would benefit from a clause that it did not negotiate.  It would, in other words, have commandeered *Cox's* clause to benefit itself.

Standard General proposes not to enforce Cox's after-acquired station clauses entered into before the transaction's close.[18]  In other words, Standard General essentially seeks to remedy the effects of coordination that has already occurred among the parties.  But the "unprecedented" structure of this transaction could not have happened without information sharing among the parties, including with respect to markets in which TEGNA and Cox overlap.  The FCC rules, of course, prohibit such information sharing.[19]

Standard General's proposed condition does not remedy all of the public interest harm caused by parties' prior information sharing.  Nor does it prevent the parties from engaging in

---

[14]    *E.g.*, ATVA Conditions Letter at 4–8.

[15]    *E.g.*, Letter from Ross Lieberman to William Lake, MB Docket No. 10-71, at 3 (filed July 24, 2015).

[16]    Letter from Cristina Chou to Marlene Dortch, MB Docket No. 22-162, at 1 (filed Oct. 20, 2022).

[17]    John Eggerton, *Unions Try to Block TEGNA-Standard General Deal*, Broadcasting and Cable (June 22, 2022), https://www.nexttv.com/news/unions-try-to-block-tegna-standard-general-deal.

[18]    SG After-Acquired Letter.

[19]    In 2014, the Commission added a new per se category of bad-faith negotiation.  *Amendment of the Commission's Rules Related to Retransmission Consent*, 29 FCC Rcd. 3351, ¶ 2 (2014).  This

Marlene Dortch
January 13, 2023
Page 5 of 7

similar activity in the future.  And even on its own terms, the proposed condition requires at least some clarification.

### A.    Expiration of Cox and TEGNA Contracts.

Standard General's proposed condition does not fully address the substance of the issue we raised in our December 2 *ex parte* letter regarding the expiration of Cox's and TEGNA's contracts.  Based on information sharing that occurred through the due diligence process among Applicants, TEGNA knows the termination date and the rates of Cox's retransmission consent agreements.  And Cox knows the termination date and the rates of TEGNA's retransmission consent agreements.  No condition can undo or waive this exchange of information.

We have previously expressed concern that application of Cox's contract to TEGNA carriage meant that, for each MVPD, Cox and TEGNA contracts would expire on the same day, creating considerable additional leverage for both parties.[20]  If Standard General waives application of Cox's after-acquired station clause, however, then the two sets of retransmission consent agreements would presumably *not* expire on the same day with respect to any MVPD.  They would expire on their respective expiration dates.

Yet the mere fact that the parties know the expiration dates of each other's contracts creates a risk of future collusion when these contracts are up for renewal.  Specifically, the party with the earlier-expiring contract could simply extend its deal to the date of the later-expiring contract.  Although in theory both the distributor and the broadcaster must agree on any extension to an expiring contract, in reality, the broadcaster controls the extension timing as

---

prohibited joint negotiation among non-commonly owned top-four rated stations in the same market.  The 2014 rule defined "joint negotiation" as "[a]ny informal, formal, tacit or other agreement and/or conduct that signals or is designed to facilitate collusion regarding retransmission terms or agreements between or among Top Four broadcast television stations that are not commonly owned, operated, or controlled, and that serve the same DMA. This provision shall not be interpreted to apply to disclosures otherwise required by law or authorized under a Commission or judicial protective order."  Former 47 C.F.R. § 76.65(b)(1)(viii)(A)(3).  Later in 2014, Congress codified the Commission's joint negotiation rule, expanding it to include all same-market stations, not just top-four rated stations.  STELA Reauthorization Act of 2014, Pub. L. No. 113-200, § 103, 128 Stat. 2059.  The Commission described Congress's language as "broader than, and thus supersed[ing], the Commission's [then-] existing prohibition." *Implementation of Sections 101, 103 and 105 of the STELA Reauthorization Act of 2014*, 30 FCC Rcd. 2380, ¶ 4 (2015).  It thus adopted Congress's language almost verbatim, prohibiting "[c]oordination of negotiations or negotiation on a joint basis by two or more television broadcast stations in the same local market to grant retransmission consent to a multichannel video programming distributor, unless such stations are directly or indirectly under common de jure control permitted under the regulations of the Commission."  47 C.F.R. § 76.65(b)(1)(viii).  Since Congress's formulation was "broader" than the Commission's earlier one, it was intended to include all component parts of the FCC's earlier formulation—including those about information sharing.

20    ATVA Conditions Letter at 2.

Marlene Dortch
January 13, 2023
Page 6 of 7

distributors will almost always want to extend and not risk a blackout for their subscribers and thus are at the mercy of the broadcaster to dictate extension terms and dates. Applicants could in this way recreate the leverage described in our December 2 *ex parte* letter notwithstanding Standard General's proposed condition.

Such conduct, in our view, would work only if the respective contracts expired relatively close to one another. We would thus amend our original proposal to provide that Cox or TEGNA must extend its agreement with any MVPD by six months upon the request of an MVPD.

### B.    Future After-Acquired Station Clauses.

Standard General's proposed condition would waive application of Cox's *existing* after-acquired station clauses to TEGNA's stations. It would not, however, prevent these parties from engaging in the very same behavior in the future. Standard General, TEGNA, and Cox presumably used the due diligence process in this transaction to share information about retransmission consent rates—including in markets where TEGNA and Cox overlap. This information sharing, in turn, enabled the parties to manipulate Cox's after-acquired station clauses such that *TEGNA* could benefit from clauses negotiated by *Cox*. Without further conditions, both Standard General and Cox—entities that have already shown a willingness to use the due diligence process and such clauses to harm the public interest—remain free to raise prices in exactly the same way, using after-acquired station clauses that they did not negotiate.

In addition to addressing the public-interest harm from *this* manipulation of after-acquired station clauses, we encourage the Commission to prevent Applicants from replicating such manipulation—either among themselves or with others. Thus, each of the Applicants should be prohibited from (1) enforcing any after-acquired station clause *which it did not negotiate*, where such enforcement would lead to higher rates; and (2) assigning or transferring control of stations unless the assignee or transferee agrees to waive enforcement of any transferred or assigned after-acquired station clause *negotiated by the Applicant*, where such enforcement would lead to higher rates. Furthermore, Applicants should be precluded from sharing any confidential information regarding retransmission consent rates they acquire through the due diligence process to each other or any other broadcaster.

### C.    Scope and Application of the Proposed Condition.

Standard General's proposal applies to Standard General L.P., SGCI Holdings III LLC, and Cox Media Group.[21] We take the proposed condition, however, as a broad assurance that *no related party* will ever seek to enforce *any* of Cox's after-acquired station clauses, or otherwise seek to apply Cox's rates to TEGNA stations. Thus, for example, when *Standard General* "voluntarily and irrevocably" waives enforcement of such clauses, so too will subsidiaries Teton Parent, Teton Midco, Teton Opco, TEGNA, individual Tegna Stations, *etc.*—as well as Apollo,

---

[21]    SG After-Acquired Letter.

Marlene Dortch
January 13, 2023
Page 7 of 7

Cox, and their various operating subsidiaries.[22]  Likewise, if someone were to purchase TEGNA from Standard General, we assume the "irrevocable waiver" would still apply and that the purchaser could not undo Standard General's commitment.

We believe this is what Standard General means when it says that "the intent and effect of such waiver is to permit any [retransmission consent agreement] with TEGNA in effect as of the time immediately prior to the Closing to continue to apply to the TEGNA Stations as of and following the Closing."[23]  It would be helpful if the Commission confirmed this understanding.

*      *      *

Should you have any questions about this matter, please direct them to me.

Respectfully submitted,

Michael Nilsson
*Counsel to the American Television Alliance*

---

[22]    This, likewise, would apply to any information-sharing condition.

[23]    SG After-Acquired Letter.

# Attachment B



October 20, 2022

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

Re: Ex Parte Communication in MB Docket No. 22-162, Applications for Transfer of Control of TEGNA, Inc., to Standard General, L.P.

Dear Ms. Dortch:

On October 18, 2022, I held two meetings via videoconference with Commission staff.  One was with Adam Cassady, Commissioner Simington's media advisor.  The other was with Holly Saurer, Barbara Kreisman, Robin Fagan, Jeremy Miller, Brendan Holland, Ty Bream, David Brown, and Sarah Whitesell of the Media Bureau.  Mike Nilsson of HWG LLP accompanied me at both meetings.

We discussed Altice's concerns with the applicants' use of after-acquired and divested-station clauses to raise retransmission consent rates.  We believe a distinction can be made between situations in which a party that negotiated the clause benefits from it and situations, such as here, where a *third-party* later "commandeers" such benefits for itself.  Where a non-party uses an after-acquired or divested-station clause it had no part in negotiating to raise consumer prices, the Commission can consider this an anticompetitive practice leading to public interest harms—and can condition the transaction appropriately.

*       *       *

1.      **Consumer Price Increases are Recognized "Harms" in Transaction Review.**

Beginning with first principles, consumer price increases rank among the foremost public interest harms of concern to the Commission in transaction review.[1]  And as ATVA has explained, there is no

---

[1]      *See, e.g., Adelphia Commc'ns Corp., Time Warner Cable Inc., and Comcast Corp.*, Memorandum Opinion and Order, 21 FCC Rcd. 8203, ¶ 116 (2006) ("[W]e find that the transactions may increase the likelihood of harm in markets in which Comcast or Time Warner now hold, or may in the future hold, an ownership interest in RSNs, *which ultimately could*

"retransmission consent exception" to this most basic aspect of transaction review.[2] Of course, such price increases must be caused by the merger—not by, for example, "a functioning retransmission consent marketplace"[3]—to constitute a public interest harm.[4] And such price increases must also be passed along to consumers at least in part—and not merely "shift surplus" among commercial parties—to constitute a public interest harm.[5]

The Commission has never suggested that, where a transaction causes higher prices, one needs to find some additional "market power" for harm to occur. Under bedrock antitrust law, which "informs" the Commission's analysis here, "'proof of actual detrimental effects . . .' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'"[6] The Department of Justice's Horizontal Merger Guidelines, for example, recognize that "[e]xplicit or implicit evidence that the merging parties intend to raise prices" are "highly informative in evaluating the likely effects of a merger."[7] Indeed, all merger reviews seek to determine whether competitive alternatives are sufficiently available to protect consumers from the harms of increased rates—and to deter such increases from occurring in the first place.[8]

### 2. Third-Party Commandeering of After-Acquired Station Clauses Constitutes a Transaction-Specific Public Interest Harm.

MVPDs have previously argued that, where a transaction triggers after-acquired station clauses that raise prices, this is a transaction specific harm. The Commission, however, has stated that:

> [A]fter-acquired station clauses were negotiated by the parties outside of this transaction, and there is no apparent reason to step in and deny one party the benefit of the negotiated bargain absent evidence of anticompetitive practices or other wrongdoing not apparent here. In addition, the Commission is not the proper forum for resolving an alleged private contractual dispute.[9]

Yet here, the harmful action is *within the transaction itself*: the after-the-fact commandeering of an after-acquired station clause by a party that did not negotiate it. Commission action therefore would not unsettle any negotiated bargain. And there *is* "evidence of anticompetitive practices or other wrongdoing"—the increased prices that will result in the marketplace from third-party commandeering of the original bargain.

---

*increase retail prices for consumers* and limit consumer MVPD choice. We impose remedial conditions to mitigate these potential harms.") (emphasis added).

[2]     Reply Comments of the American Television Alliance, MB Docket No. 22-162, at 2–4 (filed Aug. 1, 2022).

[3]     *Trib. Media Co. and Nexstar Media Grp., Inc.*, 34 FCC Rcd. 8436, ¶ 29 (2019).

[4]     *Id.*

[5]     For evidence that increases in wholesale retransmission consent fees leads to higher consumer prices, *see* Comments of the American Television Alliance, MB Docket No. 18-349, at 15–18 (Sept. 2, 2021).

[6]     *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

[7]     Horizontal Merger Guidelines § 2.2.1. Similarly, during post-consummation reviews, "[e]vidence of observed post-merger price increases . . . can be dispositive," absent evidence that the increases resulted from increased demand or other background non-merger forces. *Id.* § 2.1.1.

[8]     *See id.* §§ 5, 9; *see also FTC v. Whole Foods*, 548 F.3d 1028, 1044 (D.C. Cir. 2008).

[9]     *Trib. Media Co.*, *supra* note 3, ¶ 59.

The usual application of an after-acquired station clause effectuates the bargain *between the parties*. Cox, for example, negotiated after-acquired station clauses with Altice that would apply Cox rates to stations Cox acquires. Suppose that Cox went out and bought a new station, and, pursuant to this clause, started charging its own, higher rate to Altice for that station. One could say that, for Cox, this is simply a benefit of the bargain it struck—and the Commission should not intervene in a "private contractual dispute."

That is not what is happening here. Here, Cox, Standard General, and TEGNA have engaged in an "unprecedented series of swaps" to enable Standard General to purchase TEGNA. As part of that larger transaction, Standard General has acquired a *single* Boston station from Cox and 97 stations from TEGNA. If, as it appears, Standard General will apply the retransmission consent rates of the single Cox station to all the TEGNA stations, Cox itself will not get to apply the after-acquired station clauses it negotiated with MVPDs. Rather, *Standard General* has commandeered a clause it did not negotiate in order to raise prices.

Where a third party commandeers an after-acquired station clause it did not negotiate to raise consumer prices, that is a public interest harm. In such a case, the Commission has no interest in preserving the benefit of the bargain between the negotiating parties. It would be implausible to suggest that the parties had anything like the Byzantine transaction at issue here in mind during their negotiations. Again, the benefit here is being commandeered by an outsider to those negotiations.[10] And the transaction directly causes harm: prices will increase because Standard General is commandeering Cox's contract with Altice to raise TEGNA prices.

This, moreover, is "anticompetitive activity" that undermines the entire retransmission consent marketplace. If third parties can commandeer after-acquired station clauses in this manner, then the retransmission consent market itself will no longer function. As we described in our reply comments, acquirers can almost *always* find a higher-priced station somewhere with an after-acquired station clause to use as a vehicle for their purchases. If this becomes the norm, retransmission consent prices will no longer be the product of negotiations between individual station groups and the MVPDs that carry their stations. They will instead be the product of the sort of hedge-fund engineering that we see here.

---

[10]       Nor does any concern exist about resolving a "private contractual dispute." We do not ask the Commission to opine on the meaning of the after-acquired station clause. Rather, the actions of a third party to commandeer such a clause causes a public interest harm. Preventing such harm lies at the heart of the Commission's transaction review process.

**3.      The Commission Should Condition This Transaction to Prevent Consumer Harm.**

We believe that, where a third-party commandeers an after-acquired station clause to raise consumer prices, this constitutes a transaction-specific public interest harm.  The Commission may therefore consider this harm as it evaluates the transaction and may condition the transaction accordingly.  In this case, such a condition might say that Standard General and its affiliates may not seek to enforce after-acquired or divested-station clauses entered into between Cox and MVPDs where such enforcement would result in higher prices.


Respectfully submitted,


Cristina Chou
Vice President, Federal Affairs
Altice USA, Inc.
Cristina.chou@alticeusa.com

4

# Attachment C



HWG LLP
1919 M STREET NW
WASHINGTON, DC 20036
TEL: +1 202 730 1300 | HWGLAW.COM

Michael Nilsson
direct dial: +1 202 730-1334
mnilsson@hwglaw.com

December 2, 2022

**BY ELECTRONIC FILING**

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re:    MB Docket No. 22-162 (TEGNA-Standard General)

Dear Ms. Dortch:

On November 30 and December 1, representatives of the American Television Alliance spoke with FCC staff regarding the TEGNA-Standard General transaction.

- On November 30, we spoke with Ben Arden of Commissioner Carr's office.  Present on behalf of ATVA and its Member Companies were Stacy Fuller, Cristina Chou, Hadass Kogan, Cora Mandy, Holly Kapsimandias, Mike Jacobs, and myself.

- On December 1, we spoke with David Strickland of Chairwoman Rosenworcel's office. Present on behalf of ATVA and its Member Companies were Stacy Fuller, Hadass Kogan, Cristina Chou, Mike Jacobs, and myself.

- Also on December 1, I spoke with Sarah Whitesell and Brendan Holland of the Media Bureau.

At each meeting, we discussed the retransmission-consent related condition based on an earlier Sinclair Consent Decree,[1] which we proposed in our initial comments and modified in an *ex parte* letter filed on August 30.  For the Commission's convenience, I have reproduced the proposed condition, as modified, in its entirety.

---

[1]    *Sinclair Broad. Grp.*, Consent Decree, 35 FCC Rcd. 5877 (2020).

We also discussed a new concern related to after-acquired station clauses. Altice has alleged that Applicants intend, through this transaction, for *New TEGNA's* carriage by MVPDs to be governed by *Cox*'s retransmission consent agreements. Applicants have not denied this.

If this is so, then by definition the parties will have engaged in information sharing without need for any further action on their part. In particular, *New TEGNA* will know the termination date and the rates of *Cox's* retransmission consent agreements (because New Tegna itself will be using them). And *Cox* will, of course, know the termination date and the rates of *New TEGNA's* retransmission consent agreements (because they were originally Cox's own agreements).

This information sharing creates considerable new leverage in the next round of retransmission consent negotiations. New TEGNA will enter those negotiations knowing that another major station group's agreement expires on the same day as its own—increasing the potential harm caused if New TEGNA pulls its signals. Cox will know the same thing. This places new upward pressure on retransmission consent rates.

The Commission can address this concern without undue disruption of the Applicants' business plans. It should simply require New TEGNA to offer a single six-month extension to any requesting MVPD. Staggering termination dates would eliminate the additional leverage caused by the unique and complicated transaction structure Applicants have chosen.

Should you have any questions about this matter, please direct them to me.

Respectfully submitted,

Michael Nilsson

**ATVA PROPOSED CONDITIONS**

**Key Definitions**

1. The term "New TEGNA" means TEGNA, Inc., its Subsidiaries and Affiliates, and entities controlling it, including, without limitation, Standard General LP.

2. The term "Cox" means CMG Media Corporation, its Subsidiaries and Affiliates, and entities controlling it including, without limitation, Apollo Global Management, Inc.

3. The term "New TEGNA Station" means any station under the de jure or de facto control of New Tegna.

4. The term "Cox Station" means any station under the de jure or de facto control of Cox.

**For New TEGNA**

1. No New TEGNA employee or agent who is involved in any way in retransmission consent negotiations on behalf of New TEGNA may possess, receive, access, accept, or review in any form any retransmission consent agreement to which a Cox Station is a party, or non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results);

2. no New TEGNA employee or agent may provide a copy of any retransmission consent agreement in any form to which a Cox Station is a party, or non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results), to any New TEGNA employee or agent who is involved in any way in retransmission consent negotiations on behalf of New TEGNA;

3. no New TEGNA employee or agent may provide any retransmission consent agreement in any form, or non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results), to any third party unless the third party is a signatory of the agreement in question; and

4. information controls shall be established that

    a. prevent any New TEGNA employee or agent from, intentionally or unintentionally, sharing physical or electronic copies of any retransmission consent agreement in any form to which a Cox Station is a party, or any document containing non-public information (including, but not limited to, negotiation plans, strategies, status, and results) related to such an agreement, with any New TEGNA employee or agent who is involved in any way in retransmission consent negotiations on behalf of New TEGNA,

b. prevent any New TEGNA employee or agent who is involved in any way in retransmission consent negotiations on behalf of New TEGNA from, intentionally or unintentionally, accessing physical or electronic copies of any retransmission consent agreement in any form to which a Cox Station is a party, or any document containing non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results), and

c. prevent any New TEGNA employee or agent from, intentionally or unintentionally, sharing physical or electronic copies of any retransmission consent agreement in any form, or any document containing non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results), with any third party unless the third party is a signatory of the agreement in question.

For purposes of clarity, (i) the foregoing provisions limiting access to Cox Station retransmission consent agreements or non-public information shall not preclude access by New TEGNA employees or agents who are not in any way involved in retransmission consent negotiations on behalf of New TEGNA (who may include accounting personnel and auditors), and (ii) the foregoing provisions limiting the provision of retransmission consent agreements or non-public information to third parties shall not preclude provision of retransmission consent agreements to which New TEGNA is a signatory, or non-public information related to such agreements, to prospective third-party buyers or other third parties conducting audits arising from a New TEGNA retransmission consent agreement who affirm in writing that the information will be used solely in connection with due diligence for such audit purposes, or to other parties as may be specifically approved by the Commission.

5. Within thirty (30) calendar days after the Effective Date, New TEGNA shall appoint its Chief Accounting Officer to serve as Compliance Officer and to discharge the duties set forth below for the duration of the Compliance Plan. The Compliance Officer shall be responsible for developing, implementing, and administering the Compliance Plan and ensuring that New TEGNA complies with the terms and conditions of the Compliance Plan and this Consent Decree. In addition to the general knowledge of the Communications Laws necessary to discharge his or her duties under this Consent Decree, the Compliance Officer, prior to assuming his/her duties, shall have specific knowledge of the RPI Rules, the Rules governing updates to applications pending before the Commission, including section 1.65 of the Rules, the Retransmission Consent Rules, and the Sponsorship Identification Laws, as they are currently in effect and as they may be amended in the future. New TEGNA must notify: the Chief, Video Division, Media Bureau; the Chief, Policy Division, Media Bureau; and the Chief, Investigations and Hearings Division, Enforcement Bureau, within ten (10) business days of any changes to the Compliance Officer or the Compliance Officer's contact information.

6. New TEGNA agrees that it shall, within ninety (90) calendar days after the Effective

Date, develop, implement, and maintain a Compliance Plan that is designed to ensure future compliance with the RPI Rules, the Rules governing updates to applications pending before the Commission, including section 1.65 of the Rules, the Retransmission Consent Rules, and the Sponsorship Identification Laws, as they are currently in effect and as they may be amended in the future, and the terms and conditions of this Consent Decree, including the following:

7.  Within ninety (90) calendar days after the Effective Date, New TEGNA shall establish Operating Procedures that all Covered Employees must follow to help ensure New TEGNA's compliance with these conditions. New TEGNA's Operating Procedures shall include, at a minimum, the provisions described in paragraphs 1–4 of this section:

8.  Within ninety (90) calendar days after the Effective Date, the Compliance Officer shall develop and distribute a Compliance Manual to all Covered Employees. The Compliance Manual shall set forth a comprehensive overview of the Retransmission Consent Rules and these conditions together with the Operating Procedures that Covered Employees shall follow to help ensure New TEGNA's compliance thereto. New TEGNA shall periodically review and revise the Compliance Manual as necessary to ensure that the information set forth therein remains current and accurate. New TEGNA shall distribute any revisions to the Compliance Manual promptly to all Covered Employees.

9.  New TEGNA shall establish and implement a Compliance Training Program to ensure compliance with the Retransmission Consent Rules and these conditions. As part of the Compliance Training Program, Covered Employees shall be advised of New TEGNA's obligation to report any noncompliance under these conditions and shall be instructed on how to disclose noncompliance to the Compliance Officer. All Covered Employees shall be trained pursuant to the Compliance Training Program (as applicable to their job duties) within ninety (90) calendar days after the Effective Date, except that any person who becomes a Covered Employee at any time after the initial Compliance Training Program shall be trained within thirty (30) calendar days after the date such person becomes a Covered Employee. New TEGNA shall repeat compliance training on an annual basis, and it shall periodically review and revise the Compliance Training Program as necessary to ensure that it remains current and complete and to enhance its effectiveness.

10. The Compliance Officer shall maintain a hotline for Covered Employees to call the Compliance Officer to obtain advice on compliance with the Compliance Plan and report violations of the Compliance Plan.

11. The Compliance Officer shall submit reports to New TEGNA's Board of Directors concerning New TEGNA's compliance with this Consent Decree and Compliance Plan. At a minimum, the report shall state how New TEGNA is complying with each subsection of the Compliance Plan. The first such report shall be submitted within one-hundred eighty (180) days of the Effective Date and additional reports shall be

submitted at least annually thereafter.

12. Beginning on the Effective Date, New TEGNA shall report any noncompliance with the Retransmission Consent Rules, or the terms of this condition within thirty (30) calendar days after discovery of such noncompliance.  Such reports shall be titled "Report of Noncompliance," and shall include a detailed explanation of: (i) each instance of noncompliance and the circumstances under which it occurred; (ii) a detailed description of the time and manner in which the noncompliance was discovered, the name(s) and title(s) of the person(s) by whom it was discovered, and the names and titles of all New TEGNA employees or agents who were aware of the activity prior to the discovery that it was noncompliant; (iii) the steps that New TEGNA has taken or will take to remedy such noncompliance; (iv) the schedule on which such remedial actions will be taken; (v) the steps that New TEGNA has taken or will take to prevent the recurrence of any such noncompliance; and (vi) the schedule on which such preventive actions will be taken.  For each instance of noncompliance, the report shall identify the specific statutory requirement, rule, or Consent Decree term with which New TEGNA believes it failed to comply.  Each Report of Noncompliance shall include a certification by the Compliance Officer stating that the Compliance Officer has personal knowledge that the report is complete and accurate.  This certification shall be accompanied by a statement explaining the basis for such certification and shall comply with section 1.16 of the Rules and be subscribed to as true under penalty of perjury in substantially the form set forth therein.[2]  All reports of noncompliance submitted under this paragraph shall be submitted to Holly Sauer, Federal Communications Commission, 45 L Street NE Washington, DC 20554 or an address that the Commission may in the future designate for receipt of United States mail, and submitted electronically to XXYY.  Notwithstanding the Termination Date, this requirement shall remain in effect until one year after the Termination Date with respect to any noncompliance that occurs between the Effective Date and the Termination Date.

13. New TEGNA shall report any noncompliance with the Retransmission Consent Laws or with the terms and conditions of this Consent Decree occurring after the Effective Date within thirty (30) calendar days after discovery of such noncompliance.  Such reports shall include a detailed explanation of (i) each instance of noncompliance; (ii) the steps that New TEGNA has taken or will take to remedy such noncompliance; (iii) the schedule on which such remedial actions will be taken; (iv) the steps that New TEGNA has taken or will take to prevent the recurrence of any such noncompliance; and (v) the schedule on which such preventive actions will be taken. All reports of noncompliance under this paragraph 13 shall be submitted to Rosemary Harold, Chief, Enforcement Bureau 45 L Street NE Washington, DC 20554, or an address that the Commission may in the future designate for receipt of United States mail XXX

14. New TEGNA shall file confidential Compliance Reports with the Commission six (6)

---

[2]    47 C.F.R. § 1.16.

calendar months after the Effective Date and every six (6) months thereafter, with the final report to be submitted one week after the Termination Date. Notwithstanding the Termination Date, this requirement shall remain in effect until the final report is submitted.

15. Each Compliance Report shall include, for the relevant period:

    a.  a detailed description of efforts made by New TEGNA to comply with the terms and conditions of this Consent Decree and the Retransmission Consent Rules;

    b.  a chart listing all Non-New TEGNA Stations with which New TEGNA has an LMA, JSA, SSA, TBA,[3] or other similar agreement (with any necessary explanation regarding the purpose of the agreement), the licensee of each station, the station's Designated Market Area (DMA), and whether New TEGNA has an attributable interest in the station's licensee; and

    c.  a list of MVPDs with which New TEGNA negotiated retransmission consent, identifying the status of the negotiation or the date on which the negotiation ended, as well as the date on which any then-current carriage agreement was or is scheduled to expire. For each MVPD, New TEGNA shall provide a list of all stations represented by New TEGNA in those negotiations, the licensee of each station, the station's DMA, and whether New TEGNA has an attributable interest in the station's licensee.

    d.  In addition, each Compliance Report shall include a certification by the Compliance Officer, as an agent and on behalf of New TEGNA, stating that the Compliance Officer has personal knowledge that New TEGNA: (i) has established and implemented the Compliance Plan, including each of the Operating Procedures identified in paragraph 1–4; (ii) has utilized the Operating Procedures since the implementation of the Compliance Plan; and (iii) is not aware of any instances of noncompliance with the terms and conditions of this Consent Decree.

    e.  The Compliance Officer's certification shall be accompanied by a statement explaining the basis for such certification and shall comply with section 1.16 of the Rules and be subscribed to as true under penalty of perjury in substantially

---

[3]  An LMA is a local marketing agreement under which a broadcast licensee sells blocks of time to a broker, who supplies the programming and sells the advertising for those blocks of time. A JSA is a joint sales agreement under which a broadcast licensee authorizes a broker to sell advertising time for the brokered station. An SSA is a shared services agreement between broadcasters to share services, such as (but not limited to) technical support, back-office support, or production of newscasts. A TBA is a time brokerage agreement, which, as with an LMA, refers to "the sale by a licensee of discrete blocks of time to a 'broker' that supplies the programming to fill that time and sells the commercial spot announcements in it." *See id.* § 73.3555, Note 2(j).

the form set forth therein.[4]

    f.  If the Compliance Officer cannot provide the certification described in paragraph 15(e), the Compliance Officer, as an agent of and on behalf of New TEGNA, shall provide the Commission with a detailed explanation of the reason(s) why and describe fully: (i) each instance of noncompliance; (ii) the steps that New TEGNA has taken or will take to remedy such noncompliance, including the schedule on which proposed remedial actions will be taken; and (iii) the steps that New TEGNA has taken or will take to prevent the recurrence of any such noncompliance, including the schedule on which such preventive action will be taken.

    g.  All Compliance Reports shall be submitted to Holly Saurer, Chief, Media Bureau, Federal Communications Commission, 45 L Street NE Washington, DC 20554, or an address that the Commission may in the future designate for receipt of United States mail and Rosemary Harold, Chief, Enforcement Bureau, Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554 or an address that the Commission may in the future designate for receipt of United States mail, and submitted electronically to XXYY

**For Cox**

1.  No Cox employee or agent who is involved in any way in retransmission consent negotiations on behalf of Cox may possess, receive, access, accept, or review any retransmission consent agreement in any form to which a New TEGNA Station is a party, or non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results);

2.  no Cox employee or agent may provide a copy of any retransmission consent agreement in any form to which a New TEGNA Station is a party, or non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results), to any Cox employee or agent who is involved in any way in retransmission consent negotiations on behalf of Cox;

3.  no Cox employee or agent may provide any retransmission consent agreement in any form, or non-public information related to such an agreement, to any third party unless the third party is a signatory of the agreement in question (including, but not limited to, negotiation plans, strategies, status, and results); and

4.  information controls shall be established that

    a.  prevent any Cox employee or agent from, intentionally or unintentionally, sharing physical or electronic copies of any retransmission consent agreement

---

[4]  *Id.* § 1.16.

in any form to which a New TEGNA Station is a party, or any document containing non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results), with any Cox employee or agent who is involved in any way in retransmission consent negotiations on behalf of Cox,

    b.   prevent any Cox employee or agent who is involved in any way in retransmission consent negotiations on behalf of Cox from, intentionally or unintentionally, accessing physical or electronic copies of any retransmission consent agreement in any form to which a New TEGNA Station is a party, or any document containing non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results), and

    c.   prevent any Cox employee or agent from, intentionally or unintentionally, sharing physical or electronic copies of any retransmission consent agreement in any form, or any document containing non-public information related to such an agreement (including, but not limited to, negotiation plans, strategies, status, and results), with any third party unless the third party is a signatory of the agreement in question.

For purposes of clarity, (i) the foregoing provisions limiting access to New TEGNA Station retransmission consent agreements or non-public information shall not preclude access by Cox employees or agents who are not in any way involved in retransmission consent negotiations on behalf of Cox (who may include accounting personnel and auditors), and (ii) the foregoing provisions limiting the provision of retransmission consent agreements or non-public information to third parties shall not preclude provision of retransmission consent agreements to which Cox is a signatory, or non-public information related to such agreements, to prospective third-party buyers or other third parties conducting audits arising from a Cox retransmission consent agreement who affirm in writing that the information will be used solely in connection with due diligence for such audit purposes, or to other parties as may be specifically approved by the Commission.

5.  Within thirty (30) calendar days after the Effective Date, Cox shall appoint its Chief Accounting Officer to serve as Compliance Officer and to discharge the duties set forth below for the duration of the Compliance Plan.  The Compliance Officer shall be responsible for developing, implementing, and administering the Compliance Plan and ensuring that Cox complies with the terms and conditions of the Compliance Plan and this Consent Decree.  In addition to the general knowledge of the Communications Laws necessary to discharge his or her duties under this Consent Decree, the Compliance Officer, prior to assuming his/her duties, shall have specific knowledge of the RPI Rules, the Rules governing updates to applications pending before the Commission, including section 1.65 of the Rules, the Retransmission Consent Rules, and the Sponsorship Identification Laws, as they are currently in effect and as they may be amended in the future.  Cox must notify: the Chief, Video Division, Media Bureau; the Chief, Policy Division, Media Bureau; and the Chief, Investigations and Hearings Division,

Enforcement Bureau, within ten (10) business days of any changes to the Compliance Officer or the Compliance Officer's contact information.

6. Cox agrees that it shall, within ninety (90) calendar days after the Effective Date, develop, implement, and maintain a Compliance Plan that is designed to ensure future compliance with the RPI Rules, the Rules governing updates to applications pending before the Commission, including section 1.65 of the Rules, the Retransmission Consent Rules, and the Sponsorship Identification Laws, as they are currently in effect and as they may be amended in the future, and the terms and conditions of this Consent Decree, including the following:

7. Within ninety (90) calendar days after the Effective Date, Cox shall establish Operating Procedures that all Covered Employees must follow to help ensure Cox's compliance with these conditions. Cox's Operating Procedures shall include, at a minimum, the provisions described in paragraphs 1–4 of this section:

8. Within ninety (90) calendar days after the Effective Date, the Compliance Officer shall develop and distribute a Compliance Manual to all Covered Employees. The Compliance Manual shall set forth a comprehensive overview of the Retransmission Consent Rules and these conditions together with the Operating Procedures that Covered Employees shall follow to help ensure Cox's compliance thereto. Cox shall periodically review and revise the Compliance Manual as necessary to ensure that the information set forth therein remains current and accurate. Cox shall distribute any revisions to the Compliance Manual promptly to all Covered Employees.

9. Cox shall establish and implement a Compliance Training Program to ensure compliance with the Retransmission Consent Rules and these conditions. As part of the Compliance Training Program, Covered Employees shall be advised of Cox's obligation to report any noncompliance of these conditions and shall be instructed on how to disclose noncompliance to the Compliance Officer. All Covered Employees shall be trained pursuant to the Compliance Training Program (as applicable to their job duties) within ninety (90) calendar days after the Effective Date, except that any person who becomes a Covered Employee at any time after the initial Compliance Training Program shall be trained within thirty (30) calendar days after the date such person becomes a Covered Employee. Cox shall repeat compliance training on an annual basis, and it shall periodically review and revise the Compliance Training Program as necessary to ensure that it remains current and complete and to enhance its effectiveness.

10. The Compliance Officer shall maintain a hotline for Covered Employees to call the Compliance Officer to obtain advice on compliance with the Compliance Plan and report violations of the Compliance Plan.

11. The Compliance Officer shall submit reports to Cox's Board of Directors concerning Cox's compliance with this Consent Decree and Compliance Plan. At a minimum, the report shall state how Cox is complying with each subsection of the Compliance Plan. The first such report shall be submitted within one-hundred eighty (180) days of the

Effective Date and additional reports shall be submitted at least annually thereafter.

12. Beginning on the Effective Date, Cox shall report any noncompliance with the Retransmission Consent Rules, or the terms of this condition within thirty (30) calendar days after discovery of such noncompliance. Such reports shall be titled "Report of Noncompliance," and shall include a detailed explanation of: (i) each instance of noncompliance and the circumstances under which it occurred; (ii) a detailed description of the time and manner in which the noncompliance was discovered, the name(s) and title(s) of the person(s) by whom it was discovered, and the names and titles of all Cox employees or agents who were aware of the activity prior to the discovery that it was noncompliant; (iii) the steps that Cox has taken or will take to remedy such noncompliance; (iv) the schedule on which such remedial actions will be taken; (v) the steps that Cox has taken or will take to prevent the recurrence of any such noncompliance; and (vi) the schedule on which such preventive actions will be taken. For each instance of noncompliance, the report shall identify the specific statutory requirement, rule, or Consent Decree term with which Cox believes it failed to comply. Each Report of Noncompliance shall include a certification by the Compliance Officer stating that the Compliance Officer has personal knowledge that the report is complete and accurate. This certification shall be accompanied by a statement explaining the basis for such certification and shall comply with section 1.16 of the Rules and be subscribed to as true under penalty of perjury in substantially the form set forth therein.[5] All reports of noncompliance submitted under this paragraph 12 shall be submitted to Holly Sauer, Federal Communications Commission, 45 L Street NE Washington, DC 20554 or an address that the Commission may in the future designate for receipt of United States mail, and submitted electronically to XXYY. Notwithstanding the Termination Date, this requirement shall remain in effect until one year after the Termination Date with respect to any noncompliance that occurs between the Effective Date and the Termination Date.

13. Cox shall report any noncompliance with the Retransmission Consent Laws or with the terms and conditions of this Consent Decree occurring after the Effective Date within thirty (30) calendar days after discovery of such noncompliance. Such reports shall include a detailed explanation of (i) each instance of noncompliance; (ii) the steps that Cox has taken or will take to remedy such noncompliance; (iii) the schedule on which such remedial actions will be taken; (iv) the steps that Cox has taken or will take to prevent the recurrence of any such noncompliance; and (v) the schedule on which such preventive actions will be taken. All reports of noncompliance under this paragraph 13 shall be submitted to Rosemary Harold, Chief, Enforcement Bureau 45 L Street NE Washington, DC 20554, or an address that the Commission may in the future designate for receipt of United States mail XXX

14. Cox shall file confidential Compliance Reports with the Commission six (6) calendar months after the Effective Date and every six (6) months thereafter, with the final report to be submitted one week after the Termination Date. Notwithstanding the Termination Date, this requirement shall remain in effect until the final report is submitted.

---

[5]   *Id.*

15. Each Compliance Report shall include, for the relevant period:

    a.   a detailed description of efforts made by Cox to comply with the terms and conditions of this Consent Decree and the Retransmission Consent Rules;

    b.   a chart listing all Non-Cox Stations with which Cox has an LMA, JSA, SSA, TBA,[6] or other similar agreement (with any necessary explanation regarding the purpose of the agreement), the licensee of each station, the station's Designated Market Area (DMA), and whether Cox has an attributable interest in the station's licensee; and

    c.   a list of MVPDs with which Cox negotiated retransmission consent, identifying the status of the negotiation or the date on which the negotiation ended, as well as the date on which any then-current carriage agreement was or is scheduled to expire.  For each MVPD, Cox shall provide a list of all stations represented by Cox in those negotiations, the licensee of each station, the station's DMA, and whether Cox has an attributable interest in the station's licensee.

    d.   In addition, each Compliance Report shall include a certification by the Compliance Officer, as an agent and on behalf of Cox, stating that the Compliance Officer has personal knowledge that Cox: (i) has established and implemented the Compliance Plan, including each of the Operating Procedures identified in paragraph 1–4 (ii) has utilized the Operating Procedures since the implementation of the Compliance Plan; and (iii) is not aware of any instances of noncompliance with the terms and conditions of this Consent Decree.

    e.   The Compliance Officer's certification shall be accompanied by a statement explaining the basis for such certification and shall comply with section 1.16 of the Rules and be subscribed to as true under penalty of perjury in substantially the form set forth therein.[7]

    f.   If the Compliance Officer cannot provide the certification described in paragraph 15(e), the Compliance Officer, as an agent of and on behalf of Cox, shall provide the Commission with a detailed explanation of the reason(s) why and describe

---

[6]   An LMA is a local marketing agreement under which a broadcast licensee sells blocks of time to a broker, who supplies the programming and sells the advertising for those blocks of time.  A JSA is a joint sales agreement under which a broadcast licensee authorizes a broker to sell advertising time for the brokered station.  An SSA is a shared services agreement between broadcasters to share services, such as (but not limited to) technical support, back-office support, or production of newscasts.  A TBA is a time brokerage agreement, which, as with an LMA, refers to "the sale by a licensee of discrete blocks of time to a 'broker' that supplies the programming to fill that time and sells the commercial spot announcements in it."  *See id.* § 73.3555, Note 2(j).

[7]   *Id.* § 1.16.

fully: (i) each instance of noncompliance; (ii) the steps that Cox has taken or will take to remedy such noncompliance, including the schedule on which proposed remedial actions will be taken; and (iii) the steps that Cox has taken or will take to prevent the recurrence of any such noncompliance, including the schedule on which such preventive action will be taken.

g. All Compliance Reports shall be submitted to Holly Saurer, Chief, Media Bureau, Federal Communications Commission, 45 L Street NE Washington, DC 20554, or an address that the Commission may in the future designate for receipt of United States mail and Rosemary Harold, Chief, Enforcement Bureau, Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554 or an address that the Commission may in the future designate for receipt of United States mail, and submitted electronically to XXYY

**After-Acquired Station Clauses**

1. New TEGNA shall, upon request from any MVPD, extend the term of its retransmission consent agreement with that MVPD for six months.

2. New TEGNA shall be required to grant only one such extension to each requesting MVPD.

**Termination Date**

1. These conditions shall expire six months after Cox ceases to hold any financial interest, attributable or not, in New TEGNA.

# Attachment D

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| *In the Matter of* ) | |
| Applications to Transfer Control of TEGNA ) | MB Docket No. 22-162 |
| Inc. to Standard General L.P. ) | |
| ) | |
| ) | |

**APPLICANTS' JOINT REPLY COMMENTS**

Scott R. Flick
Jessica T. Nyman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
scott.flick@pillsburylaw.com
jessica.nyman@pillsburylaw.com
*Counsel for SGCI Holdings III LLC*

Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
jjezierny@cov.com
*Counsel for TEGNA Inc.*

Michael D. Basile
Henry H. Wendel
Cooley LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
mdbasile@cooley.com
hwendel@cooley.com
*Counsel for CMG Media Corporation*

January 20, 2023

## TABLE OF CONTENTS

I.   Introduction and Summary ................................................................................. 1

II.  The Comments Identify No Fault in Standard General's After-Acquired Waiver, and Merely Seek to Manipulate the FCC Process to Serve the MVPDs' Own Economic Interests .......................................................................................... 6

    A.  Standard General's Waiver Letter Fully Resolves the Concerns About Increased Retransmission Rates Raised by Petitioners, Whose Continuing Protective Order Violations Merit Sanctions ................................................................................ 6

    B.  DISH and ATVA Improperly Seek to Use This Proceeding to Further Their (or Their Members') Private Financial Interests. ..................................................... 10

        i.    MVPDs' Conflicting Proposals Betray Their Stated Concerns ........................ 11
        ii.   MVPDs' New "Coterminous" Concerns Are Specious ................................. 14
        iii.  ATVA Improperly Asks the Commission to Prejudge Future Transactions Unrelated to This One ................................................................................ 18

III. The December 23 Non-Coordination Letter Resolves Any Joint Retransmission Concerns and the Commission Should Reject Opportunistic and Untimely Requests for More ........................................................................................... 19

    A.  The Non-Coordination Letter's Clarifications to NCTA's Proposals Are Essential to Focusing the Conditions on the Transactions and Alleged Transaction-Specific Harms, Rather Than on Routine Commercial Activities ........................................... 20

    B.  Petitioners Misread the Non-Coordination Letter and Request Remedies That Are Beyond the Commission's Authority ................................................................. 23

    C.  The Commission Should Reject ATVA's Self-Serving and Internally Inconsistent Requests ............................................................................................................ 25

IV.  Standard General's December 22 Jobs Letter Fully Addresses Petitioners' Allegations Regarding Local News and Journalists ....................................... 27

V.   The Transactions Will Yield Numerous and Significant Public Interest Benefits ........ 30

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| *In the Matter of* | ) | |
| Applications to Transfer Control of TEGNA | ) | MB Docket No. 22-162 |
| Inc. to Standard General L.P. | ) | |
| | ) | |
| | ) | |

**APPLICANTS' JOINT REPLY COMMENTS**

## I.    Introduction and Summary

SGCI Holdings III LLC ("Standard General"), TEGNA Inc. ("TEGNA"), and CMG

Media Corporation ("CMG," and together with Standard General and TEGNA, the "Applicants")

hereby reply to comments filed on January 13, 2023 by (1) NewsGuild, Common Cause, and

UCC (collectively, "Petitioners"),[1] (2) American Television Alliance ("ATVA"),[2] (3) NCTA –

The Internet & Television Association ("NCTA"),[3] and DISH Network Corporation ("DISH"),[4]

(collectively, the "January 13 Comments") in response to the Media Bureau's December 23,

2022 public notice.  The public notice sought comment on three letters (collectively, the

"December Letters") that Standard General, CMG, and Apollo Global Management, Inc.

("AGM") filed addressing concerns earlier raised in petitions or comments as reasons to deny or

---

[1] Comments of the NewsGuild-CWA, National Association of Broadcast Employees and Technicians-CWA (together, "NewsGuild"), United Church of Christ, OC., Inc. doing business as United Church of Christ Media Justice Ministry ("UCC") and Common Cause, MB Docket No. 22-162 (filed January 13, 2023) ("Petitioners' Comments").

[2] Letter from Michael Nilsson, Counsel to ATVA, to Marlene H. Dortch, Secretary, Federal Communications Commission, MB Docket No. 22-162 (filed January 13, 2023) ("ATVA Comments").

[3] Comments of NCTA, MB Docket No. 22-162 (filed Jan. 13, 2023) ("NCTA Comments").

[4] Comments and Opposition of DISH Network Corporation, MB Docket No. 22-162 (filed January 13, 2023) ("DISH Comments").

condition grant of applications (the "Applications") seeking consent to Standard General's proposed acquisition of TEGNA and related transactions (collectively, the "Transactions").

At the outset, some level-setting is in order. Applicants are seeking approval for Transactions that will greatly serve the public interest and which have received overwhelming support in the record. Among other benefits, the Transactions will result in creation of the largest minority-owned and female-led broadcast television company in U.S. history, adding sorely needed diversity to broadcast ownership and management and making significant progress toward remedying today's vast under-representation of Asian Americans in commercial television ownership. Even without the December Letters, the Transactions are consistent with the public interest, comply with all rules, and do not present any anticompetitive harms. But Applicants have gone further than any law or rule requires, addressing even speculative harms posited by Petitioners and commenters through the waivers and commitments made in the December Letters. These include Standard General's commitment to preserve newsroom jobs during a time of great economic uncertainty and layoffs across the media industry, its unilateral waiver of freely negotiated contractual rights that eliminates any argument that the transaction structure will result in an increase in retransmission rates for TEGNA stations, and agreement to multiple additional conditions requested by its competitors in the MVPD industry.

The Transactions do not, as Petitioners claim, involve an "extraordinary and unprecedented ownership structure."[5] Standard General will be the single majority shareholder (and the only attributable shareholder) of TEGNA, holding 100% voting control. Petitioners, ATVA, and NCTA have relentlessly sought in this proceeding to inflate the importance of AGM's role as one of many investors in this transaction, claiming (falsely) that the Transactions

---

[5] Petitioners' Comments at 2.

2

will result in the "intertwining of [CMG] and TEGNA"[6] and "allow the two parties to control

about 70 television stations."[7]  But AGM and CMG will have no role in the operation of

TEGNA—they will have only usual and customary minority investor protections that the

Commission has approved countless times—rights that are explicitly enumerated in the record

and which no petitioner or commenter has even discussed, much less challenged.

Similarly, a broadcaster having an investment in another broadcaster is neither novel nor

prohibited.  Indeed, the Commission adopted a rule for just such investments *25 years ago*—the

Equity-Debt Plus Rule—to define at what level such investments should be considered of

interest to the FCC and therefore attributable.[8]  As noted in the Applications, the aggregate

---

[6] ATVA Comments at 1.

[7] Petitioners' Comments at 3.  Unbound by uncontroverted facts, Petitioners are apparently adding Standard General's existing 4 TV stations and CMG's Boston station to TEGNA's existing 65 full-power stations.  However, after the Transactions, Standard General will control only 61 TEGNA stations; CMG/AGM will have no control over those stations, nor will Standard General have control over the stations being sold to CMG.

[8] 47 C.F.R. § 73.3555, Note 2 (i); *see also Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests, Review of the Commission's Regulations and Policies Affecting Investment in the Broadcast Industry, Reexamination of the Commission's Cross-Interest Policy*, 14 FCC Rcd 12559, 12579 (1999).  Notably, as TEGNA is a publicly traded company, AGM and CMG, without even notifying the FCC, much less obtaining its approval, could today buy a far larger interest in TEGNA than is proposed in the Transactions.  And unlike in the Transactions, that interest would have (a) voting rights, (b) the right to vote on directors, and (c) an interest in the economic performance of TEGNA.  As the Equity-Debt Plus Rule makes clear, the proposed AGM interest here is certainly not "extraordinary," and in fact is not even a Transactions-specific event.  The Equity-Debt Plus Rule would permit AGM to make a far greater investment in TEGNA than is proposed here without the need for any FCC notice or applications.  If Petitioners believe attribution should be calculated differently, "the appropriate course of action is to request that the Commission institute a generic rulemaking proceeding to change its multiple ownership rules and policies."  *Spanish Radio Network*, 10 FCC Rcd 9954, 9556 ¶ 9 (1995) (*citing Patteson Brothers, Inc.*, 8 FCC Rcd 7595, 7596 (1993)).

interest in post-Transactions TEGNA proposed to be held by AGM and CMG would need to be nearly ten times larger to be considered attributable by the FCC under that rule.[9]

Further, TEGNA will be smaller following the Transactions than it is today, and CMG will similarly have fewer stations in fewer markets than it did when the Applications were filed.[10]  As such, and despite DISH's desire to recycle self-serving arguments that the Commission rejected in previous transactions,[11] the Transactions would not result in an "accumulation of stations" giving anyone "significantly more leverage during retransmission consent negotiations."[12]

---

[9] *See* Applications, Comprehensive Exhibit at 4 n.12.  Applicants note that if Apollo/CMG's interests were ten times larger, attribution would only apply with respect to the particular TEGNA stations in the markets where CMG and TEGNA will both own stations, not in TEGNA itself.

[10] In fact, with CMG's sale of 18 stations in 12 markets to Imagicomm Communications (which closed on August 1, 2022), CMG will own stations covering less than 15% of the country without application of the UHF Discount.  *See* Harry A. Jessell & Mark K. Miller, *Top 30 Station Groups*, June 29, 2022, https://tvnewscheck.com/business/article/top-30-station-groups-standard-general-leaps-into-second-place-with-tegna-acquisition/ (hereinafter "*Top 30 Station Groups*").

[11] *See, e.g.*, DISH Comments at 3 n.4 (incorporating by reference anti-consolidation arguments DISH made (and the FCC rejected) in the Media General-Nexstar and Nexstar-Tribune proceedings); *see also In the Matter of Applications for Consent to Transfer Control of License Subsidiaries of Media Gen., Inc., from Shareholders of Media Gen., Inc. to Nexstar Media Grp., Inc.*, 32 FCC Rcd 183, 192 (MB 2017) ("*MG-Nexstar*"); *In the Matter of the Applications of Tribune Media Company (Transferor) & Nexstar Media Group, Inc. (Transferee) et al.*, No. BTCCDT-20190107ADJBA, 2019 WL 4440126, at *10 (2019) ("*Nexstar-Tribune*") ("Perhaps it is in DISH's private interest to have a broader geographic reach than the broadcast companies with which it negotiates retransmission consent agreements.  But DISH certainly does not set forth a compelling argument that reducing the current disparity in geographic reach in this instance would result in rates that are anything other than the product of a competitive marketplace and therefore not in the public interest.  Moreover, with regard to DISH's allegations of prospective price increases stemming from marketplace negotiations, it does not show whether, on balance, they would reduce consumer welfare or, rather, just shift surplus between DISH and broadcast stations.").

[12] DISH Comments at 3.

None of the January 13 Comments (or any of the pleadings before them) "contain specific allegations of fact sufficient to show that granting the [Applications] would be *prima facie* inconsistent with the public interest,"[13] nor have they raised a "substantial and material question of fact . . . as to whether the [Applications] would serve the public interest."[14]  Indeed, the last factual (or other) assertion of any sort by a non-Applicant party in this proceeding that was actually supported by a declaration submitted under penalty of perjury was made in June 2022, *seven months ago*.[15]  The dozens of filings submitted by a handful of deal opponents since then have been little more than the proverbial sound and fury, signifying nothing.

Petitioners, DISH, and ATVA are now simply seeking through their comments to move the goalposts once again in the hope of creating further delay for delay's sake while seeking the Commission's assistance in advancing their purely private financial interests.  For its part, NCTA seeks to expand certain commitments beyond what is needed to address its stated concerns.  The Commission should reject Petitioners', DISH's, and ATVA's proposals, as well as any NCTA proposal that needlessly introduces ambiguity or is unconnected to the Transactions, and move swiftly to grant the Applications.

---

[13] *MG-Nexstar*, 2 FCC Rcd at 192 (citing 47 U.S.C. § 310(d)).

[14] *Id.*

[15] *See Kola, Inc.*, Memorandum Opinion and Order, 11 FCC Rcd 14297, 14305 ¶ 15 (1996) (citing 47 U.S.C. § 309(d)) (allegations unsupported by any affidavit of a person having personal knowledge cannot be considered sufficient to establish a *prima facie* showing under the *Astroline* test).

## II.    The Comments Identify No Fault in Standard General's After-Acquired Waiver, and Merely Seek to Manipulate the FCC Process to Serve the MVPDs' Own Economic Interests

### A.    Standard General's Waiver Letter Fully Resolves the Concerns About Increased Retransmission Rates Raised by Petitioners, Whose Continuing Protective Order Violations Merit Sanctions

One of the Petitioners' two main complaints against the Transactions has been their allegation that retransmission rates might rise due to application of after-acquired clauses and that MVPDs would pass on any rate increases to consumers in the form of higher subscription fees.[16] (Petitioners' other complaint—reduction of local news through journalist layoffs—is discussed in Section IV below.) The effect of after-acquired clauses was also ATVA member Altice's sole stated concern about the Transactions.[17]

The Commission has consistently rejected MVPD requests in previous transactions to consider the impact of privately negotiated after-acquired clauses a public interest harm.[18] Nonetheless, Standard General fully addressed Petitioners' and Altice's concern in the first of the

---

[16] Petition to Deny of Common Cause and UCC, MB Docket No. 22-162 (filed June 22, 2022) ("Common Cause/UCC Petition") at 21-23; Petition to Dismiss or Deny of NewsGuild, MB Docket No. 22-162 (filed June 22, 2022) ("NewsGuild Petition") at 18-22 ("Applicants' attempt to exploit 'after-acquisition' clauses in retransmission consent contracts will inevitably result in increased MVPD subscription prices that will harm Petitioners' members and all other subscribers.").

[17] *See* Comments of Altice, USA, Inc. ("Altice"), MB Docket No. 22-162 (filed June 22, 2022); *see also* Reply Comments of Altice, MB Docket No. 22-162 (filed Aug. 1, 2022); Altice *Ex Parte* Letters filed on August 22, 2022, August 30, 2022, and October 20, 2022. ATVA's own comments did not address after-acquired clauses, perhaps in recognition of the Commission's historical reluctance to deprive an applicant the benefit of its bargain), and DISH did not participate in any of the previous rounds of comments.

[18] *See, e.g.*, *Nexstar-Tribune*, 2019 WL 4440126 at *19 ("We reject the arguments raised regarding after-acquired clauses, which, according to DISH, allow a broadcaster to bring newly acquired stations under its existing retransmission agreement, substituting the bigger broadcaster's higher rate for the rate actually negotiated by the MVPDs for the acquired stations."); *MG-Nexstar*, 32 FCC Rcd at 197 (same).

three December Letters (the "Waiver Letter").[19]  Standard General irrevocably waived its rights under any term or condition of any retransmission consent agreement that would, by reason of the Transactions, result in any retransmission consent agreement associated with WFXT in Boston applying to any current TEGNA station that will be controlled by Standard General after the closing of the Transactions.  This is not merely a proposal or even a future commitment to the Commission; the irrevocable waiver letters were signed and sent to the relevant MVPDs in December.  As such, the after-acquired waiver is not a "behavioral remedy" dependent on future actions by either the FCC or Standard General (or anyone who might later "purchase TEGNA from Standard General"[20])—it is an existing fact.[21]

Altice—the primary party arguing against having the terms of after-acquired clauses it negotiated applied to it in the Transactions—did not submit any comments questioning the Waiver Letter.  Likewise, Petitioners did not have any substantive comments on the Waiver Letter.  Their only comment on the Waiver Letter is the patently false allegation that Standard General's Soohyung Kim "misrepresented to the Commission, … claiming that enhanced

---

[19] Letter from Soohyung Kim, Managing Member of Standard General, to Marlene H. Dortch, Secretary, Federal Communications Commission, MB Docket No. 22-162 (filed Dec. 16, 2022).

[20] ATVA Comments at 7.

[21] In any event, Petitioners' arguments against "behavioral remedies" are misplaced and unsupported.  The American Antitrust Institute White Paper they cite provides only an early analysis of the *Department of Justice's* ability to enforce behavioral remedies and, notably, details several reasons why "sector regulators" like the *FCC* are better equipped to monitor and enforce behavioral remedies.  *See* American Antitrust Institute, "Behavioral Merger Remedies: Evaluation and Implications for Antitrust Enforcement," John Kwoka and Diana Moss, November 2021, at 31-32.  Indeed, the Commission has frequently found that potential public interest harms can be resolved through remedial conditions and has effectively enforced those conditions as needed.  *Id.* at 33 (noting that "regulators such as the FCC … will almost always impose behavioral remedies if a merger cannot otherwise be found to be in the public interest.")*; see also News Corp. and DirecTV Group, Inc. (Transferors) and Liberty Media Corp. (Transferee)*, Memorandum Opinion and Order, 23 FCC Rcd 3265, 3268 (2008) ("[W]e find that our grant of the Application, as conditioned, serves the public interest"); *see also Applications of Comcast, GE, and NBCUniversal, Inc.*, 26 FCC Rcd 4238 (2011).

retransmission revenues *were never part* of their 'thesis' … for the transaction."[22]  Of course,

one need only look at the Waiver Letter to see Petitioners' allegation is based on something that

Mr. Kim did not say.[23]  Mr. Kim instead stated in the Waiver Letter that the impact of such

revenues "is not central" to Standard General's thesis for the Transaction.[24]  It demonstrably is

not, as Standard General voluntarily waived its contractual rights and yet is still seeking approval

to consummate the Transactions.

     This is but one more in a litany of misstatements and mischaracterizations that Petitioners

have made throughout this proceeding in their desperate attempts to land a quote in the press,

subvert a fair review, and block Transactions that comply with all Commission rules and have

resounding public interest support from more than thirty parties in the record (while the

Petitioners remain conspicuously alone in their opposition to a grant).  For example, in just their

latest filing, the Petitioners falsely claim (among other things) that TEGNA and CMG are "the

two largest TV group owners,"[25] that there are "six major markets in which Standard General

and AGM would each have TV licenses,"[26] and that the Applications propose that CMG will

---

[22] Petitioners' Comments at 3 (emphasis added); *see also id.* at 15 (falsely claiming that Mr. Kim "has now denied" that "the after-acquired bump-up…[was] considered to be part of their 'investment thesis'….").

[23] Petitioners spend pages recounting how revenue projections relating to potential retransmission consent fees were included in certain documents as if they have uncovered some smoking gun.  Applicants provided these same documents (or versions of them) to the Commission and Protective Order signatories (including NewsGuild) on June 13 and October 13, and nothing in them conflicts with Mr. Kim's statement.

[24] Waiver Letter.

[25] Petitioners' Comments at 2.  Following the Transactions, Cox will rank twelfth in number of TV markets; TEGNA would rank fifth in terms of TV markets behind Nexstar, Gray, Sinclair and Scripps.  *See Top 30 Station Groups*, Note 10, *supra*.

[26] Petitioners' Comments at 18; *see also id.* at 3.  There are only four markets where both TEGNA and CMG stations currently operate (and there will only be five post-Transactions), each of which is specifically named in Petitioners' Comments, making it obvious that Petitioners

acquire TEGNA before TEGNA is then sold to Standard General.[27]  Each of these statements is
demonstrably false, but Petitioners base their arguments upon them, while ironically making
unfounded misrepresentation claims against the Applicants.

Equally troubling are Petitioners' continuing Protective Order violations.[28]  Petitioners'
Comments discuss and include quotes from highly confidential documents (in both the public
and restricted copies of their filing[29]) that were produced pursuant to the Protective Order in this
proceeding and they suggest that they reviewed even more ("too many … to be listed and
discussed here"[30]).  But neither counsel for Common Cause nor UCC—each of whom are
signatories to Petitioners' Comments—are permitted to have access to such information because
they did not sign the Protective Order acknowledgement.[31]  So either NewsGuild's counsel
violated the Protective Order by making the contents of the highly confidential documents
available to individuals who did not sign the Protective Order, or counsel for the other Petitioners
violated Section 1.52 of the Commission's rules by signing comments that they were not legally
permitted to read, while still certifying that they have "read the document; that to the best of

---

knew that their repeated claim of six overlap markets in their comments is false.  *See, e.g.*, *id.* at
3, 18.

[27] Petitioners' Comments at 2.  The Comprehensive Exhibit provides a simple "before" and
"after" diagram of the TEGNA transfer, showing clearly that TEGNA is simply merging into a
subsidiary that will be 100% controlled by Standard General.  *See* Applications, Comprehensive
Exhibit at Exhibit A-3.

[28] *See* Standard General Written *Ex Parte* Presentation, MB Docket No. 22-162 (filed Nov. 21,
2022) at 3-4 and n.9 (detailing NewsGuild's previous Protective Order violations).

[29] The public version of Petitioners' Comments includes at least nine quotes from five documents
that AGM designated as highly confidential.  *See, e.g.*, Petitioners' Comments at 15-16 (publicly
quoting highly confidential AGM documents).

[30] *Id.* at 14.

[31] *See* Protective Order, MB Docket No. 22-162 (June 3, 2022) ("Protective Order") at ¶ 12
(permitting disclosure only to the FCC, Support Personnel (as appropriate) or another Reviewing
Party (i.e., "a person who has obtained access to Confidential Information … or Highly
Confidential Information … pursuant to" the Protective Order)).

[their] knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay."[32]  Further compounding Petitioners' violations, the restricted (unredacted) version of the Petitioners' Comments does not "distinguish among the Confidential Information, the Highly Confidential Information and the non-confidential information" as required by the Protective Order,[33] greatly increasing the risk of additional improper disclosures by readers unaware of which matter is confidential and therefore should not be repeated or circulated.

That Petitioners must resort to these bad-faith tactics underscores the lack of substance their comments have to offer.  The Commission should, accordingly, reject Petitioners' Comments and take appropriate action consistent with precedent to address their repeated, intentional violations, including actions necessary to prevent any further disclosure of the Applicants' highly confidential information.[34]

### B.  DISH and ATVA Improperly Seek to Use This Proceeding to Further Their (or Their Members') Private Financial Interests.

DISH and ATVA do not challenge the efficacy of the Waiver Letter or underlying waivers.  Instead, after previously railing against broadcasters for relying upon after-acquired clauses that MVPDs themselves negotiated (and in many cases, where MVPDs have received

---

[32] 47 C.F.R. § 1.52; *see also AT&T Corp. Application for Auth. to Discontinue Offering of High Seas Serv.*, Order on Reconsideration, 16 FCC Rcd 13636, 13654 at n.23 (July 10, 2001) ("the attorney's signature represents a certificate that he or she has read the document and that, to the best of the attorney's knowledge, information and belief, there is good ground to support the statements in the document.  The rule further provides that an attorney may be subjected to appropriate disciplinary action should he or she make false statements in a submission to the Commission.").

[33] *See* Protective Order at ¶ 13.

[34] *Id.* at ¶ 20; *see also Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 10130 (WCB 2015) (denying any further access to confidential documents submitted under the protective order to employees of party that made an unintentional disclosure of restricted information and prohibiting the individual responsible for the violation "from reviewing confidential documents submitted in this proceeding or any other proceeding before the FCC and from participating further in this proceeding.").

reciprocal after-acquired system rights), they ask the FCC to rewrite privately negotiated retransmission contracts unrelated to the Transactions—but only where such revisions would financially benefit MVPDs. As the FCC has consistently affirmed, however, its role "is to 'establish a marketplace for the disposition of the rights to retransmit broadcast signals,' but not to 'dictate the outcome of the ensuing marketplace negotiations.'"[35] Consistent with this, the Commission should reject DISH's and ATVA's proposals.

   i.   **MVPDs' Conflicting Proposals Betray Their Stated Concerns**

The efforts of DISH and ATVA to create a financial windfall for MVPDs in this proceeding are so frenzied that they present multiple conflicting arguments that contradict both their own and each other's arguments. These efforts should be soundly rejected as obvious attempts to game the FCC's review simply for their own (or their members') financial benefit.

For example, DISH inexplicably argues that *CMG* should be required to waive enforcement of its own after-acquired clauses with respect to the stations it is proposing to acquire. But since CMG has no current retransmission agreement with DISH, there would be no relevant after-acquired clause for CMG to waive. For DISH's argument to make even the slightest sense, DISH would have to be saying that if it reaches a retransmission consent agreement with CMG before closing of the Transactions, and DISH agrees to a negotiated provision allowing CMG to apply the terms of that agreement to stations CMG subsequently acquires, including any former TEGNA stations, the FCC should step in to save DISH from the terms of an agreement it just negotiated. That would be both the epitome of DISH refusing to

---

[35] *See, e.g.*, *Nexstar-Tribune*, 2019 WL 4440126 at *10; *see also id.* at *5 (rejecting MVPD's requests to "deny a merger that [the MVPD] argues would give a negotiating advantage to a broadcaster, or "if the Merger is approved, [to] adopt protections to prevent post-Merger Nexstar from negotiating what [the MVPD] believes would be anticompetitive rates.").

negotiate in good faith and a tremendous abuse of the Commission's processes. As the Commission has cautioned with regard to petitions:

> Petitions are specifically intended to enable interested parties to provide factual information to the Commission as to whether grant of an application would serve the public interest. To the extent that they are used for other than their intended purpose, *e.g.*, for private financial gain, to settle personal claims, or as an emotional outlet, the public interest is disserved.[36]

DISH's proposal also directly conflicts with Altice's and ATVA's "commandeering" theory.[37] Under this theory, Altice and ATVA asserted that the sole reason the FCC could deviate in this proceeding from its longstanding position that retransmission consent agreements are "private contractual matters" beyond the Commission's authority is because this proceeding would have involved Standard General enforcing a retransmission consent agreement assigned to it rather than one Standard General had itself negotiated. Altice and ATVA argued that this distinguished the current proceeding from all prior proceedings, and the Commission could therefore proclaim the application of an after-acquired provision in this proceeding to be anticompetitive. DISH, however, is now arguing the opposite. DISH is proposing that CMG be prevented from enforcing contract rights it negotiated on its own behalf with no change in the parties involved. MVPDs cannot have it both ways. Either (a) the "commandeering theory" is defensible, and CMG is not covered by it since CMG has not commandeered anything, or (b) it is a complete fallacy, and there is no basis for the Commission to deviate from its long-held position that retransmission consent agreements are private contractual matters outside the

---

[36] *Amendment of Sections 1.420 and 73.3584 of the Commission's Rules Concerning Abuses of the Commission's Processes*, 67 R.R.2d 1526, 1530 (1990) (citation omitted).

[37] *See* Altice Notice of *Ex Parte* Communication, MB Docket No. 22-162 (filed Oct. 20, 2022); *see also* ATVA Comments at 4.

Commission's authority. In either case, there is no basis for DISH's self-interested proposal, and indeed, DISH presents none.

DISH's proposal is also contrary to ATVA's stated information-sharing concern, in which ATVA argues that allowing a broadcaster to assume another broadcaster's retransmission consent agreements in a station purchase is inappropriate because the purchaser will then know the seller's retransmission consent agreement terms in addition to its own. Far from preventing that, DISH's proposal would actually *require* such "information sharing" by prohibiting CMG from applying any after-acquired clauses in its own agreements, and thereby *requiring* CMG to assume the TEGNA agreements for the purchased stations. Under DISH's proposal, CMG would be forced to know both CMG's and TEGNA's retransmission terms, as it would have to operate under both of them.

This is the same "harm" that ATVA alleges would arise if Standard General applied a CMG agreement to TEGNA, just in reverse. In ATVA's words, it would require CMG to

> know the termination dates and rates of [TEGNA's] retransmission consent agreements" (because [CMG] itself will be using them). And [TEGNA] will, of course, know the termination dates and rates of [CMG's] retransmission consent agreements (because they were originally [TEGNA's] own agreements.[38]

Like the other proposals for expanded MVPD rights found in the comments, DISH's position is that such information sharing is not a harm, but a benefit so long as an MVPD gets a lower rate out of it now. It also demonstrates that the MVPD handwringing in the comments over the risks of a broadcaster becoming aware of a seller's retransmission consent agreement terms or of coterminous agreements is disingenuous. DISH reveals that it will happily accept all of these future "risks" if it can manipulate the FCC into saving it a penny on retransmission rates today.

---

[38] *See* ATVA December 2, 2022 *Ex Parte* Letter at 2 ("ATVA December 2 *Ex Parte*").

13

Because DISH has not demonstrated any valid basis for the Commission to "step in and deny one party the benefit of the negotiated bargain"[39] or to otherwise interfere with private contractual negotiations, particularly in light of the voluntary waiver that Standard General has already made, the Commission should reject DISH's expansionist proposals out of hand.[40] Should DISH and CMG enter an agreement between now and closing, DISH should bargain for what it seeks in that negotiation rather than improperly enlisting the Commission to interfere after the fact.[41]

### ii.    MVPDs' New "Coterminous" Concerns Are Specious

Similarly baseless is ATVA's proposal that MVPDs should have the unilateral right to extend any TEGNA or CMG retransmission consent agreement by six months, even though it acknowledges that the Waiver Letter moots the concern ATVA first raised on December 2 about coterminous agreements.[42] Revealing its motives as yet another MVPD money grab, ATVA does not limit such extensions only to when needed to prevent TEGNA and CMG agreements from becoming coterminous, but instead proposes it as an unfettered right to be invoked by MVPDs at any time. Indeed, an MVPD could invoke this proposed right even when the maneuver ends up more closely aligning the expiration dates of TEGNA and CMG retransmission consent agreements.

---

[39] *Nexstar-Tribune*, 2019 WL 4440126 at *19.

[40] *See Nexstar-Tribune*, 2019 WL 4440126 at *19 (rejecting DISH's arguments regarding after-acquired clauses (which the DISH Comments repeat verbatim here), finding that "[s]uch after-acquired station clauses were negotiated by the parties outside of this transaction, and there is no apparent reason to step in and deny one party the benefit of the negotiated bargain absent evidence of anticompetitive practices or other wrongdoing not apparent here.").

[41] *See Nexstar-Tribune*, 2019 WL 4440126 at *19 (reminding DISH that "the Commission is not the proper forum for resolving an alleged private contractual dispute.").

[42] ATVA Comments at 4.

It is also worth noting that the unstated premise of these proposals—that TEGNA and CMG agreements could convey increased leverage in retransmission consent negotiations by being made coterminous—is not explained by any of the commenters. DISH comes closest, suggesting coterminous expirations are bad because they "increase the pressure on MVPDs," but does not say how. This claim is illogical on many levels:

1. The MVPD knows *exactly* when all of its own retransmission consent agreements expire, so it is actually the one with the information advantage over the broadcaster in setting expiration dates that it believes are optimal *for the MVPD*. DISH and ATVA are arguing here that the Commission should ensure that only MVPDs are allowed the supposed negotiating advantage of optimizing expiration dates.

2. The expiration date in a retransmission consent agreement is a term that both parties must agree on, making it impossible for a broadcaster to force a particular expiration date on the MVPD. If an MVPD agrees to a less than optimal expiration date in return for better rates, TV Everywhere rights, etc. in the negotiation, the FCC should not later entertain MVPD complaints about the expiration date being "forced" on it.[43]

---

[43] Contrary to ATVA's assertion, MVPDs are not "at the mercy of the broadcaster to dictate extension terms and dates." ATVA Comments at 6. Indeed, DISH recently elected to drop both Standard General and CMG from its system despite both broadcasters offering carriage extensions to prevent blackouts during renewal negotiations and any MVPD concerned about the potential alignment of expiration dates is free to do the same without the Commission's interference. *See, e.g.*, Jon Lafayette, Broadcasting+Cable, *Four Standard General Stations Blacked Out in Dispute With Dish*, Nov. 13, 2022, https://www.nexttv.com/news/four-standard-general-stations-blacked-out-in-dispute-with-dish ("'Dish has taken the inexplicable position that it will no longer carry the stations during the negotiations. Our stations therefore will no longer be accessible through Dish. This is Dish's choice, and not what we prefer,' the company said."); WSOC-TV.com News Staff, *DISH chooses to black out all Cox Media Group TV stations across the country*, Nov. 28, 2022, https://www.wsoctv.com/dish/ (citing Paul Curran, EVP of Television, Cox Media Group: "Let me be clear – despite their numerous false claims, it was solely DISH's decision to remove CMG's best-in-class TV stations from its service. To keep our stations on the DISH platform, we offered DISH an extension of our current agreement with no strings attached, but DISH refused.").

As ATVA itself acknowledged, "the distributor and the broadcaster must agree on any extension to an expiring contract." ATVA Comments at 5. ATVA asserts that broadcasters can offer extensions to MVPDs during negotiations as a way of shifting retransmission consent agreement expiration dates, but fails to note that such extensions rarely change the end date of a new contract, and instead merely provide more time for the parties to complete negotiations. The start and end dates of the term of the resulting agreement are rarely affected, and of course the MVPD would have to agree to any end date alteration regardless.

15

3.  Similarly, if broadcasters assigned the overriding value to coterminous expiration dates that DISH and ATVA suggest, used broadcast transactions to divine expiration dates, and had the ability to force whatever termination date they wanted on MVPDs, as ATVA suggests, then the market long ago would have coalesced around a single date for all retransmission consent agreements to expire.  That has not happened, of course, demonstrating that broadcasters value other elements of the agreement far more highly than they do any theoretical leverage they might gain through coterminous expirations dates.

4.  Given ATVA's claim that agreements that expire within six months of each other somehow convey added leverage,[44] and given the three-year term of nearly all retransmission agreements (a legacy of the three-year retransmission consent election cycle), there are at most only six expiration "windows" in a three-year term.  A broadcaster with no more than a calendar and a dart would still end up being "coterminous" with multiple large broadcasters.

When ATVA raised this "coterminous agreement" concern for the first time on December 2, it framed the alleged harm as prospective (i.e., CMG and TEGNA *would* know each other's rates *if* the CMG agreements were applied to the TEGNA stations).  Now that Standard General has mooted that concern with the Waiver Letter, ATVA has moved the goalposts, claiming that the harm (whatever that unspecified harm might be) has already occurred.  ATVA's comments misleadingly suggest that the Applicants have engaged in unlawful information sharing—they have not—and speculates that by knowing expiration dates, Applicants might seek in the future to align the TEGNA and CMG expiration dates.  ATVA is wrong in both regards, and its proposal should be rejected.

Applicants reiterate that Standard General does not, as ATVA presumes, know "the rates of Cox's retransmission consent agreements" and CMG does not know "the rates of TEGNA's retransmission consent agreements."[45]  As Standard General certified on October 13, 2022, it has

---

[44] ATVA Comments at 6.

[45] *Id.* at 5.

not reviewed CMG's retransmission consent agreements.[46]  Similarly, no CMG employee or anyone involved in the negotiation of CMG's retransmission consent agreements has reviewed any TEGNA retransmission consent agreements.  Moreover, despite ATVA's claims to the contrary, sharing such information with prospective buyers in connection with transaction diligence is neither improper nor prohibited by the Commission's rules.[47]  In fact, the Sinclair Consent Decree conditions that ATVA itself has championed throughout this proceeding specifically carve out from the information sharing prohibitions the right to provide "retransmission consent agreements…or non-public information related to such agreements, to prospective third-party buyers …."[48]  Retransmission consent agreements typically address the extent to which the agreement may be shared with prospective buyers, and MVPDs have at least as many rights (often more) to share information under these clauses.  To the extent ATVA and DISH object to such information sharing, they (or their members) can negotiate for such confidentiality in their respective agreements (as some have done) or petition the Commission to amend its rules,[49] but they should not be making unfounded claims here or demanding that the Commission change its rules in an adjudicatory proceeding.[50]

---

[46] *See* Applicants' Joint Response to the Media Bureau's Request for Information, MB Docket No. 22-162 (filed Oct. 13, 2022) ("October 13 Joint Response") at 17.

[47] *See* ATVA Comments at 4.

[48] *In the Matter of Sinclair Broadcast Group*, File No. EB-IHD-16-00021748 (rel. May 22, 2020) at 12 ("Sinclair Consent Decree").

[49] *See, e.g.*, DISH Comments at 7 (proposing that Applicants should "agree not to share confidential retransmission agreements with another Entity or broadcast station owner or manager, including without limitation in the process of negotiating or contracting future mergers, acquisitions, or similar transactions.").

[50] *See, e.g.*, *Spanish Radio Network*, 10 FCC Rcd 9954, 9556 (1995) ("Insofar as Miami Petitioners would have the rule recast so as to prohibit broadcast concentration in a market defined by language comprehension, the appropriate course of action is to request that the Commission institute a generic rulemaking proceeding to change its multiple ownership rules and policies.") (*citing Patteson Brothers, Inc.*, 8 FCC Rcd 7595, 7596 (1993)).

### iii.    ATVA Improperly Asks the Commission to Prejudge Future Transactions Unrelated to This One

Lastly, the Commission should reject ATVA's request to prohibit each of the Applicants *and* anyone else acquiring stations from any of the Applicants from *ever* "enforcing any after-acquired station clause which it did not negotiate, where such enforcement would lead to higher rates" for the MVPD.[51]  Increased retransmission consent rates are not, standing alone, a cognizable public interest harm,[52] and the Commission "has limited authority to decide the substantive outcome of retransmission consent negotiations or to determine a retransmission consent fee."[53]  Further, the Commission should refrain from pre-judging transactions that are not currently before it.[54]  Any demonstration of "anticompetitive practices or other wrongdoing" so significant as to persuade the Commission that it should "step in and deny one party the benefit of the negotiated bargain"[55] needs to be made in the relevant proceeding.  If ATVA and its members find that "[a]fter-acquired station clauses are often problematic,"[56] then they should stop agreeing to them (and similarly stop demanding reciprocal provisions for their own acquisitions) rather than accepting the benefits of their bargain and then demanding the Commission intervene when that bargain works against them.  If ATVA wants the Commission

---

[51] *See* ATVA Comments at 6 (original emphasis deleted).

[52] *Nexstar-Tribune*, 2019 WL 4440126 at *10 ("[W]e do not believe that an increase in retransmission consent rates, by itself, is necessarily a public interest harm.").

[53] *Id.* at *16; *see also id.* at 10 ("Over the years, the Commission has consistently affirmed Congress's intent, in creating the retransmission consent regime, to 'establish a marketplace for the disposition of the rights to retransmit broadcast signals' but not to 'dictate the outcome of the ensuing marketplace negotiations.'").

[54] *See* 47 U.S.C. § 309 (requiring the Commission to "determine, *in the case of each application filed with it* to which Section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application …." (emphasis added)).

[55] *Nexstar-Tribune*, 2019 WL 4440126 at *19.

[56] ATVA Comments at 4.

to reconsider its longstanding position that an increase in MVPD programming costs is not in and of itself a public interest harm, the Commission has instructed that the proper forum to make that case is a rulemaking proceeding.[57]

### III. The December 23 Non-Coordination Letter Resolves Any Joint Retransmission Concerns and the Commission Should Reject Opportunistic and Untimely Requests for More

The primary focus of ATVA's and NCTA's original comments and subsequent filings in this proceeding has been preventing "[CMG] and New TEGNA from sharing information with one another related to retransmission consent deals involving *any* of their stations, not just those in overlapping markets."[58]  To that end, they each proposed substantively similar conditions designed to prevent the Applicants from sharing retransmission consent information with each other "to ensure that the [Applicants] comply with the bar on joint retransmission consent negotiations codified in the Communications Act and the Commission's rules."[59]  NCTA proposed additional conditions to prevent Applicants from engaging common legal counsel or other agents in connection with negotiating retransmission consent agreements and from entering post-Transactions LMAs, JSAs, SSAs, or similar agreements.[60]

In the letter submitted on December 23 (the "Non-Coordination Letter"), Standard General, CMG, and AGM agreed in substance to all of the conditions NCTA originally

---

[57] *Nexstar-Tribune*, 2019 WL 4440126 at *31 (rejecting DISH's allegations and explaining that "the Commission has, in the past, considered issues related to retransmission consent—including leverage in retransmission consent negotiations—in rulemaking proceedings, and we believe that it is appropriate to continue that practice here.").

[58] *See* Comments of ATVA, MB Docket No. 22-162 (filed June 22, 2022) ("ATVA June Comments"); *see also* Letter from Radhika Bhat, Vice President & Associate General Counsel of NCTA, to Marlene H. Dortch, Secretary, Federal Communications Commission, MB Docket No. 22-162 (filed June 22, 2022) ("NCTA Letter").

[59] *See* NCTA Letter at 4-5; *see also* ATVA June Comments at 15-18.

[60] *See* NCTA Letter at 5.

19

proposed.  The NCTA Comments primarily respond to Applicants' effort in the Non-Coordination Letter to clarify NCTA's original conditions, and NCTA now proposes three additional conditions.  As to Petitioners, the complaints in their comments are premised on a willful misreading of Applicants' commitments, and their proposals exceed the Commission's authority.  Finally, ATVA simply seeks to broaden the information-sharing restrictions beyond what it previously requested and to apply conditions from another broadcaster's consent decree that are irrelevant here.  None of the January 13 Comments demonstrates that the commitments proposed in the Non-Coordination Letter are insufficient to address the joint retransmission concerns raised in this proceeding.

### A. The Non-Coordination Letter's Clarifications to NCTA's Proposals Are Essential to Focusing the Conditions on the Transactions and Alleged Transaction-Specific Harms, Rather Than on Routine Commercial Activities

NCTA originally proposed six conditions to address its concerns about potential retransmission consent coordination between the Applicants.  Applicants agreed in substance to each of those conditions.  But any conditions adopted in this proceeding must be limited to the Transactions at issue and the potential harms that the Commission has reason to believe would result therefrom.[61]  The clarifications Applicants made to NCTA's original proposals in their Non-Coordination Letter ensure that result and remove other ambiguities present in NCTA's language.

Starting with the Non-Coordination Letter's first commitment, Applicants and NCTA are mostly aligned.  However, the language that NCTA seeks to strike (i.e., prohibiting employees or

---

[61] *See, e.g.*, FCC.gov, *Overview of the FCC's Review of Significant Transactions*, https://www.fcc.gov/reports-research/guides/review-of-significant-transactions (last visited Jan. 20, 2023) ("Transactions can be approved with conditions that allow the transaction to proceed but eliminate or mitigate the potential harms the Commission has found are likely to occur.").

agents of Standard General/TEGNA and CMG/AGM from receiving non-public information "from the other") should remain in place. Striking the "from the other" clarification would otherwise permit, for example, an MVPD to force a breach of the conditions on Applicants through no fault of the Applicants, such as when an NCTA member (willfully or accidentally) conveys non-public CMG information to TEGNA. To the extent NCTA is concerned Applicants' language would permit one to indirectly deliver non-public information to the other, that can easily be resolved by adding "(including from the other's employees or agents)" for clarity. Applicants and NCTA appear to be aligned on the Non-Coordination Letter's second and third commitments.

But the Commission should reject NCTA's revisions to the Non-Coordination Letter's fourth, fifth, and sixth commitments pertaining to LMAs, JSAs, SSAs, and similar agreements. Applicants agreed in the Non-Coordination Letter to NCTA's proposed conditions relating to LMAs, JSAs, SSAs, and similar agreements (with appropriate carve-outs)[62] to the extent they relate to agreements *between* stations owned by Standard General/TEGNA and CMG/AGM. NCTA seeks to modify Applicants' commitments to encompass agreements with *non-Applicant* third parties. But NCTA fails to explain what Transaction-specific harm would be cured by requiring TEGNA and CMG to maintain in all of their public files a list of every agreement TEGNA or CMG might have with a *non-Applicant station* or requiring Applicants to upload and file copies of such third-party agreements 30 days *prior* to such agreements taking effect.

---

[62] Any relevant conditions should use the Non-Coordination Letter's more precise description of agreements over ambiguous and undefined terms used in NCTA's proposal (e.g., "sidecar agreement" and "sharing agreement") with the appropriate carve-outs enumerated in footnote 4 of the Non-Coordination Letter (e.g., ATSC 3.0-related hosting agreements, Diginet agreements, and agreements for non-broadcast station products which do not present any retransmission consent "collusion" or "coordination" concerns).

21

It is particularly difficult to envision any harm that this proposed condition is needed to resolve, given that the Commission's rules already require broadcasters to upload copies of LMAs, JSAs, and SSAs to the relevant stations' public inspection files within 30 days of execution. In other words, Applicants have already agreed to enhanced public inspection file requirements with respect to such agreements among themselves (to enable efficient monitoring of Applicants' related commitment not to enter such agreements among themselves for so long as AGM or CMG have a financial interest in TEGNA) and, to the extent NCTA is curious about which other stations Applicants have agreements with, that information is already required to be made publicly available.[63] The Commission should reject any overbroad request seeking to impose conditions that do not address a Transactions-specific harm, especially those seeking to impede relationships with parties having no connection to the Transactions.

With respect to the new conditions NCTA has proposed, Applicants are willing to formalize through conditions statements and waivers they have previously made, i.e. (a) Standard General/TEGNA and CMG/AGM will not engage in joint retransmission consent negotiations or coordination between post-closing TEGNA and CMG, AGM, or their respective affiliates, even where it would be legally permissible under the Commission's rules; and (b) the waiver set forth in Standard General's Waiver Letter. The Commission should, however, decline to adopt NCTA's new proposal regarding indirect actions as superfluous and sufficiently ambiguous as to accidentally prohibit routine commercial interactions unrelated to any alleged Transactions-specific harms. The relevant commitments as proposed in the Non-Coordination Letter and discussed above are already broad enough to bar Applicants from circumventing the prohibitions through use of employees or agents, and the Commission would not have difficultly

---

[63] *See* 47 C.F.R. § 73.3526(e)(14), (16), and (18).

enforcing the conditions against a Transactions-specific harm in the absence of the proposed addition.

### B. Petitioners Misread the Non-Coordination Letter and Request Remedies That Are Beyond the Commission's Authority

Petitioners are plainly wrong when they contend that the Non-Coordination Letter would leave Applicants free to have "unlimited discussion of ongoing or future retransmission consent negotiations, so long as their employees or agents do not share information about" existing contracts.[64]  Existing Commission rules already preclude such coordination or joint negotiation with respect to future retransmission consent agreements in markets where TEGNA and CMG both own stations and, given the practical reality that retransmission consent agreements are negotiated on a national basis, the companies would be precluded under the rules from jointly negotiating or coordinating since the agreements would cover both "overlap" and "non-overlap" markets.[65]  The Commission need not condition grant of an application on compliance with rules, as all Commission licensees are expected to comply with the Commission's rules[66] and a mechanism for Commission enforcement already exists.[67]  Indeed, where Standard General made commitments in a separate December Letter relating to certain labor matters, Petitioners

---

[64] Petitioners' Comments at 17-18.

[65] 47 C.F.R. § 76.65 (prohibiting "[c]oordination of negotiations or negotiation on a joint basis by two or more television broadcast stations in the same local market to grant retransmission consent to a multichannel video programming distributor, unless such stations are directly or indirectly under common de jure control permitted under the regulations of the Commission.").

[66] *See, e.g.*, *In the Matter of Liability of KGVL, Inc., Licensee of Radio Station KGVL, Greenville, Tex. for Forfeiture*, 42 F.C.C.2d 258, 259 (1973) ("Licensees are expected to comply with Commission requirements."); *see also In the Matter of Liability of J.C. Johnson, Trading as Lowndes Cnty. Broad. Co., Licensee of Radio Station WJEM, Valdosta, Ga. for Forfeiture*, 23 F.C.C.2d 91, 91 (1970) ("Licensees are expected to know and comply with the Commission's rules and regulations and will not be excused for violations thereof, absent clear mitigating circumstances.").

[67] *See, e.g.*, Sinclair Consent Decree; *see also In the Matter of DirectTV, LLC et al. v. Deerfield Media, Inc. et al*, Forfeiture Order, 36 FCC Rcd 12078 (2021).

complained that such actions were "already mandated by law, and thereby add[] nothing at all,"[68] so presumably the Petitioners would find conditions replicating existing joint retransmission laws similarly unnecessary.

The Non-Coordination Letter goes further than what is required by law, however. It prevents the Applicants from sharing information about existing agreements, addressing MVPD concerns that, despite such sharing not being prohibited under the Commission's rules, that information could be leveraged in future negotiations. The Non-Coordination Letter also explicitly reiterates that Standard General and AGM/CMG "will not engage in joint retransmission consent negotiations or coordination between post-closing TEGNA and CMG, [AGM] or their respective affiliates, even where it would be legally permissible under the Commission's rules."[69] And, as discussed in Section III.A above, Applicants are fine with NCTA's proposal to memorialize this commitment with a condition, rendering Petitioners' concerns moot.

Petitioners' only other stated concern, lumped into the "Retransmission Consent" section of their comments, is that the Non-Coordination Letter does not address the potential for joint negotiations in other contracts. But Petitioners fail to explain what motivation Applicants would have to "develop joint strategies for syndicated programming" (or how that would even result in public interest harms), and the Commission has no jurisdiction over "labor management negotiations," which Petitioners concede are governed by other laws, including the Sherman Act.[70] The Commission should therefore reject these efforts to continue moving the goalposts in this proceeding.

---

[68] Petitioners' Comments at 9; *see also id.* at 12.

[69] Non-Coordination Letter at 1-2.

[70] Petitioners' Comments at 18-19.

### C.  The Commission Should Reject ATVA's Self-Serving and Internally Inconsistent Requests

ATVA continues to urge the Commission to adopt the conditions set out in the Sinclair Consent Decree but now also seeks broader and conflicting conditions.  For example, although ATVA has sought for the past seven months to prevent information sharing between any "employee or agent who is involved in any way in retransmission consent negotiations" on behalf of TEGNA or CMG,[71] ATVA now demands that the Non-Coordination Letter's commitment to do just that be broadened to apply to employees who are not "involved" or do not otherwise participate in such negotiations or any other third parties.[72]  Even the Sinclair Consent Decree conditions did not go so far, recognizing that there may be legitimate business reasons to share such information that would not result in competitive harm, and the Commission should not accept ATVA's belated request to broaden the limitation here.[73]

ATVA also takes issue with the fact that the Applicants only proposed to restrict information sharing "among themselves."  But (1) Applicants cannot bind anyone but themselves or their agents to these commitments, and (2) the basis for ATVA's proposed conditions all along has been that the Transactions would "heighten[] *the parties*' incentive and ability to

---

[71] *See, e.g.*, ATVA June Comments at 15; ATVA December 2 *Ex Parte* at 3.

[72] *See* ATVA Comments at 3.

[73] *See* Sinclair Consent Decree at 12; *see also* ATVA June Comments at 16 (basing proposed conditions on Sinclair Consent Decree and proposing that "[f]or purposes of clarity, (i) the foregoing provisions limiting access to Cox Station retransmission consent agreements or non-public information shall not preclude access by New TEGNA employees or agents who are not in any way involved in retransmission consent negotiations on behalf of New TEGNA… and (ii) the foregoing provisions limiting the provision of retransmission consent agreements or non-public information to third parties shall not preclude provision of retransmission consent agreements to which New TEGNA is a signatory, or non-public information related to such agreements, to prospective third-party buyers or other third parties conducting audits arising from a New TEGNA retransmission consent agreement who affirm in writing that the information will be used solely in connection with due diligence or such audit purposes, or to other parties as may be specifically approved by the Commission.").

coordinate" retransmission consent.[74]  The Non-Coordination Letter squarely addresses that stated concern.  ATVA fails to posit any theory about how the Transactions would heighten the risk of or potential harms relating to information sharing with third parties.  Moreover, as discussed above, there are circumstances permitted under the Commission's rules (and built into the Sinclair Consent Decree conditions that ATVA has proposed applying in this proceeding) where sharing information with a third party would serve a valid business purpose (e.g., with a prospective third-party buyer) without raising any anticompetitive concerns.  The Commission should reject ATVA's capricious and ever shifting requests.

Lastly, ATVA has failed to demonstrate any need to impose the onerous compliance plan requirements of the Sinclair Consent Decree on the Transactions.  ATVA's vague assertion that its "Member Companies' recent experience with Sinclair…suggests that" the proposed conditions "work best when accompanied by detailed enforcement and reporting provisions"[75] is unsupported by any declaration or details that would enable the Commission or Applicants to evaluate this claim, or to determine whether that "experience" has anything to do with the Applicants.  As ATVA acknowledges, the Commission "has the inherent power to enforce its own conditions and to impose remedies for failure to comply."[76]

Moreover, the circumstances underlying the Sinclair Consent Decree have nothing whatsoever to do with the Transactions or the parties to them.  Quite simply, the premise of a consent decree is that a party has been alleged to have engaged in some unlawful activity, and a consent decree can be a resource-efficient way to address such allegations.  Here, ATVA proposes that the Commission become the Future Police, anticipating violations by parties that

---

[74] ATVA June Comments at 18.

[75] *Id.* at 4.

[76] *Id.*

have no record of engaging in such activities, and for which there is no evidence to suggest they ever would.  In fact, it is worth noting that included in ATVA's proposed consent decree-conditions are mandates for such things as the Sponsorship Identification and Application Updating Rules.[77]  There is simply no basis for such untargeted conditions, much less ATVA's proposed compliance plan and reporting requirements for them.

Applicants emphasize that the commitments made in the Non-Coordination Letter are not for the purpose of bringing the Transactions into compliance with the Commission's rules—they already are.  As for the future, the Applicants have represented time and again in the record that they never planned to and will not jointly negotiate or coordinate retransmission consent with each other and have agreed to formalizing that representation with a condition.  The Commission should reject baseless speculation that Applicants will act contrary to their representations.[78]

## IV.    Standard General's December 22 Jobs Letter Fully Addresses Petitioners' Allegations Regarding Local News and Journalists

In a December 22, 2022 letter (the "Jobs Letter"), Standard General supplemented its earlier statements on not reducing local news or station staffing by specifically committing not to conduct any journalism or newsroom staffing layoffs or similar reductions at its stations for a minimum of two years following the Transactions.  Standard General also made clear that it does not have plans for *any* future station staffing reductions and that it expects that implementation of its plans for TEGNA will actually increase the number of journalists and other newsroom employees at TEGNA stations.  To facilitate Commission monitoring, Standard General offered

---

[77] *See, e.g.*, ATVA December 2 *Ex Parte* at 4 (discussing "the RPI Rules, the Rules governing updates to applications pending before the Commission, including Section 1.65 of the Rules, the Retransmission Consent Rules, and the Sponsorship Identification Laws ….").

[78] *See, e.g.*, *Univision Holdings, Inc.*, Memorandum Opinion and Order, 7 FCC Rcd 6672, 6675 (1992).

to file quarterly reports providing the amount of new investments made at the local station level and, after the two-year job preservation period concludes, information regarding any layoffs in the newsrooms of TEGNA stations.  Additionally, Standard General committed to recognize each of the labor unions currently covered by a collective bargaining agreement with TEGNA as the exclusive bargaining representative of those bargaining unit employees and to cause TEGNA to honor such collective bargaining agreements.

Petitioners misinterpret the Jobs Letter as a "narrowing" of Standard General's commitments on jobs.[79]  In reality, the binding commitments made in the Jobs Letter are in addition to, rather than replacements of, the commitments Standard General has made (under penalty of perjury) throughout this proceeding.[80]  They fully rebut Petitioners' unsupported allegations that Standard General has a "business model of laying off reporters and reducing local news coverage"[81] (thoroughly discredited in the record, with Standard General's broadcast companies having added over 40,000 hours of local news in just seven years[82]) and that the Transactions could "lead to a reduction of local news coverage through reporter layoffs."[83]  And Standard General's reiteration in the Jobs Letter that it has no intention of reducing station-level staffing at TEGNA following the Transactions refutes (yet again) Petitioners' relentless and false

---

[79] Petitioners' Comments at 3.

[80] *See Kola, Inc.*, 11 FCC Rcd at 14305 (finding petitioner failed to raise a substantial and material question of fact where its "speculative allegations were completely answered and contradicted by the sworn declaration of [applicant's] Chief Financial Officer.").

[81] Reply Comments of Petitioners, MB Docket No. 22-162 (filed Aug. 1, 2022) (Petitioners' Reply) at 6.

[82] *See* Applicants' Consolidated Opposition and Response to Comments, MB Docket No. 22-162 (filed July 7, 2022) ("Applicants' Opposition") at 19.

[83] Common Cause/UCC Petition at 19; NewsGuild Petition at 15.

assertions (quite literally material misrepresentations) that job reductions at the stations are part of Standard General's "stated business model"[84] and "stated plans."[85]

Petitioners have offered nothing to support their insistence that Standard General will do other than what it says, or to support their assertion that a commitment not to conduct journalist or newsroom layoffs for a minimum of two years is insufficient to "protect locally originated news and other programming at TEGNA."[86]  It should also be noted that Standard General has indicated it is not reducing the news aired on TEGNA stations (which, as noted above, is backed up by a demonstrated history of increasing local news on the stations it has owned).[87]  Thus, uninformed claims about how Standard General will staff its stations are not only speculative, but irrelevant to the Commission's public interest review.  The Commission should therefore reject such speculation, and more generally, the Petitioners' objections to the Transactions themselves.  "In the absence of properly supported specific allegations of fact to support a contrary conclusion," the Commission "do[es] not assume that any applicant 'will not faithfully

---

[84] NewsGuild Petition at 13; *see also* Petitioners' Reply at 6.

[85] Petitioners' Reply at 26.

[86] Petitioners' Comments at 10-11.  Interestingly, the Petitioners posit a new claim—that staffing could still be reduced through attrition (where an employee departs and their position remains open either because the station cannot find a qualified replacement or the station reorganizes job responsibilities or both)—but in making this argument, the Petitioners effectively concede the effectiveness of Standard General's commitment to not engage in layoffs.  The Petitioners can hardly complain about employees who leave of their own accord, and their argument that the baseline for comparing employment figures shouldn't be closing, but before the "significant attrition at TEGNA stations in the past year" (Petitioners' Comments at 11) demonstrates two things.  First, NewsGuild is finally acknowledging that reduced staffing levels at TEGNA stations did occur on TEGNA's watch (as TEGNA detailed in the October 13 Joint Response) and were not a nefarious post-closing plan of Standard General, and second, that Petitioners have abandoned their earlier claims of "massive layoffs of journalists" and are now insisting the stations must go on hiring binges for the public interest to be served.  It becomes clear that the Petitioners have no actual public interest concerns here, as evidenced by the fact that, for the duration of this proceeding, they have refused to even meet with Standard General to discuss any TEGNA employment matters.

[87] *See* Applicants' Opposition at 19.

carry out its representations or that an applicant will be operated or controlled in a manner that differs from the [transaction] under consideration."[88]

Petitioners' remaining grievance with the Jobs Letter is Standard General's voluntary offer to file quarterly reports with the Commission regarding the amount of new investments it has made at the local station level, claiming that such reports should (1) provide more detail regarding individual station and department headcounts and (2) be publicly filed.  But publicly filing such detailed information raises potential competitive concerns and would facilitate the very harm that Petitioners caution against (i.e., information sharing with respect to labor and employment matters).[89]  In any event, the reports Standard General proposed are more than sufficient to address any concern the Commission may have as a result of Petitioners' flagrantly false allegations that Standard General's "stated business model" includes "ruthlessly cutting costs."[90]  For all of the foregoing reasons, the Commission should reject Petitioners' claims regarding the Jobs Letter.

## V.    The Transactions Will Yield Numerous and Significant Public Interest Benefits

More than thirty civil rights and labor organizations, legislators, former employees, women in tech leadership, broadcasters, and other public interest groups have filed in support of

---

[88] *Univision Holdings, Inc.*, 7 FCC Rcd at 6675; *see also Fox Television Stations Inc.*, Declaratory Ruling, 8 FCC Rcd 5341, 5350 n.28 (1993) (granting permanent waiver of newspaper-broadcast cross-ownership rule, proceeding "on the assumption that Fox will carry out its repeated representations … to 'salvage the newspaper,' 'repair the damage,' 'resuscitate a newspaper that was on the brink of failure,' and 'implement its plan to save a major daily newspaper.'") (citing *News International, PLC*, Memorandum Opinion and Order, 97 F.C.C.2d 349, 356 (1984) ("[I]t is not appropriate to infer, in the absence of information to the contrary, that [an applicant] will not faithfully carry out its representations [as to future conduct].")).

[89] *See* Petitioners' Comments at 17-18.

[90] NewsGuild Petition at 13.

the Transactions, proclaiming their numerous public interest benefits,[91] making clear that the

Petitioners stand alone in failing to perceive to those benefits.  In addition, the Committee for the

Assessment of Foreign Participation in the United States Telecommunications Services Sector

notified the Commission months ago that it had completed its review of the Applications and had

no objection to the FCC granting them.[92]

    The Applicants are clearly qualified to hold broadcast licenses, as they are all currently

Commission licensees, and the Transactions comply with the Commission's rules without the

need for any divestitures or waivers.  Importantly, the Transactions will strengthen TEGNA

station programming and benefit viewers by bringing to TEGNA Standard General's and Deb

McDermott's proven historical focus on investing in and improving local news operations.[93]

This, along with Standard General's and Deb McDermott's belief in giving local station

managers greater autonomy to serve their communities, is the very definition of localism.

    Additionally, as the Commission is well aware, the Transactions will create the largest

(by far) minority-owned and female-led television broadcast group in U.S. history.  The

Commission's *Sixth Report on Ownership of Broadcast Stations*, released just last week,

provides the latest evidence of just how significant of a public interest benefit this boost in

diversity will be.  The *Sixth Report on Ownership* indicates that Asian Americans are

significantly underrepresented in television ownership, and attributable interests held by Asian

---

[91] *See* Standard General and TEGNA Facts, *Supporters*, https://www.sgandtegna.com/supporters
(last visited Jan. 20, 2023).

[92] Letter from Andrew Coley, Office of Chief Counsel, United States Department of Commerce,
to Tom Sullivan, Chief, International Bureau, Federal Communications Commission, MB
Docket Nos. 22-162, 22-166 (dated Nov. 17, 2022).

[93] *See* Applicants' Response to Request for Documents and Information, MB Docket No. 22-162
(filed June 13, 2022) at 5.

Americans in full-power commercial television stations declined by more than half in 2021.[94]

**Tellingly, out of 1,365 full-power commercial television stations nationwide, only 8 are majority-owned by an Asian American, and only 1 of those is in a top-50 market**.[95]  And the Asian American-owned station in that one top-50 market is not even a Top-4 station.

According to the *Sixth Report on Ownership*, the Transactions would increase the number of Asian American-owned commercial TV stations by more than **700%**, but even that vastly understates the impact, as the Transactions would also end the relegation of Asian American owners to small markets.  Approval of the Applications would increase the number of Asian American-owned TV stations in the top-50 markets **from 1 to 27**, making approval of the Applications perhaps the single most impactful diversity initiative in the Commission's history.

Despite the numerous and significant public interest benefits and overwhelming support for the Transactions, the Applications have remained pending for far longer than any recently approved major TV transaction.[96]  Indeed, a review of past decisions indicates that even if the Applications were granted today, this proceeding would represent the longest period of time between the filing of applications and approval for any major television transaction *in history* not requiring rule waivers or station divestitures.

---

[94] S*ee* Media Bureau and Office of Economics and Analytics, Sixth Report on Ownership of Broadcast Stations, FCC Form 323 and Form 323-E Ownership Data as of October 1, 2021, DA 23-35 (rel. Jan. 13, 2023) ("*Sixth Report on Ownership*") at Figure A1.

[95] *See Sixth Report on Ownership* at Table A(3).

[96]*See* Scripps-ION transaction, requiring divestiture of 23 full-power stations in 21 markets and reauthorization of satellite authority for 3 stations (granted 62 days after applications were filed); Gray-Quincy transaction, requiring divestiture of 10 full-power stations in 7 markets, 3 failing station waivers, and reauthorization of satellite authority for 2 stations (granted 168 days after applications were filed); Gray-Meredith transaction, requiring divestiture of 1 full-power station (granted 185 days after applications were filed).

The delay in approving the Applications and unlocking the public interest benefits of the Transactions has been harmful to the public, and to the employees and potential new employees of TEGNA. The delay has stalled Standard General's ability to invigorate newsrooms across the country and left TEGNA in limbo, as its employees work in uncertainty and consider how denial of the Applications would increase risks to their job security in a darkening economic time. As has been widely reported, "[m]any media and tech companies have laid off employees in recent weeks as the advertising market sours."[97] TEGNA, as a publicly traded company without a controlling shareholder, would be impacted more than most broadcasters by the intense pressure of the public markets to cut costs as recessionary concerns mount.

While these harms are substantial and apparent, they defy easy quantification. What can be easily quantified, however, is one obvious aspect of the direct economic harm to TEGNA. As the Commission is aware, the Merger Agreement contains a "ticking fee" that each day escalates the price that must be paid to departing shareholders for each share of TEGNA stock. As a result, the purchase price of TEGNA has been increasing every day since November 22, 2022, and as of today, that increase now exceeds $22 million dollars.

To put that in perspective, based on RTDNA's most current survey of median salaries for television news jobs,[98] including journalists, that $22+ million dollars would be enough to pay a

---

[97] Benjamin Mullin, The New York Times, Dec. 1, 2022, *Gannet Starts Another Round of Staff Cuts*, https://www.nytimes.com/2022/12/01/business/media/gannett-layoffs.html; *see also* Clair Atkinson, Business Insider, Jan. 9, 2023, *Big Media Company Layoffs are Shrinking Traditional TV*, https://www.businessinsider.com/big-media-company-lay-offs-are-shrinking-traditional-tv-sales-teams-2023-1 ("NBCUniversal's latest round of layoffs shows how streaming is killing the traditional TV ad sales role."); Oliver Darcy, CNN Business, Nov. 30, 2022, *CNN begins layoffs amid economic uncertainty, cost-cutting pressures from parent company*, https://www.cnn.com/2022/11/30/media/cnn-layoffs/index.html.

[98] *See* Bob Papper & Keren Henderson, *2022 RTDNA/Newhouse School at Syracuse University Survey, TV News Salaries* (2022).

year's salary for over **420 additional news employees** at TEGNA stations. That is nearly **nine additional news employees** *per market*. Equally dramatic is the impact of further delay. Each *day* of further delay would be enough to pay a year's salary for an additional 7 news employees, and the ticking fee will shortly increase by 50%, magnifying this harm.

## VI.    Conclusion

While approval of the Applications is irrefutably in the public interest, further delay is not. Applicants respectfully submit that the Commission has had ample time and public input to appreciate the incontrovertible merits of the Transactions, and it is time for the Commission to complete its review and grant the Applications consistent with the foregoing and the December Letters.

Respectfully submitted,

*/s/ Scott R. Flick*

Scott R. Flick
Jessica T. Nyman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
scott.flick@pillsburylaw.com
jessica.nyman@pillsburylaw.com
*Counsel for SGCI Holdings III LLC*

Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
jjezierny@cov.com
*Counsel for TEGNA Inc.*

34

Michael D. Basile
Henry H. Wendel
Cooley LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
mdbasile@cooley.com
hwendel@cooley.com
*Counsel for CMG Media Corporation*

January 20, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Jessica Nyman, hereby certify that on January 20, 2023, copies of the foregoing

*Applicants' Joint Reply Comments* were sent by electronic mail to the following:

David Brown
Video Division, Media Bureau
Federal Communications Commission
David.Brown@fcc.gov

Jeremy Miller
Video Division, Media Bureau
Federal Communications Commission
Jeremy.Miller@fcc.gov

Chris Robbins
Video Division, Media Bureau
Federal Communications Commission
Chris.Robbins@fcc.gov

Jim Bird
Transaction Team, Office of General Counsel
Federal Communications Commission
Jim.Bird@fcc.gov

Andrew J. Schwartzman
David Goodfriend
*Counsel for the NewsGuild-CWA and NABET-CWA*
AndySchwartzman@gmail.com
David@dcgoodfriend.com

Cheryl Leanza
*United Church of Christ Media Justice Ministry*
cleanza@alhmail.com

Yosef Gettachew
Jonathan Walter
*Common Cause*
ygetachew@commoncause.org
jwalter@commoncause.org

Michael Nilsson
Harris Wiltshire & Grannis LLP
*Counsel for ATVA*
mnilsson@hwglaw.com

Pantelis Michalopoulos
Andrew Golodny
Alicia Loh
Steptoe & Johnson LLP
*Counsel for DISH Network Corporation*
pmichalopoulos@steptoe.com
agolodny@steptoe.com
aloh@steptoe.com

Rick Chessen
Mary Beth Murphy
Radhika Bhat
*NCTA – The Internet & Television Association*
rchessen@ncta.com
mbmurphy@ncta.com
rbhat@ncta.com

*/s/ Jessica T. Nyman*