No. 23-1084

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

IN RE SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION, PETITIONERS

————————————

## REPLY BRIEF IN SUPPORT OF
## CONDITIONAL PETITION FOR A WRIT OF MANDAMUS TO
## THE FEDERAL COMMUNICATIONS COMMISSION

————————————

Kevin F. King
Jennifer A. Johnson
Jocelyn G. Jezierny
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
(202) 662-6000

*Counsel for Petitioner*
*TEGNA Inc.*


David E. Mills
Michael D. Basile
Henry H. Wendel
COOLEY LLP
1299 Pennsylvania Avenue,
N.W. Suite 700
Washington, D.C.  20004
(202) 842-7800

*Counsel for Petitioner*
*CMG Media Corporation*

Miguel A. Estrada
    *Counsel of Record*
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Scott R. Flick
Jessica T. Nyman
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C.  20036
(202) 663-8000

*Counsel for Petitioner*
*SGCI Holdings III LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

GLOSSARY OF ACRONYMS ..................................................................iv

INTRODUCTION ...................................................................................... 1

ARGUMENT .............................................................................................. 4

    I.    The Commission Has Violated Its Clear Duty To Act............ 4

    II.   The Commission's Delay Is Egregious .................................. 16

CONCLUSION ......................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*American Insurance Co.* v. *Canter*,
26 U.S. (1 Pet.) 511 (1828) .................................................................. 6

*Axon Enterprise, Inc.* v. *FTC*,
No. 21-86 (U.S. Apr. 14, 2023) .......................................................... 4, 7

*Bilingual Bicultural Coalition on Mass Media, Inc.* v. *FCC*,
595 F.2d 621 (D.C. Cir. 1978) ............................................................ 10

*In re Center for Biological Diversity*,
53 F.4th 665 (D.C. Cir. 2022) ............................................................ 16

*Citizens for Jazz on WRVR, Inc.* v. *FCC*,
775 F.2d 392 (D.C. Cir. 1985) .............................................................. 9

*Cochran* v. *SEC*,
20 F.4th 194 (5th Cir. 2021) ................................................................ 7

*Collins* v. *Yellen*,
141 S. Ct. 1761 (2021) ........................................................................ 7

*FCC* v. *Pottsville Broadcasting Co.*,
309 U.S. 134 (1940) ............................................................................ 8

*Jarkesy* v. *SEC*,
34 F.4th 446 (5th Cir. 2022) ................................................................ 6

*Lucia* v. *SEC*,
138 S. Ct. 2044 (2018) ..................................................................... 5, 6

*United States* v. *Monzel*,
641 F.3d 528 (D.C. Cir. 2011) .............................................................. 6

**STATUTES**

47 U.S.C. § 309 .......................................................................... 4, 11, 13

47 U.S.C. § 310 .................................................................................... 4

47 U.S.C. § 325 .................................................................................... 8

**REGULATIONS**

47 C.F.R. § 0.283 ................................................................................. 8

**ADMINISTRATIVE PROCEEDINGS**

*Adelphia Communications Corp.*,
    21 FCC Rcd 8203 (2006) ................................................................. 11

*Commission Policies & Procedures Under Section 310(b)(4)*,
    28 FCC Rcd 16244 (2013) ............................................................... 20

*Quincy Media*,
    36 FCC Rcd 5544 (2021) ................................................................. 17

*Tribune Co.*,
    27 FCC Rcd 14239 (2012) ............................................................... 18

*Tribune Media Co.*,
    2019 WL 4440126 (F.C.C. Sept. 16, 2019) ...................................... 11

*Univision Holdings*,
    7 FCC Rcd 6672 (1992) ................................................................... 10

*Univision Radio Stations Group, Inc.*,
    2022 WL 17175457 (F.C.C. Nov. 21, 2022) ..................................... 11

*XM Satellite Radio Holdings Inc.*,
    23 FCC Rcd 12348 (2008) ............................................................... 11

**OTHER AUTHORITIES**

PR Newswire, *Scripps Prices Senior Notes Offering* (Dec. 15, 2020),
    bit.ly/3M0pETT ............................................................................... 17

S. Rep. No. 92, 102d Cong., 1st Sess. (1991) ..................................... 8

## GLOSSARY OF ACRONYMS

Administrative Law Judge.......................................................................ALJ

Federal Communications Commission................................................. FCC

Petition Addendum................................................................................ Add.

Securities and Exchange Commission...................................................SEC

# INTRODUCTION

The Commission has chosen to kill a transaction that would create the largest minority-owned, female-led broadcast-television company in U.S. history.  It knows, and never disputes, that the process it has permitted its Media Bureau to impose cannot produce a final FCC decision before the transaction's irreplaceable financing expires on May 22.  The only logical explanation is that the FCC is content to let the Bureau destroy the deal—inexplicably preventing unprecedented gains in diversity. The Commission's perplexing comfort with undermining its own fundamental goal of increasing diverse ownership subjects this transaction to a different, yet unarticulated, sui generis standard.  Yet the Commission refuses to take responsibility for that decision, flouting bedrock administrative-law rules requiring agencies to own their choices.  If the Commission truly believes a countervailing cost outweighs all the transaction's benefits, it must state its reasons on the record and defend its action in this Court.

The Commission cannot justify keeping the applications on ice for a year or exiling the applications to the ALJ hearing, where the deal will die.  Instead, the FCC attempts to disguise textbook mandamus-worthy

recalcitrance as "entirely reasonable." Opp. 4.  For example, it downplays the 400 days the applications have already languished by suggesting that Standard General's voluntary, binding commitments in December 2022 to put challengers' baseless assertions to rest—prompted by the agency's refusal to engage—somehow sent the agency back to square one.

The FCC also attempts to blame the broadcasters for devising a supposedly hyper-complicated transaction.  The supposed complexity is vastly exaggerated.  In essence, Standard General is giving up its existing stations to acquire most of the stations currently owned by TEGNA (plus one from a third party).  It is selling its existing stations (and four of TEGNA's) to make the transaction affordable and to ensure regulatory compliance.  Public records and intervenors' data demonstrate that this transaction is much *simpler* than many the FCC has approved in a fraction of the 14 months it had here.

The Commission's claim that parties must secure financing in perpetuity (or for some unspecified period the Commission does not disclose) ignores economic realities.  The suggestion that the broadcasters arbitrarily selected a deadline and foisted it on the agency is simply false and misunderstands basic finance.  The nature of financing means that deals

2

must have deadlines, and the broadcasters here secured an atypically extended timeline more than double the Commission's own target, which they disclosed to the FCC up front. The FCC should not be permitted to kill a deal, without accountability, by stretching the proceedings beyond the negotiated expiration date to consider challengers' fact-free conjecture.

The Commission's response underscores the unlawfulness of the ALJ hearing it has allowed. It simply repeats the Hearing Order's recitation of assertions made (but never substantiated) by challengers. Reviewing the challengers' submissions shows there is no underlying evidence to justify a hearing on any issue the Hearing Order raised. The Commission's brief tacks on case citations for truisms about the FCC's abstract authority over "localism" or potential abuses of market power, without any effort to tie those principles to any facts here. Indeed, while Commission precedent expressly *disclaims* power over the areas the hearing would explore, the Commission now asserts such power might exist after all, never explaining how delegating those decisions is lawful or appropriate. And it opposes (at 32) "material relief" for the unconstitutional insulation of its ALJ—a fatal defect the Supreme Court today

unanimously confirmed inflicts "a here-and-now injury" and justifies im-
mediate judicial review.  *Axon Enterprise, Inc.* v. *FTC*, No. 21-86 (U.S.
Apr. 14, 2023), slip op. 13 (citation omitted).

If the FCC truly believes the transaction would not advance the
public interest despite its benefits for diversity and local news, that de-
termination belongs in a judicially reviewable Commission decision—not
in a procedural ruling by a subordinate or a backfilling appellate brief.
The FCC cannot lawfully veto this transformative deal through inaction.
The petition should be granted.

## ARGUMENT

The broadcasters undisputedly have no judicial remedy besides
mandamus.  This Court dismissed the broadcasters' direct appeal.
Whether the writ should issue thus turns on whether the Commission
has violated a clear legal duty to act and whether its delay is unreasona-
ble.  Nothing in the oppositions casts doubt on either point.

## I.    The Commission Has Violated Its Clear Duty To Act

No one disputes the Commission's mandatory duty to decide the
broadcasters' applications.  47 U.S.C. §§ 309(a), (d)(2), 310(d).  The Com-
mission claims instead (at 4, 16-30) that it is *fulfilling* that obligation by

allowing the ALJ hearing to proceed.  That contention fails because the FCC knows this procedure cannot reach *any* conclusion before the deal dies.  Neither the Commission nor its supporters assert that the ALJ hearing can yield any final Commission decision before May 22—let alone in time to facilitate judicial review.  The FCC has foreordained the outcome by entrenching that procedure.

The Commission cannot hide behind the ALJ hearing in any event because it is unlawful three times over.  Its attempts to rescue the hearing fail.

A.     The Hearing Order subjects the broadcasters to proceedings before an officer unconstitutionally insulated by *three* layers of removal protections.  Pet. 24-27.  The FCC does not dispute those three layers. That should be the ballgame.

Instead, the Commission argues (at 30-31) that triple for-cause removal protections are proper because its ALJ performs "adjudicatory," not "enforcement" or "policymaking," functions.  That distinction is illusory.  The Supreme Court has held that materially indistinguishable SEC ALJs are inferior Executive officers subject to Article II's constraints.  See *Lucia* v. *SEC*, 138 S. Ct. 2044, 2049 (2018).  They accordingly exercise

Executive power and none other; if they wielded any Judicial power, their positions would violate Article III.  See *American Insurance Co.* v. *Canter*, 26 U.S. (1 Pet.) 511, 546 (1828) (Marshall, C.J.); *Jarkesy* v. *SEC*, 34 F.4th 446, 464-465 & n.19 (5th Cir. 2022).

Indeed, in *Lucia*, the government *conceded* that, absent a saving construction of SEC ALJs' removal restrictions, "the limitations  * * *  on removal of the [SEC] ALJs would be unconstitutional."  Gov't Br. 53, *Lucia*, *supra* (No. 17-130).  The Commission does not reprise that ersatz saving construction here—which would not help because two for-cause layers would still remain.  See *Jarkesy*, 34 F.4th at 465.  The FCC also wisely does not embrace intervenors' assertion (at Intervenors' Opp. 25) that the ALJ is an officer for other purposes but not for *this case*.  See *Lucia*, 138 S. Ct. at 2052 n.4.  And its observation (FCC Opp. 31-32) that other courts have embraced the agency's mistaken view is irrelevant: mandamus turns not on nose-counting but on whether the correct answer is clear.  *United States* v. *Monzel*, 641 F.3d 528, 532, 534-537 (D.C. Cir. 2011) (granting writ despite circuit conflict).

The Commission disconcertingly contends (at 22) that the unconstitutional insulation of its ALJ warrants no "material relief."  Opp. 32-33.

6

The FCC misreads *Collins* v. *Yellen*, 141 S. Ct. 1761 (2021), which concerned relief available *after* a violation occurs and a challenger has no "claim for prospective relief." *Id.* at 1783, 1787. The broadcasters do not seek redress for past ALJ acts. They seek "an administrative adjudication untainted by separation-of-powers violations." *Cochran* v. *SEC*, 20 F.4th 194, 201 n.16 (5th Cir. 2021) (en banc), aff'd, No. 21-1239 (U.S. Apr. 14, 2023). As *Axon* reaffirmed today in upholding immediate judicial review of such challenges, "[t]he harm" of "'being subjected'" to "a 'proceeding by an unaccountable ALJ'" is a "'here-and-now injury'" that "is impossible to remedy once the proceeding is over." Slip op. 13 (citations omitted). That is all the more reason for acting *now*.\*

B.    The FCC also fails to show that either issue designated for hearing is within the agency's authority. If the Commission believed its precedent should (and lawfully could) be modified to permit such inquiries, that would present a novel issue that even the Media Bureau (and *a*

---

 \* Agency counsel professes confusion (at 33 n.22) about "what benefit the Applicants would obtain by disqualifying" the ALJ, since the Commission or a single Commissioner could preside. But there has been no "Commission" vote to do *anything in this case,* because the Media Bureau, which is run by a member of the Chairwoman's staff, seeks to kill the deal without accountability before this Court—and without any vote by the Commissioners.

*fortiori* the ALJ) cannot decide on delegated authority. 47 C.F.R. § 0.283(c).

*Retransmission consent fees.* The Commission's claimed power (Opp. 22-24) to regulate retransmission consent fees is illusory. By statute, retransmission consent agreements are a matter for private agreement. The Commission can ensure parties negotiate in good faith. 47 U.S.C. § 325(b)(3)(C). But Congress deliberately did not authorize the FCC "to dictate the *outcome* of the ensuing marketplace negotiations," such as by prohibiting retransmission rates from increasing under any circumstances. S. Rep. No. 92, 102d Cong., 1st Sess. 35-36 (1991) (emphasis added). The Commission's own authority recognizes that its public-interest mandate does not encompass "adjustment of conflicting private rights." Opp. 6 n.4 (quoting *FCC* v. *Pottsville Broadcasting Co.*, 309 U.S. 134, 138 (1940)).

The Commission nevertheless asserts authority to scrutinize retransmission consent agreements *if* "anticompetitive" practices are present. Opp. 22-24. But neither the FCC's brief nor the Hearing Order cites any remotely "anticompetitive" practice under any recognizable

principle of antitrust law.  The Order vaguely gestured to the transaction's supposedly "unique" structure.  Add. 950.  But under many structures that parties might adopt, an acquiror would succeed to contracts (including retransmission rights) previously negotiated at arm's length.  The Commission never explains how succeeding by acquisition or merger to such market-negotiated rights might be "anticompetitive," or lead to "artificial" or "supra-competitive" rates.  Opp. 17, 23-24.

Amici suggest the FCC can regulate retransmission fees because it is "axiomatic" that they are automatically passed on to consumers.  ATVA Br. 7 n.2.  But amici identify no record support for that proposition.  They simply *assume* consumer price increases and offer their assumption as proof of anticompetitive activity.  *Id.* at 11.  The Commission cannot justify searching for an antitrust fire without identifying even a wisp of smoke.  *Citizens for Jazz on WRVR, Inc.* v. *FCC*, 775 F.2d 392, 397 (D.C. Cir. 1985).

*Staffing levels.*  The Commission's assertion of power over station staffing levels is equally groundless.  Opp. 28-30.  The FCC has no sweeping license to scrutinize a transaction's impact on staffing levels.  It has "never suggested" that a "nondiscriminatory" "reduction in a station's

staff is contrary to the public interest." *Univision Holdings*, 7 FCC Rcd 6672, 6683 n.45 (1992). Instead, the Commission can "analyz[e]  * * * employment practices" "*only*" to the extent those practices would adversely impact "minority" programming or "raise questions about the character qualifications of the licensee." *Bilingual Bicultural Coalition on Mass Media, Inc.* v. *FCC*, 595 F.2d 621, 628 (D.C. Cir. 1978) (en banc) (emphasis added). The Commission's citation (Opp. 29 n.20) of decades-old cases alluding generically to the importance of broadcasters' service to local communities is wholly inapposite absent anything tying those ideas to these facts.

The Hearing Order likewise invokes only generic "localism" concerns untethered to the two areas of inquiry. Add. 956-957; see FCC Opp. 25-28. And the supposed threats to localism rest on mischaracterizations. For example, intervenors echo the Hearing Order's recitation of intervenors' own unsubstantiated claim that a Washington, D.C. news bureau "would feed *nationally* oriented coverage." Opp. 22 n.45 (emphasis added). That accusation has matters backwards. As the Commission has recognized, a Washington bureau would provide a powerful local-news *benefit* by providing access to key events that a local station could

not otherwise afford to cover—for example, on-the-Hill interviews with a district's Member of Congress.  Add. 628; *e.g.*, *Tribune Media Co.*, 2019 WL 4440126, at *11 & n.138 (F.C.C. Sept. 16, 2019).

C.    Finally, the FCC fails to show how an ALJ hearing is necessary to resolve any "substantial and material questions of fact," 47 U.S.C. § 309(d)(2), especially in view of Standard General's commitments.

1.    The Commission has no persuasive response to Standard General's voluntary commitments to waive the after-acquired clauses and not to conduct journalism or newsroom layoffs for at least two years, which put the Media Bureau's purported concerns to rest.  Add. 831-833. The FCC has previously deemed such commitments sufficient to grant an application.  *Univision Radio Stations Group, Inc.*, 2022 WL 17175457, at *3-4 (F.C.C. Nov. 21, 2022).  If the Commission wished to "monito[r] or enforc[e]" those commitments (Opp. 21), it could make them conditions of granting the applications.  *E.g.*, *XM Satellite Radio Holdings Inc.*, 23 FCC Rcd 12348, 12394-12417, 12427 (2008); *Adelphia Communications Corp.*, 21 FCC Rcd 8203, 8336-8339 (2006).  But it cannot doom the deal while dismissing such pledges wholesale as "unsolicited." FCC Mot. to Dismiss 4, No. 23-1083 (Mar. 29, 2023) (FCC Mot.).

The Commission probes for gaps in these blanket commitments but comes up empty. It suggests (at 20) that affiliates of new TEGNA might secure increased retransmission consent fees by enforcing the after-acquired clauses despite Standard General's commitments. But the waiver's text categorically forecloses that possibility. Add. 831, 1075. The FCC also claims (at 20-21) that the waiver does not address "other possible mechanisms" for increasing retransmission fees in future agreements. But that concern is transparently speculative—not a concern regarding *these* applications—and resolved in any event by a separate commitment concerning post-closing information sharing and coordination. Add. 831, 834-837.

For the first time, the Commission (at 28) deems Standard General's two-year commitment regarding layoffs "narrow." But it ignores that Standard General has stated on the record its plans to *increase* station-level staffing and cabined its commitment solely to preserve its ability to respond to unforeseeable economic conditions. Add. 832-833. Tellingly, the Commission never specifies why two years is insufficient, what longer period would suffice, or any legal basis for that invisible benchmark.

The Commission now incredibly cites these very commitments as evidence that its purported concerns were legitimate. Opp. 22. But as the Commission previously conceded, the commitments were "unsolicited." FCC Mot. 4. Standard General volunteered them not in response to any legitimate concerns the Commission raised, but because Commission staff *refused* to discuss their concerns while allowing the clock to run. Add. 1085. The FCC never stated whether it shared challengers' unsubstantiated concerns. Nevertheless, without conceding that the original applications were deficient, Standard General sought to revive the stalled proceedings by taking those concerns off the table. Yet the Commission now perversely turns these commitments into an excuse to elongate proceedings further.

2.     The Media Bureau independently lacked authority to order a hearing because it was not presented with (and never cited) affidavits based on personal knowledge (or documents subject to official notice) supporting challengers' allegations. 47 U.S.C. § 309(d).

| Retransmission Fees | |
|---|---|
| **Document/Pages Cited in Order** | **Supporting "Evidence"** |
| NewsGuild petition. Add. 498-500. | None. |
| Common Cause/UCC petition. Add. 408-410. | (1) Magazine article about prior CMG transaction; (2) Standard General proxy statement related to *prior* effort to propose minority of board members for TEGNA. |
| Altice comments. Add. 550-552. | (1) Letter submitted by cable trade group in opposition to unrelated application; (2) statement in broadcasters' application that describes how transaction will be implemented but says nothing about parties' intent to invoke particular contractual rights. |
| Altice letter. Add. 754. | None. |
| ATVA comments. Add. 563. | None. |
| DISH Network Corp. comments. Add. 861. | (1) Unsworn letter from DISH itself; (2) NewsGuild petition; (3) ATVA comments; (4) challengers' own motion for additional information. |

14

| Staffing Levels | |
|---|---|
| **Document/Pages Cited in Order** | **Supporting "Evidence"** |
| Common Cause/UCC petition.  Add. 405-407. | (1) Standard General proxy statement related to *prior* effort to propose minority of board members for TEGNA; (2) news articles, including one headlined "Standard General tells Tegna employees 'no intention to reduce staff.'" |
| NewsGuild letter. Add. 725-726. | Deal documents, produced by Standard General, referring to staffing reductions *TEGNA has already independently undertaken*. |
| NewsGuild supplement. Add. 764-768, 770-772. | Email from banker *to* Standard General in which banker refers to "synergies." |

The Hearing Order thus identified no evidence that could create a genuine dispute warranting a hearing.  The FCC and intervenors cannot now backfill the Bureau's analysis by citing other evidence.  Nor do they seriously try.  They cite the same documents as the Hearing Order; two pages produced in discovery; and comment letters, which claim reliance on the broadcasters' "internal documents."  FCC Opp. 16-21, 26; Intervenors' Opp. 19-24.

The few attempts to substantiate retransmission-fee and station-staffing concerns rest on inaccurate characterizations of the record.  For

example, the Commission's suggestion (at 25-26) that Standard General intends to make *future* staffing reductions—despite its enforceable commitment to the contrary—rests on staffing reductions TEGNA had *already* undertaken before the transaction agreement was executed. Add. 745-746. The Commission's conjecture about "job cuts contemplated by Standard General stem[ming] from its own acquisition plans" (Opp. 26) thus grossly distorts the factual record.

*****

Even if the Commission's position were otherwise sound, it still would not justify killing the deal by inaction. If the FCC views the transaction as problematic, it should say so in a judicially reviewable order. It cannot hide behind the Bureau's order and thereby escape judicial review.

## II.    The Commission's Delay Is Egregious

The Commission does not dispute that it has failed to render a decision for 400 days and counting, and that the ALJ hearing it has allowed to proceed *cannot* result in any decision before the May 22 deadline. That deal-killing inaction is "egregious" and warrants mandamus. *In re Center*

16

*for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (citation omitted).  The FCC attempts to shift the blame to the broadcasters for that extraordinary delay.  That effort fails at every step.

A.    Assertions of the transaction's purportedly "unprecedented complexity," *e.g.*, Intervenors' Opp. 13; FCC Opp. 5, are demonstrably false.  The transaction is straightforward.  It entails a series of standard corporate acquisitions that will result in the formation of the Nation's largest-ever minority-owned and female-led television station group.  Add. 605-616.  To achieve that outcome, Standard General is giving up stations it currently owns and acquiring all but a few stations currently held by TEGNA, plus another from a third party.  Although a layperson might need some time to trace the steps, that is true of many large corporate transactions.  Surely the FCC, which routinely encounters more complicated transactions, did not need a full year to understand it.

Indeed, the Commission has approved much more complicated transfers in a fraction of the time elapsed here.  It most recently approved one application requiring divestiture of 10 stations and multiple other special dispensations in 168 days, and another requiring divestiture of 23 stations in 62 days.  *Quincy Media*, 36 FCC Rcd 5544, 5544 (2021); PR

Newswire, *Scripps Prices Senior Notes Offering* (Dec. 15, 2020), bit.ly/3M0pETT; Add. 1038. The transaction here required *no* divestitures or waivers. The Commission's review if anything should have been faster.

Instead, as intervenors' own data indicate (Opp. 15-16 & Ex. A), the Commission has dragged its feet here to an unprecedented degree. Of the prior proceedings they canvass that (like this proposed transaction) involved television-station acquisitions that complied with the Commission's rules without waivers or divestitures, the *longest* took 182 days— less than half of the 400 days already consumed here. Even considering all television-station acquisitions listed (*i.e.*, even those requiring waivers or divestitures), the mean and median "Total Time" from application to decision were 243 and 207 days, respectively. Only one such proceeding required more time than has already passed here: the Tribune bankruptcy, where the FCC had to defer processing the application pending a bankruptcy court's approval of a reorganization. *Tribune Co.*, 27 FCC Rcd 14239, 14243-14244, 14249 (2012). The statistics refute any suggestion that the supposed complexity of this transaction excuses the FCC's delay.

18

B.     The Commission's (at 35-36) and intervenors' (at 12-14) claim that the broadcasters failed to afford the agency adequate time to complete its review fails for much the same reason.  Against the backdrop of the FCC's self-imposed 180-day target and its track record of reviewing comparable transactions in that time or less, the 14-month window secured by the broadcasters should have been more than sufficient.

The Commission's apparent view that the broadcasters should have secured indefinite financing commitments disregards market realities. Financing commitments entail substantial costs, which increase over time and burden parties' operations.  They cannot last forever.  That is Finance 101.  And neither the Commission nor intervenors identify how *much* more time the broadcasters should have negotiated—or how they could have anticipated the FCC's subsequent claim that more than double the longest period (182 days) it has taken to approve a comparable transaction is insufficient here.  Add. 1038.  On their theory, an agency could pocket-veto any transaction by delaying a decision past the expiration of financing or other key commitments and fault the applicants every time.

19

As the National Association of Broadcasters explains, that approach would stifle the industry's access to capital. Amicus Br. 15-16. That, in turn, could seriously undermine the FCC's own goal of promoting diverse ownership, because "limited access to capital is a concern in the broadcast industry, especially for \* \* \* minorities and women." *Commission Policies & Procedures Under Section 310(b)(4)*, 28 FCC Rcd 16244, 16249 (2013). The Commission's disregard of a commercially reasonable financing deadline would exacerbate a problem the FCC is charged to correct.

C.    Finally, the FCC (at 22, 33-37) and intervenors (at 8) implausibly assert that the broadcasters themselves caused delay. The Commission principally points (at 22) to Standard General's commitments to resolve challengers' retransmission-fee and local-staffing issues. But those commitments were submitted in December 2022 only because, despite the extraordinary demands and scrutiny by challengers to which the Media Bureau acquiesced, the FCC had refused to engage with Standard General or to explain what problems *the FCC* might perceive with the transaction (and still refused even after Standard General presented its commitments). Pet. 13-14. The purpose and effect of those

20

commitments was to eliminate issues challengers had raised. It would be disingenuous to describe pledges meant to bring the matter to a close as derailing the process and resetting the clock.

The remaining arguments are makeweights. The Commission suggests (at 36 n.24) that it could not act on the applications until the transactions cleared interagency review. But as it admits, that review was completed in November 2022. *Ibid*; Add. 817.

Intervenors argue that the broadcasters caused delay by not acquiescing in intervenors' intrusive discovery demands. Opp. 8. The broadcasters produced millions of pages in discovery and furnished the Commission with all the information it needed in any event. Pet. 10-14. (The FCC's application form, notably, does not even *ask* applicants for information regarding retransmission consent fees or local staffing.) If the Media Bureau nevertheless believed it needed more, it should have asked promptly. Neither intervenors' dissatisfaction with the FCC's forms nor the Bureau's inaction for a year can justify a pointless and unlawful ALJ hearing now.

Finally, the Commission simultaneously faults the broadcasters for acting too slowly *and* too quickly in seeking to correct the Bureau's errant

course.  Opp. 34-35.  The FCC complains the broadcasters sought judicial redress "just *ten days*" after seeking the agency's intervention—timing necessary to pursue the direct appeal—yet also insists the broadcasters should have objected to the Bureau's delay even *earlier*, before "it issued the Hearing Order." *Ibid.*  Heads-we-win, tails-you-lose is not the law. The FCC's effort to blame the broadcasters for its own failure to act while the clock runs out is meritless.

## CONCLUSION

This Court should grant the petition and issue a writ of mandamus ordering the Commission to rule on the applications by April 28, 2023.

April 14, 2023

Respectfully submitted,

  /s/ *Miguel A. Estrada*

Kevin F. King
Jennifer A. Johnson
Jocelyn G. Jezierny
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
(202) 662-6000

*Counsel for Petitioner*
*TEGNA Inc.*

David E. Mills
Michael D. Basile
Henry H. Wendel
COOLEY LLP
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C.  20004
(202) 842-7800

*Counsel for Petitioner*
*CMG Media Corporation*

Miguel A. Estrada
  *Counsel of Record*
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Scott R. Flick
Jessica T. Nyman
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 663-8000

*Counsel for Petitioner*
*SGCI Holdings III LLC*

23

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this reply complies with the applicable typeface, type style, and type-volume limitations.  This reply was prepared using a proportionally spaced type (New Century Schoolbook, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this reply contains 3,898 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this reply.

April 14, 2023                              Respectfully submitted,

                                             */s/ Miguel A. Estrada*
                                             Miguel A. Estrada
                                             GIBSON, DUNN & CRUTCHER LLP
                                             1050 Connecticut Avenue, N.W.
                                             Washington, D.C. 20036
                                             (202) 955-8500
                                             mestrada@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on April 14, 2023, I electronically filed the foregoing reply with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the foregoing reply to be hand-delivered in hard copy to the Clerk's Office of the United States Court of Appeals for the District of Columbia Circuit.

April 14, 2023

Respectfully submitted,

*/s/ Miguel A. Estrada*

Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com